**2022-1641; 2022-1723**

# United States Court of Appeals for the Federal Circuit

ALIFAX HOLDING SPA,

*Plaintiff-Appellant,*

SIRE ANALYTICAL SYSTEMS SRL,

*Plaintiff-Appellee,*

– v. –

ALCOR SCIENTIFIC LLC, FRANCESCO A. FRAPPA,

*Defendants-Cross-Appellants.*

---

*On Appeal from the United States District Court for the District of Rhode Island in No. 1:14-cv-00440-WES-LDA, Chief Judge William E. Smith*

---

## NON-CONFIDENTIAL BRIEF FOR PLAINTIFF-APPELLANT

ROBERT H. STIER, JR.
CHRISTOPHER BAXTER
PIERCE ATWOOD LLP
Merrill's Wharf
254 Commercial Street
Portland, ME 04101
(207) 791-1163
rstier@pierceatwood.com
cbaxter@pierceatwood.com

TODD R. TUCKER
JOSHUA FRIEDMAN
CALFEE, HALTER & GRISWOLD LLP
The Calfee Building
1405 East Sixth Street
Cleveland, OH 44114
(216) 622-8231
ttucker@calfee.com
jfriedman@calfee.com

*Counsel for Plaintiff-Appellant*

JULY 1, 2022

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

| | |
|---|---|
| **Case Number** | 2022-1641, 2022-1723 |
| **Short Case Caption** | Alifax Holding SpA v. Alcor Scientific, Inc. |
| **Filing Party/Entity** | Alifax Holding SpA |

**Instructions:** Complete each section of the form.  In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.  **Please enter only one item per box; attach additional pages as needed and check the relevant box**.  Counsel must immediately file an amended Certificate of Interest if information changes.  Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 07/01/2022

Signature: /s/ Todd R. Tucker

Name: Todd R. Tucker

FORM 9. Certificate of Interest

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☑ None/Not Applicable |
| Alifax Holding SpA | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐   Additional pages attached

ii

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable        ☐ Additional pages attached

| | | |
|---|---|---|
| Michael H. Selter, Manelli Selter PLLC | Daniel A. Lev, Pierce Atwood LLP | Michael J. Daly, Pierce Atwood LLP |
| Stuart E. Benson, Manelli Selter PLLC | Kyle M. Noonan, Pierce Atwood LLP | Nicole M. Matteo, Pierce Atwood LLP |
| Christopher H. Little, Pierce Atwood LLP | Margaret Minister O'Keefe, Pierce Atwood LLP | |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☑ None/Not Applicable        ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable        ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................vi

STATEMENT OF RELATED CASES ......................................................1

STATEMENT OF JURISDICTION..........................................................1

STATEMENT OF THE ISSUES..............................................................3

STATEMENT OF THE CASE..................................................................4

    A.    Introduction ..............................................................................4

    B.    Background ...............................................................................7

           1.    Alifax developed transformative ESR measurement
                 technology ..................................................................7

           2.    Alcor recruits Frappa to steal Alifax technology and
                 launch a competing instrument in only eight months...............12

           3.    Alifax files suit and obtains a jury verdict of willful
                 misappropriation of trade secrets and $6.5 million in
                 compensatory damages ..............................................19

           4.    After trial, the court erases the jury verdict and then
                 precludes Alifax from obtaining any damages .........................25

SUMMARY OF THE ARGUMENT ......................................................31

ARGUMENT ........................................................................................34

    A.    Standard of Review ..................................................................34

    B.    The court erred in dismissing Alifax's trade secret case after
        issuing a series of increasingly contentious rulings that
        constrained Alifax from prevailing in a new trial ................................35

           1.    The court erred in ordering Alifax could not pursue
                 compensatory damages in a new trial, and dismissing
                 the case on that basis, because there was sufficient
                 evidence in the record to bring that claim to a jury .................37

2.    The court erred in prohibiting the jury from considering Alifax's "signal acquisition" trade secret claim in both trials.................................................40

a.    The District erred as a matter of law in refusing to present the "signal acquisition" trade secret to the jury...........................................................42

b.    The court erred as a matter of law in precluding Alifax from pursuing "signal acquisition" in a new trial.........................................................47

C.    The court abused its discretion in ordering new trials on liability and damages because it relied on erroneous standards of law and ignored key evidence supporting a verdict that even the court found admittedly reasonable.........................................50

1.    The court abused its discretion in ordering a new trial for liability because <u>use</u> of a trade secret is not needed for misappropriation.................................................51

2.    The court abused its discretion in ordering a new trial on damages because Bokhart's "summary" testimony on Alcor's revenues was relevant and admissible and there was no unfair prejudice.................................................55

a.    Bokhart's testimony, and any underlying evidence, was relevant and admissible under FRE 611(a) and 703.....................................................56

b.    Bokhart's testimony created no prejudice and the court did not even analyze prejudice...........................61

CONCLUSION.................................................................64

CONFIDENTIAL MATERIAL OMITTED

The material redacted from this brief is subject to a protective order. The confidential information on page 11 is a proprietary conversion algorithm for calculating ESR, which is part of the subject trade secret of this suit. The confidential information in footnotes 5 and 6, on pages 26 and 27, respectively, includes exemplary calculations using the proprietary conversion algorithm.

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Astro-Med, Inc. v. Nihon Kohden Am., Inc.*,
  591 F.3d 1 (1st Cir. 2009) ................................................ 40, 47, 49

*Atari, Inc. v. JS & A Group, Inc.*,
  747 F.2d 1422 (Fed. Cir. 1984) ....................................... 34

*Atl. Rsch. Mktg. Sys., Inc. v. Troy*,
  659 F.3d 1345 (Fed. Cir. 2011) ....................................... 34

*Cigna Ins. Co. v. Oy Saunatec, Ltd.*,
  241 F.3d 1 (1st Cir. 2001) ................................................. 34, 42

*Drumgold v. Callahan*,
  707 F.3d 28 (1st Cir. 2013) ............................................... 48, 49

*Espeaignnette v. Gene Tierney Co.*,
  43 F.3d 1 (1st Cir. 1994) ................................................... 62

*Gasoline Prods. Co. v. Champlin Refining Co.*,
  283 U.S. 494 (1931) .......................................................... 48

*Griggs-Ryan v. Smith*,
  904 F.2d 112 (1st Cir. 1990) ............................................ 47

*Independent Oil & Chem. Workers of Quincy, Inc. v.
  Procter & Gamble Mfg. Co.*,
  864 F.2d 927 (1st Cir. 1988) ............................................ 50, 52

*Javelin Inv., S.A. v. Municipality of Ponce*,
  645 F.2d 92 (1st Cir. 1981) .............................................. 63

*Jennings v. Jones*,
  587 F.3d 430 (1st Cir. 2009) ............................................ 34

*Midwest Indus., Inc. v. Karavan Trailers, Inc.*,
  175 F.3d 1356 (Fed. Cir. 1999) ....................................... 34

*Primarque Prod. Co. v. Williams W. & Witts Prod. Co.*,
  988 F.3d 26 (1st Cir. 2021) .............................................. 34

*Rodriguez-Valentin v. Doctors' Ctr. Hosp. (Manati), Inc.*,
  27 F.4th 14 (1st Cir. 2022) .............................................. 51, 52

*United States v. DeSimone*,
 488 F.3d 561 (1st Cir. 2007) ........................................................ 57, 59, 60

*United States v. Frabizio*,
 459 F.3d 80 (1st Cir. 2006) .......................................................................63

*United States v. Milkiewicz*,
 470 F.3d 390 (1st Cir. 2006) ........................................................ 57, 58, 60

*United States v. Nivica*,
 887 F.2d 1110 (1st Cir. 1989) ............................................................ 56, 63

*United States v. Rivera Rangel*,
 396 F.3d 476 (1st Cir. 2005) .............................................................. 50, 51

*United States v. Rothrock*,
 806 F.2d 318 (1st Cir.1986) .....................................................................50

*United States v. Sawyer*,
 85 F.3d 713 (1st Cir. 1996) ......................................................................63

*White v. New Hampshire Dep't of Corr.*,
 221 F.3d 254 (1st Cir. 2000) ....................................................................42

*Whitserve, LLC v. Computer Packages, Inc.*,
 694 F.3d 10 (Fed. Cir. 2012) ...................................................................34

*Wilson v. Mar. Overseas Corp.*,
 150 F.3d 1 (1st Cir. 1998) .................................................................. 43, 47

*Wortley v. Camplin*,
 333 F.3d 284 (1st Cir. 2003) ....................................................................37

*Zenith Elecs. Corp. v. Exzec, Inc.*,
 182 F.3d 1340 (Fed. Cir. 1999) ..................................................................1

## Statutes & Other Authorities:

28 U.S.C. § 1295(a)(1) ....................................................................................1

28 U.S.C. § 1338(a) .........................................................................................1

28 U.S.C. § 2107 .............................................................................................1

Fed. R. App. P. 4(a) ........................................................................................1

Fed. R. Evid. 611 ..........................................................................................58

Fed. R. Evid. 611(a) ............................................................... *passim*

Fed. R. Evid. 703 .................................................................. *passim*

Fed. R. Evid. 1006 ................................................................ *passim*

R.I. Gen. Laws § 6-41-1(1) .........................................................53

R.I. Gen. Laws § 6-41-1(2)(i) .....................................................52

## STATEMENT OF RELATED CASES

No appeal in or from this proceeding was previously before this or any other appellate court. Alifax does not believe that any cases pending in this or any other court or agency will directly affect or be directly affected by this court's decision in the pending appeal.

## STATEMENT OF JURISDICTION

The United States District Court for the District of Rhode Island had subject matter jurisdiction over this action under 28 U.S.C.§1338(a) because the complaint includes claims of patent infringement. Appx2102-2103. This Court has appellate jurisdiction of the appeal under 28 U.S.C. §1295(a)(1), even though judgment of patent claims are not appealed, because the patent infringement claims were adjudicated in the final judgment. Appx101-102; *Zenith Elecs. Corp. v. Exzec, Inc.*, 182 F.3d 1340, 1346 (Fed. Cir. 1999). The Notice of Appeal was timely filed in accordance with 28 U.S.C. §2107 and Fed. R. App. P. 4(a) on April 25, 2022. The appeal is from the court's Order granting defendants' motion for new trial regarding the trade secrets misappropriation claim where the jury found willful misappropriation of certain Alifax trade secrets and awarded compensatory

1

damages, Appx1-67; the court's subsequent rulings restricting the scope of the new trial, Appx68-83 and precluding Alifax from seeking compensatory damages for trade secret misappropriation at the new trial, Appx84-93; the court's order dismissing Alifax's claim for trade secret misappropriation with prejudice, Appx94-100; and the final judgment Appx101-104.

## <u>STATEMENT OF THE ISSUES</u>

1. Did the trial court err as a matter of law in dismissing Alifax's trade secret claim with prejudice after ruling that Alifax may not present evidence of compensatory damages, when a calculation of Alcor's unjust enrichment—an admittedly "rational measure of damages"—could be "derived through simple arithmetic using the financial data from a spreadsheet created by Alcor," and the spreadsheet could be offered in evidence through Alcor's CEO?

2. In the First Circuit, failure to instruct is reversible error if the requested instruction was substantively correct, not incorporated into the charge and integral to an important issue. Did the trial court err as a matter of law when it excluded misappropriation of Alifax's "signal acquisition" trade secrets from jury consideration, despite the inference that "a competitor who hires away a rival's valued employee with access to inside information has done so in order to use that inside information"?

3. A claim that survives a summary judgment motion is entitled to be tried by a factfinder. Did the trial court err as a matter of law when it ruled that Alifax could not prove misappropriation of all its asserted software and firmware trade secrets in a new trial, even though that claim survived summary judgment?

3

4. A trial court abuses its discretion when it ignores a material factor, relies on an improper factor, or makes a serious mistake in weighing factors. Did the trial court abuse its discretion in granting a new trial on liability when it failed to weigh the evidence according to RIUTSA, and in granting a new trial on damages where Alcor suffered no prejudice and the alleged "miscarriage of justice" was an admittedly "rational appraisal of Alcor's unjust enrichment"?

## STATEMENT OF THE CASE

### A.    Introduction

After twelve trial days in 2019, a Rhode Island jury found a local company, Alcor Scientific, and its Vice President of Research & Development, Francesco Frappa, liable for willful and malicious misappropriation of trade secrets and awarded $6.5 million to Frappa's former employer, an Italian company, Alifax Holdings S.p.A. The trade secrets case was a straightforward, largely undisputed common narrative of a company hiring an employee from a direct competitor to use that employee's knowledge for competitive gain.

Alifax makes instruments that automate analysis of human blood samples to diagnose inflammation. Alcor wanted to make a competing instrument, but lacked

the skill and resources. It recruited Frappa, who was responsible for programming instruments at Alifax, and after only eight months Alcor launched a directly competitive device. Frappa **admitted** taking Alifax source code when he left employment at Alifax. He **admitted** sending emails with technical data from Alifax to his personal email account only days before he left. It is **undisputed** that source code Frappa wrote for Alcor contained Alifax's proprietary "conversion algorithm" for generating results from a blood sample. Frappa agreed in writing to sell that algorithm to Alcor, along with other proprietary information about instrument operations, in exchange for 3% of the profits from Alcor's new product line. Under these facts, the jury found Frappa breached his obligation under Italian law not to use Alifax's confidential information in any subsequent employment—a finding that remains an unchallenged part of the judgment below.

Alcor profited handsomely from misappropriating Alifax's trade secrets. It launched its device, called "iSED," in July 2012. By 2018, according to Alcor's own spreadsheet, the iSED product line was generating revenues of nearly $11 million in just the first three quarters of that year, with less than $1.5 million in cost of goods sold. At trial, Alifax argued that by misappropriating its trade secrets, Alcor had given itself at least a one-year head-start in the market, "an outcome that

may be reasonably inferred from the trial evidence," according to the court, which also found that the "jury's award of $6.5 million was a rational appraisal of Alcor's unjust enrichment." Appx51.

But after acknowledging evidentiary support for the jury verdict, the court granted a new trial on liability and damages. First, the court found that the misappropriation verdict was against the clear weight of the evidence. This was not based on an examination of proof required under the Rhode Island Uniform Trade Secrets Act ("RIUTSA"), but instead on whether "Alifax's algorithm was capable of producing highly accurate results in a non-Alifax device." Appx51. Second, on damages, the court reversed itself on a ruling it made prior to the damages portion of the bifurcated jury trial permitting an Alifax witness to testify about Alcor's spreadsheet showing revenues and costs relating to the iSED product line. The case was returned to the trial calendar in September 2019.

The parties held a series of unsuccessful settlement conferences with the magistrate judge in the fall of 2019, followed by a two-day mediation conducted by the trial judge in February 2021. When those proved fruitless, Alcor filed a "request for a case management order" arguing that Alifax should not be permitted to present any evidence of compensatory damages at the new trial. Disregarding its

6

own comments during trial about alternate ways that Alifax might introduce the same damages evidence, the court ruled that Alifax would not be permitted to pursue compensatory damages at a new trial. After further briefing by the parties about the consequences of that decision, the court simply dismissed Alifax's trade secrets claim with prejudice without explaining what procedural mechanism authorized that dismissal. This appeal was timely noticed.

## B.    Background

Alifax filed this action in 2014 for patent infringement, breach of the duty of confidentiality and trade secret misappropriation under RIUSTA. In 2019, the case went to trial. During the bifurcated liability phase, the jury found that defendant Frappa had breached his duty of confidentiality to Alifax and that he and defendant Alcor had willfully and maliciously misappropriated Alifax's trade secrets, including "portions of a computer program source code." Appx15193-15195. Subsequently, in the damages phase, the jury awarded Alifax $6.5 million in compensatory damages. Appx15490.

### 1.    *Alifax developed transformative ESR measurement technology.*

This case concerns devices and techniques for measuring the Erythrocyte Sedimentation Rate (ESR) of a blood sample. ESR is the rate at which red blood

7

cells aggregate and separate from the plasma in blood. Appx14102-14104.

Inflammation in the body is accompanied by plasma proteins that contribute charge

to red blood cells, causing the cells to aggregate more quickly. Appx14110-14111.

Thus, a higher ESR (more rapid cell aggregation) indicates the presence of

inflammation.

Measuring ESR to screen for inflammation was invented almost 100 years

ago by Dr. Alf Vilhelm Albertsson Westergren. Appx13907-13908. He found that

if a blood sample was left standing in a vertical pipette for an hour, some red blood

cells would aggregate and drop to the bottom of the pipette, leaving clear plasma

above. The distance from the top of the sample to the line of demarcation between

clear plasma and red blood cells was an indication of the degree of inflammation—

the greater the distance, the higher the ESR. Appx13908. This time-consuming

Westergren Test is still considered the "gold standard" for measuring ESR to

screen for inflammation. Appx13907-13908.

In the 1990s, Dr. Enzo Breda, Giovanni Battista Duic and their colleagues at

SIRE Analytical,[1] were exploring ways to measure ESR in less time than it took to

_____

[1] SIRE was completely acquired by and merged into Alifax in 2015. *See* Appx2085-2086. References hereafter to "Alifax" refer also to SIRE.

conduct a Westergren Test. Appx14579-14583. They first developed and patented a centrifuge-based instrument to accelerate blood sedimentation using photometrics to measure ESR. Appx15518. While the centrifuge-based system sold well and significantly lowered test time, it had drawbacks, including costly maintenance of seals to prevent blood leakage. Appx13913-13914, Appx14582-14583. In developing the centrifuge system, however, Dr. Breda noticed that blood in the capillary tube leading to the centrifuge would stop in different places for different samples, and that the location appeared to correspond with the ESR value of a sample. Appx13917-13918. Dr. Breda decided to remove the centrifuge and measure the blood sample in the capillary tube, avoiding the centrifuge seals. *Id.*

Dr. Breda's new instrument included a pump that moved blood from a sample tube through a clear plastic capillary to a photometer, known internally as a capillary photometer sensor or "CPS." Appx14115. When the pump stopped, light transmitted through the blood in the capillary was measured by the photometer and recorded. Appx14116-14117. Dr. Breda used a microscope to observe the behavior of the blood as it was pumped through the capillary and then as the pump was stopped. Appx13924.

9

Dr. Breda and his colleagues ran experiments comparing results from their instrument with Westergren Tests on 40,000 blood samples over 10 months. Appx13919. The photometric signals generated by the samples yielded a characteristic curve known as a syllectogram. Appx13922. Dr. Breda wrote his own software to correlate the measured signals with results from the Westergren Test. Appx13919-13920. During this research, Dr. Breda developed a series of mathematical formulas to explain his observations, using acronyms that are still used internally at Alifax: OTF (optical transmission during flow), OT (optical transmission minimum) and ED (end detection). Appx13924-13925, Appx14141-14142.



Figure 1. Syllectogram.

10

CONFIDENTIAL MATERIAL REDACTED

Appx709; *see also* Appx15838.

Acquiring a reliable signal from a blood sample is complex. Appx14184-14185. For example, programming the pump to produce an appropriate flow rate, determining when to stop the pump, timing the sample detection to avoid air bubbles, detecting and reporting errors in the system (e.g., leftover matter from a prior sample), and reducing electrical noise caused by system components are all problems that need to be solved. Appx14178-14184. These techniques are part of a process referred to herein as the "signal acquisition" process.

Once a reliable signal is acquired, it must be converted into a value that correlates highly with the result of a Westergren Test on the same sample. Appx13937-13938. Dr. Breda's research and his development of programming code to analyze SIRE's 40,000 comparative tests enabled him to create a proprietary "conversion algorithm" to correlate the area under the right side of the syllectogram curve—the integral of the curve—and the ESR value from a Westergren Test. The form of Dr. Breda's conversion algorithm was unusual:

ESR Conversion Algorithm

Appx14186-14187, Appx710. This algorithm, with its distinctive constants, or a minor variation thereof, is programmed into the software for all of the Alifax ESR

11

analyzers, even today. *See* Appx13970-13977 (discussing Alifax software in

Appx15529-15550).

The result of this work was an automated instrument capable of reporting

reliable ESR values from blood samples in only 20 seconds! As of trial, Alifax had

installed more than 6,000 ESR analyzers in 120 countries worldwide. Appx13935-

13936. Alifax derived revenues not only from the sale of instruments but also from

ancillary components, especially controls and test cards that are needed to perform

each test. Appx15351-15354, Appx15366-15373.

> 2. *Alcor recruits Frappa to steal Alifax technology and launch a competing instrument in only eight months.*

Francisco Frappa began working at Alifax as an intern in 2000. Appx13964-

13965. In the mid 2000s, he transitioned to the programming department where he

updated and developed software and firmware for ESR analyzers. Appx13965-

13966. By 2008 Frappa had been promoted to Alifax's director of software.

Appx13977. During this time, Alifax's management repeatedly and explicitly

reiterated the highly-confidential nature of Alifax's products to Frappa.

Appx13979-13982. Alifax also forbade Frappa from downloading any Alifax

materials onto his personal computing devices and took steps to ensure he was

unable to do so. Appx13983.

12

In August of 2011, Frappa suddenly announced his resignation. Appx13984, Appx15588. Unbeknownst to Alifax, Frappa had just returned from a trip to Rhode Island where he was recruited by Alcor—a U.S. company that until that time had only distributed ESR analyzers—to enable Alcor to make and sell its own ESR analyzer, a goal that Alcor had tried but failed to achieve. Appx7534.[2] During the trip, Frappa spent a week as a guest at the home of Alcor's founder, Carlo Ruggeri, Appx7536, Appx7768, where Ruggeri convinced Frappa to quit Alifax and come to work for Alcor. Appx7539.

Frappa concealed all this from Alifax and instead misrepresented that he was leaving to work in the field of environmental energy in Italy. Appx13985-13986. He even asked for a letter of recommendation, which Alifax provided. Appx13986, Appx15590. On October 31, 2011, while Frappa was still officially employed by Alifax, Alcor announced internally that he had become its "vice president of research and development." Appx7542. Earlier that week, Frappa emailed several Alifax documents to his personal email account for later use. Appx7771-7772,

---

[2] Deposition testimony referenced in this section was presented at trial by video before the jury. Appx14351, Appx14391.

13

Appx7773-7774. He also downloaded Alifax source code onto a flash drive that he took with him. Appx14750.

Shortly after Frappa's departure, Alifax began to hear rumors that Alcor had hired someone with intimate knowledge of Alifax's instruments to work on a competing ESR analyzer. Appx14005-14006, Appx15709. Given his recent departure, Alifax immediately suspected Frappa and grew concerned about the potential disclosure of its confidential information relating to Alifax's ESR analyzers. *See* Appx15707-15713.

Just three months after his departure, Frappa asked Alifax for a notarized copy of his letter of recommendation to assist him in obtaining a U.S. visa. Appx14004-14005, Appx15711. This all-but-confirmed Alifax's suspicion that Frappa had defected to Alcor. Alifax declined the request, Appx14006, and admonished Frappa against passing "a good part of our technology to the competition." Appx15710. Frappa continued to deny that he was working with Alcor. Appx14007-14010. That was a lie, and Frappa's email response was actually drafted by Alcor's CEO, which made it all the more notable for its uncharacteristic tone, as Alifax expressly observed: "it is as if it wasn't written by you." Appx7548-7549, Appx15707.

14

The motivation for this deception was clear. In late 2011, Alcor had urgent need of Alifax's confidential information to create a working ESR analyzer—"time was [of] the essence to the meet the deadline of having a working prototype by July 22nd [2012]." Appx7549. Alcor had tried for years to develop an ESR analyzer, but even with the help of a medical device consulting firm, it failed. Appx14397-14398, Appx14406. Alcor had hoped to launch a device in July 2011 at the American Association for Clinical Chemistry ("AACC") trade show, a key venue for launching new products in medical diagnostics, but it missed that deadline. Appx7549. With Frappa's input, however, in less than eight months after he joined, Alcor launched its iSED ESR analyzer at the July 2012 AACC, claiming "It's not from the future, it's here and now." Appx7551, Appx15734. Alcor touted it as a "resounding" success and immediately ramped up marketing. Appx7551.

In April 2012 with the AACC trade show looming and facing extreme pressure to launch its ESR analyzer, Alcor had paid Frappa to disclose his knowledge about how Alifax's ESR analyzers worked. Alcor offered Frappa a 3% royalty on all sales of ESR systems and accessories including tests, controls and calibrators in return for Frappa:

> relinquish[ing] all the notes and all the technical documentation relative to the project; and more specifically: documentation in printed and

15

electronic form of procedures, software algorithms, electronic circuits, mechanical and chemical systems; comparison studies; conversion algorithms; and calibration procedures studies.

Appx15714. Frappa quickly held up his end of the bargain, circulating a memo the very next day divulging the same four parameters at the heart of Alifax's ESR process (OTF, OT, ED and INT) and then laying out in detail how to acquire a signal from a blood sample. Appx15716–15719. A few weeks later on May 20, Frappa incorporated the Alifax conversion algorithm into source code that he wrote for Alcor's forthcoming iSED analyzer. The four constants in Dr. Breda's algorithm are easily identified in that code: 2.2, 1000, -3 and ^1.9. Appx15720-15724.

In November and December 2012, months after launch, the Alifax conversion algorithm was still present in the iSED software. Appx14213-14217. In fact, Frappa did not even begin to analyze test data for an alternate conversion algorithm until January 17, 2013, Appx14450, and until January 28, 2013, the Alifax conversion algorithm was the only conversion algorithm ever programmed into any iSED device. Appx16469, Appx14450-14454, Appx14896.

Weeks before Frappa tried to develop his own conversion algorithm, he completed hundreds of comparative blood tests to demonstrate the correlation of

16

iSED results with the Westergren Test. Frappa personally carried out those tests, which he documented in his own handwriting, using an iSED prototype device. Appx7759-7761. The prototype used software version 1.00—which included Alifax's conversion algorithm. Appx15742, Appx7761.

These tests were particularly significant because Alcor submitted them to the FDA in 2014 to document the supposed excellent correlation between iSED and Westergren Test results. Alcor understood in 2012 that its laboratory customers would be required to operate the iSED as a "Highly Complex" instrument until it received a Moderately Complex CLIA[3] designation, making the designation critical. Appx15796, Appx14468-14469. Alcor understood that it was important to be accurate in providing materials to the FDA. Appx14468-14469. Among the materials requested by the FDA was data showing the iSED's correlation with the Westergren Test. Appx15826, Appx15830-15835, Appx14471-14473. The FDA also asked Alcor for the conversion algorithm that it used to derive its ESR values. Appx15836, Appx14474. Yet when Alcor submitted the correlation data to the FDA in 2014, it sent the results of Frappa's prototype tests from December 2012

---

[3] CLIA refers to the Clinical Laboratory Improvement Amendments, a program administered by the FDA's Centers for Medicare and Medicaid Services.

17

and January 2013. Appx14474-14475. In the same submission, Alcor asserted that

the conversion algorithm used "to extract the ESR value" was its new algorithm,

and not the one in code (i.e., Alifax's) that Frappa used to conduct the actual tests.

Appx15838.

That was a blatant misrepresentation. The results obtained with Alcor's own

conversion algorithm (below from Appx15968 -15977) were obviously inferior to

Frappa's prototype tests, so Alcor told the FDA that it had obtained the better

results using its own inferior conversion algorithm.

| Appx15751 (result sumbmitted) | Appx15977 (actual results) |
|---|---|
|  | |

As of the time of trial in 2019, Alcor was still promoting its iSED device using the data Frappa obtained on the prototype iSED, which prompted Alifax to seek injunctive relief after it prevailed at trial. *See* Appx16590-16597.

3.    *Alifax files suit and obtains a jury verdict of willful misappropriation of trade secrets and $6.5 million in compensatory damages.*

Alifax filed its complaint against Alcor and Frappa in October 2014, alleging infringement of two Alifax patents, trade secret misappropriation under Rhode Island's Uniform Trade Secrets Act ("RIUTSA") and breach of confidential relationship against Frappa. Appx146-149. All of these claims were directed to Alcor's iSED ESR analyzer, including the improper means Alcor used to rush the device to market. Alcor later counterclaimed for intentional interference with Alcor's contracts with distributors. Appx2235.

During discovery, Alifax reviewed Alcor's iSED source code and found that it contained the exact same unique conversion algorithm constants, and same variable names (OFT, OT, ED) that Dr. Breda had developed. Alifax amended its complaint to include a count for copyright infringement relating to source code. Appx2106-2107. During discovery, Alifax also identified several misappropriated trade secrets. Appx1999-2000. For purposes of this appeal, the asserted trade secret was:

19

The manner in which the software used in Plaintiffs' ESR analyzers initiates an ESR measurement from a blood sample loaded in the ESR analyzer, handles a blood sample to introduce it into the capillary container, instructs the ESR analyzer to obtain photometric data, and handles and converts the photometric data to calculate the ESR of the blood sample.

Appx2000(¶5).

In March 2018, the parties cross-moved for partial summary judgment. Alifax moved for judgment against Alcor's intentional interference counterclaim. Appx6008, Appx7047. Alcor moved for summary judgment of non-infringement and invalidity of the asserted patents, no trade secret misappropriation, and non-infringement of the asserted copyrights. Appx3932. The court granted Alifax's motion and denied Alcor's. Appx11746.

Notably, at summary judgment, Alcor argued that (1) aspects of Alifax's identified trade secret relating to acquiring a signal from blood data were not protectable trade secrets and (2) Alifax's conversion algorithm and constants were "device specific" and this could not have worked on Alcor's iSED devices. Appx11730-11731. The court disagreed on both counts. First, the court credited Alifax's expert testimony that "[i]t was not generally known and would not have been readily ascertainable how to acquire signal data for a blood sample" and that it would have taken a skilled engineer "at least one entire month working full time

20

just to program the signal acquisition feature of the instrument." Appx11730 (quoting Appx4644). Second, the court found that it was "undisputed that Alifax's conversion algorithm and constants (an alleged trade secret) were incorporated into . . . the iSED's software," and noted that "[a]cquisition by improper means, even without disclosure or use" is actionable under Rhode Island law. Appx11731. In other words, the Court acknowledged that the act of acquisition by itself was a violation of RIUTSA.

Before trial, the court issued several significant evidentiary rulings. Foremost, the court excluded Alifax's expert testimony on copyright damages. Appx13809. Without evidence on copyright damages, Alifax dropped the copyright claim. It is not part of this appeal. The court deferred ruling on the same expert's testimony regarding trade secret damages. *Id.*

The three-week jury trial was bifurcated between liability and damages. Midway through the liability trial, Alifax agreed to drop its patent infringement claim. After Alifax's technical expert, Dr. Bergeron, had completed his direct and cross-examinations, the court conducted its own examination for nearly 45 minutes. Appx14296-14332. The court then permitted Alcor a second cross-examination, during which the expert surprisingly conceded that a claim limitation

21

was missing from the accused iSED device. Appx14339. On the next day of trial,

Alifax agreed on the record to stop pursuing its patent infringement claim.

Appx14385-14388. The patent claim is not part of this appeal.

With only the trade secret claims remaining at the end of the liability phase,

the parties argued over a draft special verdict form that described the software

trade secret as follows:

> Portions of computer program source code concerning the [acquisition and] conversion of photometric measurements, including source code containing four specific conversion constants.

Appx15193; *see also* Appx14943-14944. Alifax argued that the bracketed

"acquisition" of photometric measurements—its "signal acquisition" trade secret—

should be part of the special verdict form, pointing to expert testimony and

documentary evidence. Appx14945, Appx15716-15719. The court sided with

Alcor and, without any formal opinion and over objection from Alifax, removed

"signal acquisition" from the case. Appx14944-14948. That had a snowball effect,

as explained below.

Still, the jury found Alcor and Frappa liable for misappropriation of the remaining trade secrets.[4] Appx15193-15199. The jury also found that Alcor's misappropriation was willful and malicious and that Frappa had breached his obligations of confidentiality to Alifax under Italian law. *Id.*

The night before the damages phase began, the court issued a ruling barring opinion testimony from Alifax's damages expert and leaving unclear what evidence would be permitted and how Alifax would make its case. Before the damages phase began, the court asked: "How are you going to meet your initial burden of proof with respect to proving revenues in light of the ruling I made last night?" Appx15309. Alifax proposed calling its expert, Chris Bokhart, "to present revenues and costs" based on one spreadsheet, a financial statement Alcor prepared that offered all the necessary evidence about Alcor's sales. Appx15309-15312. Alifax explained the spreadsheet would show that "it's largely the test cards from which [Alcor is] deriving profit," and that Bokhart could summarize Alcor's financial statement. Appx15311-15312. The court also raised the possibility of admitting the same evidence through Alcor's CEO. Appx15312.

---

[4] There were two other trade secrets submitted to the jury that are not relevant to this appeal.

23

Eventually, the ***court*** that suggested that Bokhart testify as a summary fact witness. Appx15323. Alifax specifically asked that it be allowed to present damages evidence relating to sales "in particular for the test cards and the consumables" that "drive the sales and profits," evidence previously excluded due to the bifurcation. Appx15327-15328. The court agreed: "I would give you leeway to prove whatever you have an entitlement to prove. I'm not constraining you in the damages phase of the trial from proving whatever facts you need to prove for causation or for the amount of damage." *Id.* After Bokhart testified, the court found no issue with his testimony: "He hasn't expressed any opinions. He's just run the numbers, these are what the numbers are, and summarized it for the jury." Appx15393. Alcor's spreadsheet containing its financial data was admitted without objection. Appx15957-15964, Appx15366.

Alcor cross examined Bokhart, and then called its own expert, Ronen Arad, who could have addressed the revenues and costs in the spreadsheet. *See* Appx15404. Instead, Arad scrupulously avoided any testimony about that exhibit. Appx15414-15434. After hearing the testimony from both sides, the jury returned a verdict of $6.5 million. Appx15490.

24

4.    *After trial, the court erases the jury verdict and then precludes Alifax from obtaining any damages.*

The court threw out the verdict and ordered a new trial, explaining that it felt better equipped to decide the case than a jury that was purportedly unable to "grasp unfamiliar technological and mathematical concepts amid a complex and shifting web of legal theories." Appx2. Despite admitting that the jury's misappropriation verdict was "supported by a rational interpretation of Alifax's evidence," Appx40, the court nonetheless found the verdict "contrary to the clear weight of the evidence." Appx3. The court was misled, however, by testimony from Alcor's technical expert, Brad Smith, who claimed to have proven that the Alifax's conversion algorithm was incapable of producing meaningful ESR values in an iSED device. Appx50-55.

Smith created a spreadsheet that purportedly showed that if raw ESR readings (the "integral") from Alcor's iSED devices were plugged into Alifax's algorithm, the results were "an order of magnitude larger" than permissible ESR values. Appx16493-16495, Appx54. For example, looking at "sample 1" in

25

CONFIDENTIAL MATERIAL REDACTED

Smith's spreadsheet, his "calculation"[5] showed an ESR value of 16 using Alcor's

algorithm, but an ESR value of 774 using Alifax's algorithm which, according to

Smith, was beyond the acceptable range of 0 to 180. Appx16493-16495,

Appx14894. This spreadsheet was not produced or admitted into evidence in native

format and the pdf version provided did not disclose the equation Smith used or

give any indication of how Smith's calculations were performed. Nor did Smith try

to walk through his calculations with the court or jury, instead giving only a

cursory explanation. Appx14893-14894. Still, his artifice was clear: the results

were "off" because he left out a critical step—the required "fudge factor" Frappa

used.

Frappa realized early on, *see* Appx15742-15770, Appx775, that Alcor's

device needed a "fudge factor" to align with Alifax's results, so he divided the

integral value by 6 before applying the Alifax conversion algorithm. Appx15722,

---

[5] It appears Smith simply applied the Alifax conversion algorithm described above, *supra* p. 11, to obtain the ESR value as follows:

(1) ESR Calculation $= 16424$

(2) $16424$ ESR Calculation $=$ ESR Calculation

(3) ESR Calculation $=$ ESR Calculation

(4) ESR Calculation $=$ ESR Calculation

(5) ESR Calculation $= 773.43.$

CONFIDENTIAL MATERIAL REDACTED

Appx14188-14189. The comment Frappa left in the code (preceded by "//" below) left no doubt that his divide-by-6 fudge factor was intended to make Alifax's algorithm work with the iSED device:

> dummyInt /=6 // make the integral comparable with the old revision calculation

Appx15722. Even though Frappa used this fudge factor to get "comparable" results when using Alifax's algorithm, Smith omitted the step from his calculations. If he had followed Frappa's iSED program code, he would have obtained a result of 8,[6] which is well within the acceptable range. Appx14894.

The jury was not fooled. They understood exactly why Frappa included this fudge factor in the iSED code to mirror Alifax's results. In closing, counsel for Alifax explained to the jury that Smith's calculations were unreliable due to his omission of the fudge factor:

---

[6] If Smith had used the fudge factor Frappa included in Alcor's code, the ESR value would have been:

(1) ███████ = 16424
(2) **16424/6 = 2737.3**
(3) 2737.3 ███████ =
(4) ███████ = ███████
(5) ███████ = ███████
(6) ███████ = 8.18

27

> They say, Oh, this doesn't work, you couldn't use this in another device, couldn't use this source code; yet Mr. Smith said it wouldn't even work, can't use their conversion algorithm. But you know what? Look at this line of code: "dummy.Int divided by 6" -- this is Frappa's code – "make the integral comparable with old revision calculation."

> You make some adjustments in the code so that the same conversion algorithm can work with the data even if the hardware is a little different. And that's exactly what they did.

Appx15052. The jury also saw evidence that Frappa had successfully run the December 2012 and January 2013 tests, Appx15742-15770, using a prototype device when the only available conversion algorithm was the one misappropriated from Alifax. Thus, Smith's testimony that no meaningful results could be obtained using the Alifax conversion algorithm hardly rose to the level of "potent and unrefuted scientific proof," as the court chose to characterize it, much less "unimpeachable contradicting evidence and universal experience" or "immutable laws of physics," as in the cases the court cited to rationalize overturning the jury verdict. Appx49-50. As the court admitted, "the jury was free to reject Smith's testimony." Appx55. The jury did just that, and rightly so.

The court also overturned the jury's damage award as unfairly prejudicial, despite having approved summary fact testimony by Alifax witness Chris Bokhart in the interests of practicality and fairness, Appx60, and having observed after

28

Bokhart testified that his testimony had been appropriately circumscribed. It thus seemed like there was going to be a new trial. Instead, after a series of increasingly unsupportable orders that were not even the result of motions, the court dismissed Alifax's claim for trade secret misappropriation with prejudice and entered final judgment. First, after a request for a "case management order" to consider the scope of the new trial, the court ordered that Alifax would be limited to arguing the "conversion algorithm" trade secret alone (and specifically not "signal acquisition") in the new trial. Appx72-74. In the same order, the Court also forbade Alifax from bringing any "new evidence or witnesses" and excluded Bokhart from testifying in any capacity. Appx71-72, Appx74-76.

Second, the court required Alifax to "articulate its theory of damages," in light of the court's severe evidentiary restrictions for the new trial. Alifax laid out admissible evidence, specifically Alcor's spreadsheet of sales revenues and costs, Appx15957-15964, that could be introduced through an adverse witness if necessary, and that would support a damages verdict in its favor. Appx18480-18481.

Third, while it acknowledged that other fact witnesses could provide context for the damages, the court ruled that Bokhart could not testify, and concluded that

29

without the "structure" of his testimony, Alifax could not prove compensatory damages. Appx90(n.4). The court predicated its ruling that "Alifax will be precluded from seeking compensatory damages" on its decision to exclude Bokhart completely, despite its observation that "the materials Bokhart would presumably summarize are not sufficiently voluminous to justify a summary witness." Appx88, Appx90. The court ignored its previous finding that Alcor's unjust enrichment "can be derived through simple arithmetic using the financial data from a spreadsheet created by Alcor," Appx50, and its observation that the spreadsheet could be introduced through Alcor's CEO. Appx15312.

Fourth, having ruled that Alifax could not seek compensatory damages in the new trial, the court asked for briefing on the consequence of that ruling. In a joint status report, Alifax indicated that it was prepared to stipulate to entry of summary judgment in favor of Alcor limited to damages and injunctive relief. Appx18511-18512. But the court did not enter summary judgment. Without citing any rules, case law or other procedural justification, the court simply dismissed

30

Alifax's trade secret misappropriation claim with prejudice and entered judgment.[7]
Appx91-98.

## SUMMARY OF THE ARGUMENT

From before trial until the dismissal of the action, the court whittled away at

Alifax's case until there was almost nothing left. Still, the jury found that Alcor

and Frappa had committed ***willful and malicious*** misappropriation of Alifax's

trade secrets and that Alcor had unfairly benefited to the tune of $6.5 million.

While recognizing the jury verdict was supported by evidence, the court threw it

out and ordered a new trial, and then forbade Alifax from offering any new

evidence to correct the court's perceived defects. When Alifax demonstrated that

even with the restrictions, it ***still*** could prove misappropriation and damages, the

court essentially threw up its hands and dismissed the case. The court committed

error as a matter of law in dismissing the case when Alifax still had pending claims

and more than enough evidence to support them in front of a[nother] jury.

---

[7] With respect to Alifax's claim for injunctive relief for trade secret
misappropriation, the court asserted that its denial of Alifax's motion for injunctive
relief as moot (in view of the grant of new trial) constituted a dismissal of Alifax's
claim for injunctive relief. Appx96(n.4).

The court committed multiple errors and, to be crystal clear, for this Court to affirm the ultimate dismissal of the case below, it would have to affirm ***every one*** of the court's erroneous orders. Many of the errors are subject to de novo review. First, the court erred as a matter of law in precluding Alifax from seeking any compensatory damages and dismissing the case under the false pretense that Alifax had no way to introduce the same convincing evidence it did in the original trial without Bokhart. Second, the court erred in forbidding Alifax from offering any new evidence or witnesses in the new trial. This order arbitrarily prevented Alifax from responding to the new circumstances after the court ***retroactively changed its rulings***. Third, even though Alifax did not need expert opinion testimony to make its damages case, the court nonetheless abused its discretion in excluding Alifax's expert opinions in the first place. And contrary to the court's assertion, those opinions were supported in the record. Fourth, the court erred as a matter of law in removing Alifax's "signal acquisition" trade secret from the jury's consideration even though it was more than adequately supported in the trial record.

Fifth, the court abused its discretion in ordering a new trial on liability because it erroneously concluded that proof of "use" of the trade secret was required for misappropriation, when the statute is clear that mere acquisition will

32

suffice, and acquisition was undisputed. Sixth, and finally, the court abused its discretion in ordering a new damages trial based on Bokhart's testimony allegedly exceeding the scope of FRE 1006, even though the testimony was admissible under other rules, Alcor was not unfairly prejudiced, and the court never explained how permitting the jury's "rational appraisal of Alcor's unjust enrichment" to stand would "constitute a miscarriage of justice."

The court's increasingly harsh orders demonstrate a pattern of error and abuse that demands reversal. Foremost, Alifax respectfully requests that this Court find the court abused its discretion in ordering new trials for liability and damages, reverse those holdings and reinstate the jury verdict of willful and malicious misappropriation and unjust enrichment of $6.5 million. ***If the verdict is reinstated, this Court need not address any of the other issues in this appeal***. If, however, this Court believes a remand is warranted, Alifax requests that this Court order a full and fair retrial where Alifax can pursue both its conversion algorithm and signal acquisition trade secrets, as well as compensatory damages, using evidence and witnesses that were disclosed prior to the original trial.

33

# **ARGUMENT**

## A.  **Standard of Review**

This Court applies the law of the regional circuit where the district court sits when reviewing issues unrelated to patent law. *Midwest Indus., Inc. v. Karavan Trailers, Inc.*, 175 F.3d 1356, 1359 (Fed. Cir. 1999) (citing *Atari, Inc. v. JS & A Group, Inc.*, 747 F.2d 1422, 1440 (Fed. Cir. 1984) (en banc)). Alifax's trade secret claims arise under RIUTSA, and are thus reviewed under First Circuit law. *Atl. Rsch. Mktg. Sys., Inc. v. Troy*, 659 F.3d 1345, 1356 (Fed. Cir. 2011).

Judgment as a matter of law and summary judgment are reviewed de novo. *Primarque Prod. Co. v. Williams W. & Witts Prod. Co.*, 988 F.3d 26, 32 (1st Cir. 2021). Failure to give a jury instruction is likewise reviewed de novo. *Cigna Ins. Co. v. Oy Saunatec, Ltd.*, 241 F.3d 1, 8 (1st Cir. 2001). An order for a new trial is reviewed for abuse of discretion. *Jennings v. Jones*, 587 F.3d 430, 436 (1st Cir. 2009); *Whitserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 26 (Fed. Cir. 2012).

34

**B.      The court erred in dismissing Alifax's trade secret case after issuing a series of increasingly contentious rulings that constrained Alifax from prevailing in a new trial.**

Above all else, the court had no justification for finding before any new trial commenced that Alifax could not prove compensatory damages as a matter of law and dismissing the entire cause of action on that basis. Appx91-98, Appx101-102. The court's ultimate decision simply ignored evidence admitted at the original trial—evidence upon which a jury found unjust enrichment worth $6.5 million—based on a record that the court itself repeatedly called "legally sufficient." Appx27.

On top of ignoring a reliable evidentiary record, the court's reasoning was predicated on a series of increasingly punitive orders. The court's order that Alifax could not prove compensatory damages was a direct result of two prior, related orders: one holding that Alifax's damages expert Bokhart would be fully excluded from any new trial and the other that the scope of the new trial would be limited to the conversion algorithm trade secret. Appx68-83. The gist of the court's stacked rulings was this: Alifax cannot not prove compensatory damages without Bokhart and Alifax cannot use Bokhart if it is limited to arguing the conversion algorithm. The ultimate dismissal must be reversed if ***any*** of these orders is reversed.

35

At the highest level, the court erred because Alifax could *still* prove compensatory damages without Bokhart and for the conversion algorithm by itself. Alifax could make the exact same case, already found by a jury and considered by the court "a rational measure of damages," by introducing evidence that was received without objection during the original trial, Appx15957-15964, through witnesses who were also identified or present at the original trial (e.g., Alcor's CEO and Alifax's Manager of International Business). The court acknowledged as much when it observed that the Alcor financial spreadsheet was "not sufficiently voluminous to justify a summary witness," Appx88, and that a rational measure of damages "can be derived through simple arithmetic using the financial data from a spreadsheet created by Alcor." Appx50.

The court's holding that Alifax could not prove compensatory damages was also in error because it required two other flawed rulings. First, the court's change of heart about Bokhart is particularly troubling because Alifax is now being punished for following the court's own suggestion that Bokhart testify as a summary fact witness, when Alifax could have introduced the same information through other witnesses if Bokhart had not been available. Second, the court's order excluding Bokhart was dependent on another critical error of law: the court's

36

decision during the charge conference to withhold Alifax's "signal acquisition" trade secret from the jury. Appx14943-14944, Appx72-74. But for this erroneous ruling, Bokhart's expert opinion would have been admissible. Appx15116.

In short, the dismissal with prejudice of Alifax's trade secrets claim was necessarily predicated upon multiple rulings, many of which were errors of law. If the Court agrees that any of these rulings were wrong, the judgment should be reversed and remanded for a new trial of appropriate scope.

1. *The court erred in ordering Alifax could not pursue compensatory damages in a new trial, and dismissing the case on that basis, because there was sufficient evidence in the record to bring that claim to a jury.*

The court's finding that "Alifax did not disclose an admissible damages expert and therefore has no evidence at this late date that could sustain the relief it seeks," Appx90, is a manifest error of law. In the First Circuit, expert testimony is not required to prove damages. *See Wortley v. Camplin*, 333 F.3d 284, 296 (1st Cir. 2003). In any event, the court had already permitted a trial on damages after excluding Alifax's expert opinion testimony. Its ruling was specific to Bokhart, because Bokhart would not be permitted to testify at the new trial ***in any capacity***, "Alifax is therefore left with no admissible evidence to support its claim for compensatory damages on the algorithm trade secret." Appx95. That was error.

37

The ruling assumes that Bokhart's testimony was essential to the case, which is contradicted by the court's own observations that other avenues were available for introducing this evidence.

First, as the court found, Alcor's net profits from its one-year head start "can be derived through simple arithmetic using the financial data from a spreadsheet created by Alcor." Appx50. Second, although the spreadsheet was introduced at trial by Bokhart, the court noted it could have been admitted (at least) by calling Alcor's CEO. Appx14942. Third, the court described Alcor's financial data as "not sufficiently voluminous" to require testimony from a summary witness. Appx88.

In short, Bokhart's testimony was not necessary for Alifax to prove its damages. While the court seemed most concerned that Bokhart had testified about revenues not just from the sale of iSED devices, but also from test cards and other iSED accessories, Appx63, Alifax could and would present the same evidence about the convoyed sales from other witnesses.[8] Notably, the percentage of revenues from test cards is listed right on the financial statement itself.

---

[8] To the extent the court's "no new evidence or witnesses" order for the new trial, Appx71-72, would preclude evidence or witnesses identified in Alifax's pre-trial disclosures, such a ruling is arbitrary, capricious and has no basis in law.

38

Appx15957-15964. As another example, Alifax could have introduced through Alcor's CEO a document explaining how "Alcor's revenue model assumes a one-time sale of the main device and recurring sales of accessories: smart cards for ESR tests . . . . Recurring sales were . . . 73% for diagnostic products in 2015." Appx13223-13224. This document was identified as trial exhibit 132. Appx10483.

As fact witnesses who might testify at a new trial, Alifax had identified not only Carlo Ruggeri and Alifax's own manager of international business, Manuela Rossetto, but also several other Alcor and Alifax employees. Appx18481. All these witnesses had been duly identified in the parties' pretrial memoranda. Appx10477. The court dismissed these alternative sources of damage evidence with an offhand footnote asserting that "the strongest foundation [from available fact witnesses] is little use without a structure (Bokhart's testimony) to go on top." Appx90(n.4). That reasoning is especially dubious given the court's contemporaneous assertion that *a summary witness was not needed*. Appx88. Of course, the reason Alifax did not use any of the above evidence or witnesses in the original trial was because it did not have to—Alifax instead followed the court's suggestion to use Bokhart as a summary witness. Appx15322.

Finally, wholly apart from other witnesses who could provide evidence of the unjust enrichment that Alcor derived from the recurring sales associated with its iSED devices, convoyed sales only concern the *extent* of the unjust enrichment. Even without including *any* convoyed sales, Alifax could still prove significant compensatory damages in a new trial. Revenues just from the sales of iSED devices through the first three quarters of 2018 were more than $8.5 million, as indicated by line 4210 on the Alcor spreadsheet. Appx15957. There was thus no justification for the court's finding that Alifax could not prove *any* compensatory damages at a new trial, even without Bokhart. At the very least, this error of law warrants reversal and remand for a new trial.

> 2.      *The court erred in prohibiting the jury from considering Alifax's "signal acquisition" trade secret claim in both trials.*

The court erred in removing signal acquisition from the jury in the original trial because there was supporting evidence and because it was reasonable for the jury to make "a logical inference that a competitor who hires away a rival's valued employee with access to inside information has done so in order to use that inside information to compete with the rival." *Astro-Med, Inc. v. Nihon Kohden Am., Inc.*, 591 F.3d 1, 19 (1st Cir. 2009). The court then compounded this error by misinterpreting "partial retrial" law to hold that because Alifax supposedly failed

40

to sufficiently make its claim in the original trial, it would be prevented from trying again in the new trial. This was nothing more than a summary judgment order without even attempting to meet the requisite burden. It was a clear error of law that should be reversed.

This error had a snowball effect. The court's only express reason for excluding Bokhart's expert opinions was that his "head start conclusions are derived from an opinion related to a trade secret theory [signal acquisition] the Court rejected as unsupported by the evidence," as opposed to being derived from the conversion algorithm trade secret that went to the jury. Appx15116; *see also* Appx74-76 ("new trial scope" order citing the same reasoning). Thus, if the court erred in removing signal acquisition from the case, the sole basis for excluding Bokhart also disappears.[9]

---

[9] Bokhart's head start damage opinions for the conversion algorithm was also supported by evidence and it was an abuse of discretion to exclude it. Alifax's technical expert, Dr. Bergeron, stated in his report:

> Assuming that the signal could be acquired, one would then have to convert the signal data into a value that correlates with that of a standard or modified Westergren test. That would require carrying out a significant number of parallel tests using both the ESR analyzer and the Westergren method. I understand, for example, that a team of researchers at Alifax's predecessor SIRE spent the better part of three years running tens of thousands of tests in order to develop an algorithm

41

a. <u>The District erred as a matter of law in refusing to present the "signal acquisition" trade secret to the jury.</u>

The court committed several errors in removing signal acquisition from jury consideration. The court's ruling at the charge conference eliminating signal acquisition from the special verdict form is reviewed de novo and is reversible error where the requested instruction was "(1) correct as a matter of substantive law, (2) not substantially incorporated into the charge as rendered, and (3) integral to an important point in the case." *Cigna Ins. Co. v. Oy Saunatec, Ltd.*, 241 F.3d 1, 8 (1st Cir. 2001) (citing *White v. New Hampshire Dep't of Corr.*, 221 F.3d 254, 263 (1st Cir.2000)). All three prongs are met here—Alifax was entitled to have the full scope of its trade secrets put before the jury, the full scope was not put before the jury, and the omission acted as a *de facto* summary judgment on Alifax's signal acquisition trade secret claim.

---

that would adequately correlate their results with the Westergren standard.

Appx4644(¶45). At trial, Bergeron testified that "[i]t would definitely take months" to develop a "commercially viable conversion algorithm if you were starting from scratch." Appx14196-14197. Bokhart was justified in relying on this evidence and he should not have been excluded from testifying as an expert. Appx11511(n.3).

42

In *Wilson v. Mar. Overseas Corp.*, 150 F.3d 1, 10 (1st Cir. 1998), the First Circuit explained that a court is "duty-bound to give instructions on all issues of material fact raised by the evidence adduced at trial." Similar to a summary judgment ruling, the court cannot make factual determinations, but instead "must determine whether the evidence presented at trial, along with all inferences that may reasonably be drawn therefrom, could plausibly support a finding for either party on any given issue of material fact." *Id*. Here, as expressly stated in *Astro-Med*, the jury at least could have plausibly inferred misappropriation of trade secrets based solely on the fact the Alcor poached Frappa for his knowledge of Alifax's ESR products. But the court not only overlooked that clear inference, it ignored other significant trial evidence as well.

In exchange for a 3% royalty, Frappa agreed to provide Alcor with "technical documentation," in particular the software and procedures that enable an ESR analyzer to perform its necessary mechanical and chemical functions. Appx15714. The day after he signed his agreement with Alcor, Frappa detailed the "ISED Software Procedures" involved in measuring a blood sample with an ESR analyzer. Appx15716-15719. The software procedures identified the same syllectogram parameters (even with the same names: OTF, OT and ED) that Alifax

43

acquired and recorded. It indicated how the instrument acquires a signal from a blood sample. *Id.*; *see also* Appx14178. The document detailed specific flow rates, explaining that after samples are mixed for three minutes, a peristaltic pump is activated "to move the sample into the reading chamber with a flow rate of 120 µL S-1." Appx15718. It illustrated the pump timing in a series of figures illustrating the blood sample being introduced to the reading cell and triggering a "pump off command." Appx15719. It described how to store Breda's parameters, stating that the "last amplitude value of the CELL_SENS is saved in local as OTF value." Appx15719. And it instructed how to reduce electrical noise in the device: "[a]fter the pump is stopped, the heater system and all the motors must be switched off before measurement is made to reduce induced electrical noise to the analog channel." Appx15719. None of this information was publicly available. Appx14177, Appx14184-14185. The jury was entitled to infer that Frappa's detailed plan for acquiring a signal from a blood sample was derived from his eleven years at Alifax, particularly in view of the other evidence at trial.

Not surprisingly, the iSED device was "practically identical" to Alifax's ESR analyzers. Appx14010. Its function was similarly identical to Alifax's instruments: a pump pushed the blood sample to the photometer and then stopped.

44

The subsequent measurement of the sample also functioned identically to the

Alifax ESRs. Appx14016.

Alifax's manager, GB Duic, testified that "all of the Alifax ESR analyzers

work according to the same principle." Appx13936. He explained that, just as

Frappa's memo described, the sample is mixed for three minutes, then sent via a

capillary tube to a photometer. Appx13937. Once the blood is sensed inside the

photometer, the pump is stopped and the optical density of the blood sample is

measured. *Id.* He testified that from this measurement of optical density, three

specific parameters are identified: OTF (optical transmission during flow), OT (the

minimum level of optical transmission, after the pump stopped) and ED (end of

detection). Appx13925. These techniques and parameters, developed by Dr. Breda,

are still used internally in the Alifax source code. Appx13924-13925.

Testimony at trial also showed that the "signal acquisition" operation was a

protectable trade secret. Alifax's expert testified that Alifax's method of acquiring

a signal from a blood sample was "not generally known," not ascertainable from

examining the hardware, and that it would take "months" for a skilled engineer to

work out. Appx14177, Appx14184-14185. He concluded that the signal acquisition

functions Frappa memorialized for Alcor in his memo, was "something that would

45

be of value to know if you were making this system, replicating the system, knowing this information would give you a huge advantage over having to do this from scratch." Appx14184.

Ignoring this evidence, the court proposed a verdict form that omitted the signal acquisition trade secrets, stating: "I don't believe that the evidence that has been introduced during the course of the trial would support a finding by the jury that source code or software used in Alifax's analyzers were misappropriated to acquire the photometric measurements." Appx14944. Counsel directed the court to Frappa's memo (Exhibit 64). After hearing argument from Alcor's counsel, the court stated: "I'm looking through this exhibit right now and I actually don't see any reference to software in this exhibit. Can you -- am I missing it?" Appx14945. Counsel for Alifax pointed out that the title of the document literally read "ISED Software Procedures description." Appx15716-15719, Appx14945-14946. The court overruled Alifax's objection and adopted the narrow definition of the trade secret on the verdict form.

Under the circumstances, in determining the trade secrets that would be considered by the jury, the court was obligated to give Alifax the benefit of all reasonable inferences that might be drawn from the evidence, including the logical

46

inference under First Circuit law that a competitor who hires away a rival's valued employee with access to inside information has done so in order to use that inside information to compete with the rival. *Astro-Med*, 591 F.3d at 18. Here, Alcor recruited Frappa because he knew how to program the "brains" of an ESR analyzer to make it operate—information that was proprietary to Alifax and not available by reverse-engineering. Alifax was entitled to have the jury decide whether Alcor misappropriated all these trade secrets, not just the conversion algorithm.

> b. The court erred as a matter of law in precluding Alifax from pursuing "signal acquisition" in a new trial.

Even if the court was right to exclude signal acquisition from the jury *after close* of the original trial, that in and of itself is not a justification for excluding the issue entirely *before* the new trial because the question asked at each stage is entirely different. At the close of the original trial, the question before the court was whether there were "issues of material fact raised by the evidence *adduced at trial*." *Wilson*, 150 F.3d at 10 (emphasis added). This is critically different than a pre-trial summary judgment, where a court determines whether the *entire record* presents an issue of material fact. *Griggs-Ryan v. Smith*, 904 F.2d 112, 115 (1st Cir. 1990). In the former case, the question is whether a party *did* make a case to convince a jury; in the latter case, the question is whether a party *could* make a

47

case to convince a jury. Here the court erred in holding that because (in its view) Alifax did not make a sufficient case in the original trial, that it could not do so in the second. Of course, the court ***already found*** the record did present an issue of material fact for signal acquisition when it expressly denied Alcor's summary judgment motion on that issue. Appx11729-11731.

The court's reasoning for mixing these standards rests on an improper reading of partial retrial law, which is not even applicable here because signal acquisition was never tried in the first place (and thus cannot be "retried"). For example, the court cited *Gasoline Prods. Co. v. Champlin Refining Co.*, 283 U.S. 494 (1931), which considered whether an error relating to damages during trial required retrying also liability, or whether the liability verdict could remain intact and the issue resolved with a partial retrial of damages only. Appx73. The Supreme Court held that partial retrials are permissible, but only if the undisturbed aspects of the verdict and the retried aspects of the verdict are "so distinct and separable" as to avoid injustice. *Gasoline Prods.*, 283 U.S. at 500. The Supreme Court thus allowed that issues decided by a jury at trial may be separably upheld or retried.

Likewise, in *Drumgold v. Callahan*, 707 F.3d 28, 47 (1st Cir. 2013), the issues was which of several findings of the jury should be allowed to remain in

48

force versus which should be retried. When the First Circuit reiterated that after "some issues have been properly and conclusively resolved" a court has discretion to hold "a partial retrial on the remaining issues," it meant after some issues have been properly and conclusively resolved *by the jury*. *Id.* at 46. The type of discretion addressed in these cases is exactly the discretion the court exercised in its new trial order when it kept intact the jury's verdict against Frappa for breach of confidential duty and ordered a partial retrial on trade secret liability and damages. These cases do not give a court discretion after a new trial order to dispense with claims that were never before the jury or to summarily dismiss some of the issues, but this is exactly what the court did below.

The court did not have discretion to remove "signal acquisition" from the jury and then decide the issue itself in its "new trial scope" order, even if Alifax had failed to make a sufficient case during the original trial. For the same reasons discussed above for the charge conference error, the court erred as a matter of law in ignoring the clear inference to be drawn from Alcor poaching Frappa, *Astro-Med*, 591 F.3d at 18, and from the multitude of evidence supporting that Frappa was paid to hand the signal acquisition trade secret to Alcor. *See, e.g.*, Appx15716-

49

15719. This court should thus reverse the signal acquisition order and allow Alifax to bring it before the jury if there is a new trial.

**C.      The court abused its discretion in ordering new trials on liability and damages because it relied on erroneous standards of law and ignored key evidence supporting a verdict that even the court found admittedly reasonable.**

This Court need not address the errors identified above if it agrees with Alifax that the trial court abused its discretion, substituted its fact-finding for the jury's, and overturned a verdict that was not against the weight of the evidence or unfairly prejudicial to Alcor. An "[a]buse occurs when a material factor deserving significant weight is ignored, when an improper factor is relied upon, or when all proper and no improper factors are assessed, but the court makes a serious mistake in weighing them." *Independent Oil & Chem. Workers of Quincy, Inc. v. Procter & Gamble Mfg. Co.*, 864 F.2d 927, 929 (1st Cir.1988). This happened here.

The First Circuit has explained that there are "definite limits upon a district court's right to upset a jury verdict" and a trial judge "is not a thirteenth juror who may set aside a verdict merely because he would have reached a different result." *United States v. Rivera Rangel*, 396 F.3d 476, 486 (1st Cir. 2005) (quoting *United States v. Rothrock*, 806 F.2d 318, 322 (1st Cir.1986)). Where a "new trial is

50

predicated on the district court's evaluation of the weight of the evidence rather than its concern about the effect of prejudicial acts that may have resulted in an unfair trial, . . . it [must be] quite clear that the jury has reached a seriously erroneous result." *Id.* (alteration in original). *See also Rodriguez-Valentin v. Doctors' Ctr. Hosp. (Manati), Inc.,* 27 F.4th 14, 21 (1st Cir. 2022) (trial judges "do not sit as thirteenth jurors, empowered to reject any verdict with which they disagree.").

Here, the court's new trial orders were predicated on errors of law and a disregard of substantial evidence. For liability, the court applied the wrong legal standard under RIUTSA ("use" instead of "acquisition") and ignored evidence where a jury could reasonably infer misappropriation. For damages, the court threw out the verdict based solely on testimony the court initially permitted, without determining whether the underlying evidence was properly admissible, what specific prejudice there was (if any), and whether the asserted prejudice was outweighed by the value of the testimony.

1.      *The court abused its discretion in ordering a new trial for liability because <u>use</u> of a trade secret is not needed for misappropriation.*

The court erred in granting a new trial on liability based on its opinion that the liability verdict was against the clear weight of the evidence. Alifax has

51

demonstrated above how the court was misled by Alcor's technical expert and his misleading "test" claiming that the Alifax conversion algorithm could not be used in the iSED device. *Supra* pp. 25-28. But wholly apart from this fundamental flaw in the court's analysis of the evidence, the grant of new trial was also an abuse of discretion because the court was focused on the wrong question. The ultimate issue was not whether "Alifax's algorithm was capable of producing highly accurate results in a non-Alifax device." Appx51. Instead, all that was needed to support the liability verdict was evidence of misappropriation under RIUTSA, which is satisfied where there is "[a]cquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means." R.I. Gen. Laws § 6-41-1(2)(i).

Because the court relied on "an improper factor" in evaluating the evidence—namely "use"—it was an abuse of discretion under First Circuit law to grant the new trial. *Independent Oil & Chem. Workers of Quincy, Inc. v. Procter & Gamble Mfg. Co.*, 864 F.2d 927, 929 (1st Cir.1988).

First, there is no question that Alcor "acquired" Alifax's conversion algorithm with its unique constants. As the court found at summary judgment, "[i]t is ***undisputed*** that Alifax's conversion algorithm and constants (an alleged trade

52

secret) were incorporated into some iteration of the source code for Version 104A

of the iSED's software." Appx11731 (emphasis added). The Alcor source code that

included the trade secret conversion algorithm was admitted in evidence,

Appx15902-15915, and Frappa admitted that he incorporated the constants from

Alifax's trade secret conversion algorithm into Alcor source code:

> Q. You admit, Mr. Frappa, that you included in the Alcor source code
> the four constants from the Alifax conversion algorithm that we have
> identified as 1000, minus 3, 2.2, and 1.9. Isn't that true?
>
> A. I did that.

Appx14753-14754; *see also* Appx14186-14189 (Alifax's expert testifying that he

found the constants in Alcor's source code).

Second, evidence showed that the Alifax conversion algorithm was taken

through improper means and that Alcor knew or should have known about it.

"Improper means" is expressly defined by statute to include breach or inducement

of a breach of a duty to maintain secrecy. R.I. Gen. Laws § 6-41-1(1). The jury

found that Frappa had breached his duty of confidentiality to Alifax, a finding that

remains unchallenged to this day. Moreover, Alcor induced that breach. Multiple

witnesses testified, and documents corroborated, that Alcor lured Frappa to

develop its own ESR analyzer and paid him expressly for turning over "conversion algorithms." Appx15714, Appx15716-15719.

Third, Alifax proved that the conversion algorithm constituted a trade secret. Dr. Breda developed the algorithm after months of painstaking research, analysis and experimentation. Appx13919. Alifax's expert confirmed that recreating a conversion algorithm like Alifax's would be "an arduous process" that would require "an infrastructure of devices, an infrastructure of data" and that would "definitely take months." Appx14193-14194. Evidence showed that Alifax worked to maintain confidentially, including discussing confidentiality frequently at company meetings. Appx15569, Appx13979-13981. The court found this evidence "sufficient to support the jury's conclusion that Alifax's took reasonable efforts under the circumstances to maintain the secrecy of its conversion algorithm," Appx31, and did not challenge its status as a trade secret in ordering a new trial.

Thus, the court ordered a new trial based solely on its perceived lack of "use" of the conversion algorithm by Alcor. *See, e.g.*, Appx51, Appx53, Appx54, Appx56, Appx57, Appx58. But again, a plaintiff need not show that the defendant "'used' [the plaintiff's] trade secrets; disclosure or acquisition is sufficient to constitute misappropriation, subjecting defendants to liability for actual loss and

54

unjust enrichment caused by the misappropriation." *Astro-Med*, 591 F.3d at 18.

The court itself recognized that proof of use is not required—not just once, but

many times in its summary judgment opinion. *See, e.g.*, Appx11726 (n.11) ("Use,

however, is not required under RIUTSA"); Appx11731 ("Acquisition by improper

means, even without disclosure or use, is actionable under RIUTSA.")

In summary, the court abused its discretion in granting a new trial based on a

total non-factor—use. By the court's own admissions, the weight of the evidence

fully supported the jury's liability verdict under the proper statutory factors.

2.     *The court abused its discretion in ordering a new trial on damages because Bokhart's "summary" testimony on Alcor's revenues was relevant and admissible and there was no unfair prejudice.*

The court also abused its discretion in vacating the damages verdict and

ordering a new trial solely on the basis that Alifax's damages expert, Bokhart,

allegedly "exceeded the scope" of the rule under which the court suggested he

testify. The court never explained why the limited testimony Bokhart gave was

actually inadmissible, which is the test for exceeding the scope of FRE 1006. Nor

did the court explain how the testimony was prejudicial, and it never weighed

whether the probative value of the testimony was outweighed by prejudice. The

court did, however, admit that "[a] year-long delay is one outcome that may be

reasonably inferred from the trial evidence" and that the "jury's award of $6.5 million was a rational appraisal of Alcor's unjust enrichment." Appx51. The court's failure to perform even the most basic evidentiary analysis before its harsh decision to throw out the jury's admittedly "rational" verdict was a clear abuse of discretion.

a.  <u>Bokhart's testimony, and any underlying evidence, was relevant and admissible under FRE 611(a) and 703.</u>

The sole reason the court gave for granting a new trial on damages was that Bokhart's testimony "exceeded the scope permitted by Rule 1006, unfairly prejudicing Alcor." Appx64. This ignores completely whether or not the evidence and testimony at trial was actually admissible. The First Circuit has made clear that even where "the court acted under the 'wrong' rule" in admitting testimony, "we will not reverse so long as the material was properly admissible for the same purpose under a different rule of evidence." *United States v. Nivica*, 887 F.2d 1110, 1127 (1st Cir. 1989). As such, whether or not Bokhart's trial testimony exceeded the scope of FRE 1006 is immaterial because his trial testimony was admissible under FRE 611(a) and FRE 703. The court's failure to consider the actual admissibility of the evidence before throwing out the verdict was a clear abuse of discretion.

56

The First Circuit has gone to great lengths to clarify the "easily blurred" lines between Federal Rules of Evidence 1006, 611(a) and 703. *United States v. Milkiewicz*, 470 F.3d 390, 395–398 (1st Cir. 2006). As the Circuit explained, these "rules are not mutually exclusive and often may be read together in a common sense manner." *United States v. DeSimone*, 488 F.3d 561, 576 (1st Cir. 2007). To summarize the Circuit's lengthy discourse in *Milkiewicz*, a document, demonstrative or testimony that can serve as a substitute for underlying evidence is more properly admitted under FRE 1006. *Milkiewicz*, 470 F.3d at 398. Evidence that is used for context, to "illustrate or clarify a party's position" or to "assist expert testimony" is more properly admitted under FRE 611(a) or 703. *Id.* Such contextual evidence "may be less neutral in its presentation" and may include "inferences and conclusions drawn from the underlying evidence." *Id.*

Against this backdrop, in *DeSimone*, the First Circuit found testimony proffered under FRE 1006 was admissible under FRE 703 where the witness was "qualified to testify as an expert" and where the underlying "data [was] already admitted into evidence." *DeSimone*, 488 F.3d 561, 577. This was after the court had described the evidence as "a summary. Everything listed here has been admitted [in evidence]." *Id.* (alteration in original.)

57

Similarly, in *Milkiewicz*, the First Circuit held that a trial judge did not abuse his discretion in allowing "summary" evidence at trial under FRE 611 and 703. *Milkiewicz*, 470 F.3d at 399. The court held arguments against the underlying evidence were waived because there was no objection to the underlying evidence at trial. *Id.* The First Circuit also found that there was little risk of prejudice because the court "excise[d]" potential prejudicial content from the documents in question. Finally, the court found prejudice unlikely because the underlying documents "were routine financial records, and creating summaries of the data took patience but not expertise." *Id.* at 401.

Bokhart's trial testimony in this case was one permissible means of introducing Alcor's financial documents, with minimal context and repetition of material already in the record, all of which was admissible under FRE 611(a) and 703. The only reason FRE 1006 is even at issue is that the court suggested it after excluding Bokhart's damages opinions the night before the damages phase was set to begin. Appx14952. That forced Alifax into a last-minute scramble for a way to admit evidence of Alcor's finances, because Alifax had planned to do so through Bokhart. Appx15312. FRE 1006 was the option the court proposed among many that were available for the same evidence, including testimony from Alcor's CEO

58

or another lay witness. *Id.*; *see also* Appx18481 (suggesting Alifax's manager of international business as another option). There thus seems little question that the financial documents and contextual testimony were also admissible under FRE 611(a) or 703, because they could have come in under another witness, and would have if the court had not suggested using Bokhart.

The testimony was also admissible under FRE 703. As in *DeSimone*, Alifax laid out Bokhart's qualifications as an expert. Appx15342-15345. The underlying financial evidence was admitted into evidence (Appx15957-15964 and Appx15978), and the minimal context Bokhart provided (how financials are reported in the industry, what the terms mean, etc.) was intended to help the jury navigate and understand the document. Also, just as the court in *DeSimone* found that the testimony was "a summary" and "[e]verything listed here has been admitted [in evidence]," *DeSimone*, 488 F.3d at 577, the court here, right after the testimony at issue, commented that the testimony was proper: "I've allowed him to testify as summary fact witness. That's all he's done. He hasn't expressed any opinions. He's just run the numbers, these are what the numbers are, and summarized it for the jury." Appx15393. And as more fully explained below,

59

everything in Bokhart's testimony can be found elsewhere in the record. Thus, based on *DeSimone*, Bokhart's limited testimony was admissible under FRE 703.

As in *Milkiewicz*, Alcor had no objection to the underlying financial spreadsheet; the underlying financial data has never been challenged, nor could it be, since it was Alcor's own data. Appx15366. Just as in *Milkiewicz*, the documentary evidence was routine financials, and the court admitted that damages could "be derived through simple arithmetic using the financial data from [the] spreadsheet created by Alcor and introduced through Alifax's only damages witness." Appx50. Moreover, like in *Milkiewicz*, the court "excised" any potentially prejudicial information from the testimony, removing notes relating to head start from the financial documents. Appx15356-15358; *compare* Appx11511 (original) *with* Appx15979 (trial exhibit, notes removed). Bokhart testified solely about the revenues, and the jury was free to infer the head start period from other evidence, *supra* pp. 15–16, which it apparently did. Bokhart's limited contextual testimony was thus admissible also under FRE 611(a).

Bokhart never opined at trial on Alcor's head start from its misappropriation, nor did he testify in favor of any specific damage amount. The few specific instances of testimony that the court cited in its order are not opinions on damages.

60

First, the court cited Bokhart's observation that Alcor's financial statements "didn't always agree" and that there were "inconsistencies from document to document." Appx62 (quoting Appx15346). It is not clear how this statement is an opinion on the damage amount or method of calculating damages, or how it is possibly prejudicial—it is simply on observation about the document. Likewise, Bokhart's testimony that revenues are not determined by "taking a look at just a number for sales of an item" is not a damages opinion, it's a general explanation about how revenues work, again for context of the admitted spreadsheet.

   b. <u>Bokhart's testimony created no prejudice and the court did not even analyze prejudice.</u>

  Fundamentally, the court abused its discretion in ordering a new trial based on having allowed Bokhart's admissible testimony because there was no prejudice and the court could not cite any specific prejudice to Alcor. Most significantly, once Alifax had introduced evidence of Alcor's sales, the burden shifted to Alcor to establish any portion of the sales not attributable to the trade secret. *See* appx15307-15309. Alcor was not prejudiced by any testimony about test cards or accessories because it had both the opportunity on cross-examination and through its own expert, Ronan Arad, to correct any factual errors. Why did Alcor choose not to introduce any testimony from its own expert on its financial spreadsheet?

Because there were no errors in any evidence offered by Bokhart, and any testimony from Alcor's expert would only bolster Alifax's damage claim. This is not prejudice.

The court's conclusion that Bokhart's testimony was "too closely entwined with his excluded expert opinion" because it was purportedly based on "thousands of documents" he reviewed and his "accounting expertise" also did not speak to prejudice. Appx62. The court's focus on convoyed sales, asserting that there was "no evidence from any other witness" concerning convoyed sales items, like "test cards," ignored the grouping of Alcor's tests, controls and other accessories in its underlying financial documents. *Id.* at 63. Further, the sale of tests, controls and calibrators was so closely related to the sale of iSED devices that Frappa insisted on a royalty that included these convoyed sales. Appx15714. Clearly, Alcor did not want evidence of its significant recurring sales before the jury, but it was not unfairly prejudiced because the truth came out, especially when it had the chance to correct any errors both through cross-examination and through its own expert.

Given these facts, the court abused its discretion by "vastly overestimate[ing] the danger of unfair prejudice" from Bokhart's testimony. *Espeaignnette v. Gene Tierney Co.*, 43 F.3d 1, 5 (1st Cir. 1994). In particular, the

62

court's failure to weigh the alleged prejudice against the importance of this evidence to Alifax's case was also a clear abuse of discretion. *United States v. Frabizio*, 459 F.3d 80, 91 (1st Cir. 2006).

The First Circuit requires more for a finding of prejudice. For example, in *United States v. Sawyer*, 85 F.3d 713, 740 (1st Cir. 1996), the First Circuit permitted summary testimony were the underlying (summarized) evidence was already admitted and where the other party had opportunity to cross-examine the summary witness (which it did) to enter its own contrary evidence (which it did not). Likewise, in *United States v. Nivica*, 887 F.2d 1110, 1126 (1st Cir. 1989), the First Circuit allowed summary testimony where the nature of the testimony was properly explained to the jury, where the underlying evidence was admitted and where the other party was given opportunity to cross-examine. Finally, in *Javelin Inv., S.A. v. Municipality of Ponce*, 645 F.2d 92, 96 (1st Cir. 1981), despite a summary exhibit being "poorly prepared and contain[ing] at least one error," it was found to present no prejudice because the underlying data was submitted to the jury and the evidence was thoroughly examined during trial.

In the end, the court itself recognized that the damages in this case "can be derived through simple arithmetic using the financial data from [the] spreadsheet

63

created by Alcor" and that the jury's ultimate verdict was "rational appraisal of Alcor's unjust enrichment." Appx51. How can a rational appraisal of unjust enrichment simultaneously constitute a "miscarriage of justice?" The court abused its discretion in granting a new trial on damages without finding any true prejudice from the testimony that it both allowed Bokhart to give and approved as appropriate afterwards.

## CONCLUSION

In light of the court's many legal errors and abuses of discretion, Alifax respectfully requests foremost that court's post-trial rulings be reversed and that this Court reinstate the jury verdict of willful misappropriation of trade secrets by Alcor and the $6.5 million award for unjust enrichment. At the least, if this Court believes that a new trial is warranted, Alifax respectfully requests that court's rulings removing signal acquisition from the jury and precluding compensatory damages be reversed and the case remanded for a full and fair new trial.

Respectfully submitted,

Dated: July 1, 2022

/s/ Todd R. Tucker
Todd R. Tucker
ttucker@calfee.com
Joshua A. Friedman
jfriedman@calfee.com
CALFEE, HALTER & GRISWOLD LLP

64

1405 East Sixth Street
Cleveland, OH 44114-1607
216-622-8200

Robert H. Stier Jr.
rstier@pierceatwood.com
Christopher A. Baxter
cbaxter@pierceatwood.com
PIERCE ATWOOD LLP
1 New Hampshire Ave
#350 Pease International Tradeport
Portsmouth, NH 03801
603-373-2079

ADDENDUM

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

```
_____
                               )
ALIFAX HOLDING SPA,            )
                               )
          Plaintiff,           )
                               )
     v.                        )    C.A. No. 14-440 WES
                               )
ALCOR SCIENTIFIC INC.; and     )
FRANCESCO A. FRAPPA,           )
                               )
          Defendants.          )
_____)
```

## OPINION AND ORDER

WILLIAM E. SMITH, Chief Judge

   This intellectual property odyssey came before the Court for a three-week jury trial in the spring of 2019.  The jury found that the Defendants willfully misappropriated two of plaintiff Alifax Holding SpA's trade secrets in violation of Rhode Island law.  The jury also found that defendant Francesco Frappa alone misappropriated a third trade secret and breached his confidential relationship with Alifax under Italian law.[1]  The jury awarded Alifax $6.5 million in unjust enrichment damages.  Before the Court are the Defendants' post-trial motions, which renew their requests

--------

   [1] The jury's verdict concerning the third trade secret – "information concerning an anemia factor set forth in exhibits 19 and 34," see Jury Verdict Form Phase I: Liability, ECF No. 292 – is not the subject of the pending post-trial motions.

for judgment as a matter of law[2] and, in the alternative, seek a new trial or remittitur.[3] See Alcor's Mot. for a New Trial, or in the Alternative, for Remittitur ("Mot. for New Trial"), ECF No. 303; Alcor's Renewed Mot. for J. As A Matter of Law ("Renewed Mot. for JMOL"), ECF No. 304.

Three sophisticated parties aided by experienced counsel and experts locked horns in this dispute for nearly half a decade. In contrast, a lay jury was asked to grasp unfamiliar technological and mathematical concepts amid a complex and shifting web of legal theories in a tiny fraction of that time. The Court has calibrated

---

[2] Frappa's renewed request for judgment as matter of law on Count III is considered in a separate order filed contemporaneously with this opinion. The Court asked for supplemental briefs regarding whether the exclusion of Alifax's theory of damages pertaining to Frappa individually necessitates a judgment in his favor on Count II. Trial Tr. vol. 11, 29:19-21, May 1, 2019. Such briefing never materialized; the parties glibly addressed the issue in their other filings. The Court concludes that the Defendants' liability on Count II is joint and several. Melvin F. Jager, 1 Trade Secrets Law § 3.42, at n.4.10 (2019) (citing cases); see also Salton, Inc. v. Phillips Domestic Appliances & Personal Care B.V., 391 F.3d 871, 877 (7th Cir. 2004); Fishkin v. Susquehanna Partners, G.P., Civil Action No. 03-3766, 2007 WL 853769, at *3 (E.D. Penn. Mar. 19, 2007). Thus, Alifax's untimely disclosure of its theory does not extinguish the claim against Frappa. As Frappa's other grounds for judgment as a matter of law were co-extensive with Alcor's, see Trial Tr., Vol. 6, 110:10-120:4, Apr. 24, 2019, the Court construes the balance of Alcor's Rule 50(b) motion as a joint motion.

[3] Considering the Court's rulings on the Defendants' Rule 50(b) motion, the Court accepts Alcor's invitation to construe its Rule 59 motion as a joint request from both defendants. See Mot. for New Trial 1, n.1.

Appx2

the rigor of its post-trial assessment to reflect the length and complexity of this action.

Regarding the Defendants' Rule 50(b) motion, the Court finds that Alifax failed to introduce sufficient evidence that using a clear, plastic photometer sensor ("CPS") in an ESR analyzer was a protectable trade secret under the Rhode Island Uniform Trade Secrets Act ("RIUTSA"), R.I. Gen. Laws § 6-41-1 et seq. Thus, for the reasons that follow, the jury's verdict regarding this theory of liability must be vacated and judgment must enter for the Defendants. The Defendants' Rule 50(b) motion is otherwise denied.

As for the Defendants' request under Rule 59, the Court has conducted an exhaustive review of the trial record. Important policies discourage overturning a jury's verdict, and there is no doubt that the jury in this action made a conscientious effort to find the facts and apply the law. Nevertheless, after a careful examination of evidence, the Court is left with a firm and abiding conviction that the verdict finding that the Defendants' misappropriated Alifax's secret conversion algorithm is contrary to the clear weight of the evidence. The Court is similarly persuaded that Alifax's sole damages witness exceeded the scope permitted by Federal Rule of Evidence 1006 and that a dramatic trial exhibit (a prototype black reading cell) was admitted in error, unfairly prejudicing the Defendants. These findings justify a new trial on what remains of Count II.

I.  Background

The legal and technical principles that drive this dispute are complex.  The story is simple.[4]  Alifax produces automated clinical instruments that are used to determine the erythrocyte sedimentation rate ("ESR") of human blood samples.[5]  Francesco Frappa, an employee of an Alifax subsidiary, departed the company and began working with Alcor, a Rhode-Island based competitor.[6]  Within a year, Alcor debuted a new instrument – the iSED – with rapid analytical capabilities comparable to Alifax devices.  This thunderous litigation ensued.

Alifax has accused Alcor and Frappa of developing the iSED by pilfering its intellectual property.  Alifax's claims included the following:  (1) infringement of two patents under 35 U.S.C. § 271; (2) willful and malicious misappropriation of numerous trade secrets under the Rhode Island Uniform Trade Secrets Act ("RIUTSA"), R.I. Gen. Laws § 6-41-1 et seq.; (3) breach of Frappa's

---

[4] Only the context for the Defendants' Rule 50 and Rule 59 motions is provided here.  A more detailed chronicle of particular chapters from this dispute can be found in the Court's prior rulings.  See, e.g., Alifax Holding SpA v. Alcor Sci. Inc, No. CV 14-440 WES, slip op. (D.R.I. Mar. 26, 2019); Alifax Holding SpA v. Alcor Sci. Inc., 357 F.Supp.3d 147 (D.R.I. 2019).

[5] ESR is a common clinical test that is used to detect non-specific inflammation.

[6] Frappa was employed by Sire Analytical S.r.l.  During this litigation, Sire merged completely into Alifax.  Unless otherwise noted, the Court refers herein to both entities simply as "Alifax."

4

confidential relationship with Alifax; and (3) copyright infringe-

ment. <u>See generally</u> Second Am. & Suppl. Compl., ECF No. 68; Pl.'s

Identification of Misappropriated Trade Secrets, ECF No. 61-4.

Alcor and Frappa have always denied these contentions. Alcor even

counterclaimed, seeking declarations of patent invalidity and al-

leging Alifax intentionally interfered with its prospective con-

tractual relations. Defs.' Ans. to Pl.'s Second Am. & Suppl.

Compl. & First Am. Countercl. ("Ans.") ¶ 43, ECF No. 71.

The parties filed dispositive motions targeting various

claims in mid-2018. In that context, the Court ruled that Italian

law governed the substance of Alifax's cause of action for breach

of a confidentiality relationship. <u>Alifax Holding SpA v. Alcor

Sci. Inc.</u>, 357 F. Supp. 3d 147, 152 (D.R.I. Jan. 8, 2019). The

Court denied the Defendants' motion for summary judgment on the

claims of patent infringement, trade secret misappropriation, cop-

yright infringement, and patent invalidity. <u>Alifax Holding SpA v.

Alcor Sci. Inc</u>, No. CV 14-440 WES, slip op. at 40 (D.R.I. Mar. 26,

2019). As the Court observed, a hairsbreadth stood between some

of Alifax's claims and an adverse result. <u>Id.</u> Regardless, the

<u>Noerr-Pennington</u> doctrine supported summary judgment for Alifax on

Alcor's intentional interference counterclaim. <u>Id.</u>

The parties tried the remaining claims to jury over three

weeks in April and May 2019. The trial was bifurcated into two

phases: liability and damages. Prior to the start of trial, the

5

Court excluded the copyright-related opinion of Alifax's damages expert.  See Alifax Holding SPA v. Alcor Sci. Inc., C.A. No. 14-440 WES, 2019 WL 1579503, *1 (D.R.I. Apr. 12, 2019).  Without a theory of damages, the parties agreed that Alifax's copyright claim was "out of the case."  Trial Tr. vol. 1, 3:10-16, Apr. 15, 2019.  It was not tried to the jury.  Five days of testimony later, Alifax expressed that it no longer wished to proceed on its patent in-fringement claims.  Trial Tr. vol. 5, 4:7-10, Apr. 22, 2019.  Without objection from any party, the Court reconsidered its March 26th ruling and granted summary judgment for Alcor on Count I of Alifax's Second Amended Complaint.  Id. at 77:16-78:7.  The parties also executed a covenant not to sue, which disposed of Alcor's invalidity counterclaims.  Id. at 78:11-79:14.  Thus, at the end of the liability phase, the jury deliberated over just two claims: misappropriation of trade secrets and breach of a confidential relationship.  By that time the number of alleged trade secrets had been whittled down to four.

On April 30, 2019, the jury returned its verdict.  The jury found for Alifax, concluding that Alcor and Frappa misappropriated two of Alifax's trade secrets:

1. Using a clear, plastic capillary photometer sensor ("CPS") in an automated ESR analyzer, but only through February 6, 2014; and

2. Portions of computer program source code con-cerning the conversion of photometric

>       measurements, including source code contain-
>       ing four specific conversion constants.

Jury Verdict Form Phase I: Liability, ECF No. 292.  It also found

Frappa (but not Alcor) misappropriated a trade secret comprised of

"[i]nformation concerning an anemia factor . . . ".  <u>Id.</u>  The jury

found that both Defendants had acted willfully and maliciously.

<u>Id.</u>  At the conclusion of damages phase, the jury awarded Alifax

$6.5 million in unjust enrichment damages attributable to Alcor's

misappropriation of Alifax's source-code related trade secret.[7]

Jury Verdict Form Phase II: Damages 2, ECF 299.  One dollar in

nominal damages was awarded for the Defendants' misappropriation

of the CPS-related trade secret.

II. Legal Standard

     Granting judgment as a matter of law to overturn a jury's

verdict is warranted only if no reasonable jury could have found

for the non-moving party.  Fed. R. Civ. P. 50; <u>Rinsky v. Cushman

& Wakefield, Inc.</u>, 918 F.3d 8, 26 (1st Cir. 2019).  The Court must

examine the evidence from the nonmovant's case-in-chief, draw all

reasonable inferences in the non-movant's favor, and determine

---

[7] The Court ruled that the jury would not be permitted to
award damages based on Frappa's alleged unjust enrichment as an
individual because Alifax failed to adequately disclose that the-
ory prior to trial.  Trial Tr. vol. 11, 28-29, May 1, 2019.  The
Court also ruled that Alifax would be held to its representation
that it was only seeking nominal damages for misappropriation of
the CPS-related trade secret.

whether the verdict has a sufficient evidentiary basis. Zimmerman v. Direct Fed. Credit Union, 262 F.3d 70, 75 (1st Cir. 2001); Coyante v. Puerto Rico Ports Auth., 105 F.3d 17, 22 (1st Cir. 1997) (confining Rule 50 review to "the record upon which the plaintiff rested her case . . ."). The Court "may not consider the credibility of witnesses, resolve conflicts in testimony, or evaluate the weight of the evidence." Barkan v. Dunkin' Donuts, Inc., 627 F.3d 34, 39 (1st Cir. 2010). A verdict cannot be jettisoned with caprice; the evidence must "point[] unerringly to an opposite conclusion." Zimmerman, 262 F.3d at 75. Nevertheless, claims built on conjecture, speculation, or a "mere scintilla" of evidence do not pass muster. Katz v. City Metal Co., 87 F.3d 26, 28 (1st Cir. 1996). If a district court grants a renewed motion for judgment as a matter of law, it must make a conditional ruling on whether it would grant a new trial if the judgment is later vacated. Fed. R. Civ. P. 50(c)(1); Jennings v. Jones, 499 F.3d 2, 21 (1st Cir. 2007).

A trial court has much greater discretion under Rule 59. Jennings v. Jones, 587 F.3d 430, 436 (noting that a trial court may exercise "broad legal authority" in this context). A district court may order a new trial "whenever, in its judgment, the action is required in order to prevent injustice." Id. (quotations omitted);

8

Ins. Co. of N. America v. Musa, 785 F.2d 370, 375 (1st Cir.1986) (stating grounds for a new trial include finding "the verdict is against the clear weight of the evidence, is based upon evidence that is false, or resulted from some trial error and amounts to a clear miscarriage of justice.") (quotation marks omitted). The Court is not bound by Rule 50's strictures. It is free to consider witnesses' credibility, independently weigh the proof, and order a new trial "even where the verdict is supported by substantial evidence." Jennings, 587 F.3d at 439 (quoting Lama v. Borras, 16 F.3d 473, 477 (1st Cir. 1994)). The Court may also order a new trial if any legal or factual errors were sufficiently grievous "as to have rendered the trial unfair.'" Astro-Med, Inc. v. Plant, C.A. No. 06-533 ML, 2008 WL 4372727, *1 (Sept. 23, 2008), aff'd sub nom. Astro-Med, Inc. v. Nihon Kohden America, Inc., 591 F.3d 1 (1st Cir. 2009) (quoting Parker v. Town of Swansea, 310 F. Supp.2d 356, 370 (D. Mass. 2004)). Still, district courts must exercise their discretion with caution. See Jennings, 587 F.3d at 436 ("[T]rial judges do not sit as thirteenth jurors, empowered to reject any verdict with which they disagree.").

Alcor has also asked the Court to consider an alternative course: remittitur. If the court finds that jury's damages were excessive or contrary to the weight of the evidence, a district court may compel a victor to accept either a new trial on damages or a reduced award. See Conjugal P'ship Comprised by Joseph Jones

9

& Verneta G. Jones v. Conjugal P'ship Comprised of Arthur Pineda & Toni Pineda, 22 F.3d 391, 397 (1st Cir. 1994); see also Phelan v. Local 305, 973 F.2d 1050, 1064 (2d Cir.1992). A court-ordered abatement is justified if, when considered in the most favorable light to the prevailing party, the jury's award "exceeds any rational appraisal or estimate of the damages that could be based upon the evidence before [the jury]." E. Mountain Platform Tennis, Inc. v. Sherwin-Williams Co. Inc., 40 F.3d 492, 502 (1st Cir. 1994); see also Trainor v. HEI Hosp., LLC, 699 F.3d 19, 32 (1st Cir. 2012) (holding remittitur required when evidence was "so thin" that award was "vastly out of proportion" to maximum recovery supported by evidence). The First Circuit follows the "maximum recovery rule." Trainor, 699 F.3d at 33. Thus, any remittitur must reflect "the highest reasonable total of damages for which there is adequate evidentiary support." Marchant v. Dayton Tire & Rubber Co., 836 F.2d 695, 704 (1st Cir. 1988).

III. Discussion

    A.    The Clear, Plastic Capillary Photometer Sensor Trade Secret

        1.    Alifax Did Not Introduce Legally Sufficient Evidence to Support Its Claim That The CPS-Related Trade Secret Was Protectable Under RIUTSA.

Alcor argues that the Court should vacate the jury's liability verdict on Alifax's CPS-related trade secret claim because Alifax failed to introduce evidence showing that the first asserted trade

secret – "[u]sing a clear, plastic capillary photometer sensor ("CPS") in an automated ESR analyzer" – satisfied RIUTSA's requirements for protectability.  See Renewed Mot. for JMOL 4-15. Alcor alternatively requests a new trial on this claim.  See Alcor's Mot. for New Trial 4-11.  The Court agrees on both scores.

RIUTSA defines a "trade secret" in broad terms.  The statute protects:

> [I]nformation, including a formula, pattern, compilation, program, device, method, technique, or process, that:
>
> (i) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
>
> (ii) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

R.I. Gen. Laws § 6-41-1(4).  The Court required Alifax to disclose "with reasonable particularity" the trade secrets it alleged the Defendants misappropriated. [8]  Scheduling Order ¶ 3, ECF No. 36. This request was not busy work.  It is a common-sense requirement

---

[8] Such disclosure orders are commonplace in trade secret misappropriation cases. See, e.g., DeRubeis v. Witten Techs., Inc., 244 F.R.D. 676, 681 (N.D. Ga. 2007) (analyzing discovery considerations and finding "it is appropriate . . . to require [the plaintiff] to first identify with 'reasonable particularity' those trade secrets it believes to be at issue"); BioD, LLC v. Amnio Tech. LLC, No. 2:13-cv-1670-HRH, 2014 WL 3864658 (D. Ariz. Aug. 6, 2014).

11

that furthers the practical needs of discovery and a basic premise
of misappropriation claims: a party must be able to identify its
asserted trade secrets with reasonable specificity.   See, e.g.,
IDX Sys. Corp. v. Epic Sys. Corp., 285 F.3d 581, 583 (7th Cir.
2002); Dow Chem. Canada, Inc. v. HRD Corp., 909 F. Supp. 2d 340,
346 (D. Del. 2012); Utah Med. Prods., Inc. v. Clinical Innovations
Assoc., Inc., 79 F. Supp.2d 1290, 1313 (D. Utah 1999), aff'd, 251
F.3d 171 (Fed. Cir. 2000).

Like other embodiments of the Uniform Trade Secrets Act
("UTSA"), RIUTSA does not protect "general categories of infor-
mation" from exploitation.   Luigino's, Inc. v. Peterson, 317 F.3d
909, 912 (8th Cir. 2003); Sarkissian Mason, Inc. v. Enter. Hold-
ings, Inc., 955 F. Supp.2d 247, 255 (S.D.N.Y. 2013), aff'd, 572
Fed. Appx. 19 (2d Cir. 2014).   To show a protectable interest, a
plaintiff "must assert specific allegations that it possessed in-
formation that meets the definition of trade secret under [the
act] and must proffer evidence that Defendants actually received
the trade secret and improperly used it."   Sun Media Sys., Inc. v.
KDSM, LLC, 564 F. Supp.2d 946, 965 (S.D. Iowa 2008) (interpreting
language of Iowa UTSA); see also IDX Sys. Corp., 285 F.3d at 583
(affirming summary judgment for defendants on misappropriation
claim because plaintiff "failed to identify with specificity the
trade secrets that it accuses the defendants of misappropriat-
ing."); Imax Corp. v. Cinema Techs., Inc., 152 F.3d 1161, 1164

(9th Cir. 1998) ("A plaintiff seeking relief for misappropriation of trade secrets 'must identify the trade secrets and carry the burden of showing that they exist.'").

The uniform statute's language is the source of this principle. A fact finder cannot judge whether an alleged trade secret has "independent economic value" if its contours are not reasonably defined. See R.I. Gen. Laws § 6-41-1(4)(i). Nor could one assess whether such information is not generally known or readily ascertainable. See Dow Chem. Canada, Inc., 909 F. Supp. 2d at 346 (holding trade secret "must be particular enough as to separate the trade secret from matters of general knowledge in the trade or of special knowledge of persons skilled in the trade."); Utah Med. Prods., Inc., 79 F. Supp.2d at 1313 (concluding plaintiff "must define its claimed trade secret with the precision and particularity necessary to separate it from the general skill and knowledge possessed by [defendants].").

Alifax first identified its asserted trade secrets in May 2016. See Pl.'s Identification of Misappropriated Trade Secrets, ECF No. 61-4. It amended its disclosures twice over the ensuing ten months. See Pl.'s First Am. Identification of Misappropriated Trade Secrets, ECF No. 61-5; Pl.'s Second Am. Identification of Misappropriated Trade Secrets ("Pl.'s Second Disclosure"), ECF No. 137-27. The scope of its trade secret claims narrowed further at summary judgment. See Mem. of Law in Opp'n to Defs.' Mot. for

13

Partial Summary J. 13 n.2, ECF No. 167 (dropping asserted trade secrets concerning the means of creating a capillary channel in the plastic CPS or the use of screws with Teflon washers). Each and every one of Alifax's pretrial disclosures describes the material for the plastic CPS as "a single, block of <u>clear</u> acrylic" and defines the component as a "hard <u>transparent</u> block with a capillary channel inside . . . ". Pl.'s Second Disclosure ¶¶ 1-2 (emphasis added).

Based on Alcor's disclosures, the Court defined the CPS-related trade secret at the close of the liability phase as "[u]sing a clear, plastic capillary photometer sensor ("CPS") in an automated ESR analyzer, but only through February 6, 2014." <u>See</u> Verdict Form Phase I: Liability, ECF No. 292; Charge Conf. Tr. 7-11, Apr. 26, 2019, ECF No. 345. The Court included the term "clear" over Alifax's objection and explained its rationale. <u>See</u> Charge Conf. Tr. 7:18-8:17. Paragraph 1 of Alifax's disclosure described the CPS as a "transparent block." Pl.'s Second Disclosure ¶ 1. Paragraph 2 described the CPS as a component made from "a single[] block of clear acrylic." <u>Id.</u> ¶ 2. Thus, paragraph 2 simply specified the material (clear acrylic) for the "transparent block" referenced in paragraph 1. Charge Conf. Tr. 10.[9] The question

_____

[9] Contrary to Alifax's argument, the liability phase charge conference was the first time that Alifax suggested it was asserting two separate CPS-related trade secrets. <u>See</u> Charge Conf. Tr. 10; <u>see also</u> Mem. of Law in Opp'n to Defs.' Mot. for Partial

confronting the Court is whether the evidence at trial can be rationally linked to the identified trade secret (a clear, plastic CPS).

Viewed in the light most favorable to the verdict, Alifax's trial evidence showed that it was developing a CPS that was black or made of "dark material" to increase its analyzer's reliability and reduce maintenance. Two witnesses, Giovanni Batista Duic and Dr. Paolo Galiano, testified that "La Mecca" was a project to improve Alifax's instruments by replacing the Teflon tubing with a plastic reading cell.[10]  Trial Tr. vol. 2, 40:7-41:6, Apr. 16, 2019; Trial Tr. vol. 6, 82:21-83:6.  In 2008, Frappa corresponded with an Alifax vendor about producing "La Mecca" reading cells by using a "completely opaque . . . varnish or a thin layer of black plastic material" to create an "optical shield" around a clear reading cell.  See Trial Ex. 421.  This evidence comports with Frappa's account of "La Mecca" in his October 2011 technical

_____

Summary J. 12-13 ("the use of a plastic reading cell in a capillary ESR analyzer was a trade secret") ("the use of a plastic reading cell as a component in the Alifax ESR analyzer was not generally known").  Alifax pressed that the Court's characterization of the asserted trade secret at summary judgment (which was silent as to CPS's opacity) was more accurate.  But that issue was not before the Court at that time and was not ruled on in the Court's decision. The question at summary judgment was whether a genuine dispute existed about incorporating a plastic CPS into an ESR analyzer. See Alifax Holding SpA v. Alcor Sci. Inc., No. CV 14-440 WES, slip op. at 18-20 (D.R.I. Mar. 26, 2019).

    [10] The terms "reading cell" and CPS are synonymous.

report.  See Trial Ex. 33.  It describes the reading cell as a
"block of dark material with a transparent area, inside, [sic]
which can be traversed by the light . . . ".  Id.  The codename
"Mecca" was itself a reference to the reading cell's dark plastic
material (i.e., to the Kaaba in Mecca, Saudi Arabia).  See Trial
Tr. vol. 2, 41:1-8. There is no mention of a "clear" or "trans-
parent" reading cell.  Duic confirmed that Frappa's report was
"accurate and complete."  Id. at 108:23-25.

What Duic could not confirm was that Sire employed Frappa
when the company produced both clear and black prototype reading
cells.  Trial Tr. vol. 2, 53:4-8.  He affirmed – at most – that
the prototypes in Fall 2011 were black.  Id. at 53:11-12.  Several
days later, Alifax introduced a tangible prototype of a  black
reading cell introduced into its analyzers in 2014.  See Trial Ex.
136.  Alifax's counsel invited the jury to compare the prototype
to Alcor's design drawings for a plastic CPS in his summation.
See id.; Trial Tr. vol. 9, 54:10-11, Apr. 29, 2019.

Alifax now claims that the color of the CPS is irrelevant.
Pl.'s Opp'n to Def. Alcor Sci. Inc.'s Renewed Motion for J. as a
Matter of Law ("Opp'n to JMOL") 6-7, ECF No. 313.  That cannot be.
Alifax's asserted trade secret was not the use of any plastic CPS
in an automated ESR analyzer.  It was the use of a plastic CPS
that was "transparent" and made from a block of "clear
acrylic."  These are the particular features Alifax used to

16

distinguish its trade secret from general industry knowledge.  Fur-
thermore, Alifax contends that this information constituted a
"combination" trade secret comprised of public domain elements.
See Opp'n to JMOL 7; Pl. Alifax Holding SpA's Opp'n to Def. Alcor
Sci. Inc.'s Mot. for a New Trial, or in the Alternative, for
Remittitur ("Opp'n to New Trial") 6, ECF No. 314.  For such in-
formation to be protectable, the "unified process" resulting from
the asserted combination must "afford[] a competitive ad-
vantage."  Imperial Chem. Indus. Ltd. v. Natl. Distillers & Chem.
Corp., 342 F.2d 737, 742 (2d Cir. 1965).  In other words, the
elements of the combination trade secret must together create in-
dependent economic value. See, e.g., Electro-Craft Corp. v. Con-
trolled Motion, Inc., 332 N.W.2d 890, 900 (Minn. 1983) (explaining
that independent economic value element of UTSA "carries forward
the common law requirement of competitive advantage"); Champion
Foodservice, LLC v. Vista Food Exch., Inc., No. 1:13-CV-1195, 2016
WL 4468001, *12 (N.D. Ohio August 24, 2016) (granting summary
judgment as plaintiff "advanced no evidence as to how the unique
combination of the database files—taken as a whole—constitutes
information not readily available to the public or within the
industry, or how this unified combination of information provides
Champion with a competitive economic advantage within the indus-
try.")

17

Here, evidence of an essential element of the "unique combi-
nation" claimed by Alifax throughout this litigation was missing:
the clear reading cell.  The substance of Alifax's evidence from
its case in chief relates exclusively to the development of a CPS
made from "black" or "dark" material.  Although Frappa's May 2008
email makes passing mention of a clear reading cell, the same
passage refers to covering such a cell in "a completely opaque
layer of varnish or a thin layer of black plastic material . . .".
See Trial Ex. 421.  This speck of evidence cannot, by itself,
support the conclusion that Alifax was developing a clear reading
cell for use in its ESR analyzers during the relevant time period.

This was not the only flaw in Alifax's case concerning the
CPS-related trade secret. It is well-established that information
that a party can acquire through "normal business channels" is not
protectable.  APG, Inc. v. MCI Telecomm. Corp., 436 F.3d 294, 307
(1st Cir. 2006) (affirming summary judgment for defendant on mis-
appropriation claim holding disputed information was "obtainable
within normal business channels," even if acquired by other means);
Rego Displays, Inc. v. Fournier, 379 A.2d 1098, 1101 (R.I. 1977)
(stating that information comprises a trade secret only if it
"could not be obtained through public channels").  Thus, accepting
for argument's sake that the opacity of the CPS was immaterial,
Alifax still had to prove that its CPS-related trade secret was
not "generally known" or "readily ascertainable by proper means"

18

Appx18

by persons who could "obtain economic value from its disclosure or
use." R.I. Gen. Laws § 6-41-1(4)(i); see also Giasson Aerospace
Sci., Inc. v. RCO Engrg., Inc., 680 F. Supp. 2d 830, 841 (E.D.
Mich. 2010) ("There can be no trade secret where the 'secret' is
readily ascertainable from the public domain."); MicroStrategy
Inc. v. Business Objects, S.A., 331 F. Supp. 2d 396, 416-17 (E.D.
Va. 2004) ("If a competitor could easily discover the information
legitimately, the inference is that the information was either
essentially 'public' or is of de minimus economic value.").

Again, the Court must consider the evidence from Alifax's
case in chief in the light most favorable to the verdict.  Alifax
elicited testimony that its employees worked on the Mecca project
for several years.  See Trial Tr. vol. 2, 41:16-24.  Evidence was
introduced that Alifax worked with a third-party vendor to produce
tangible versions of the CPS component.  See id. at 41:11-15; Trial
Ex. 421.  The jury also heard some testimony concerning measures
intended to maintain the confidentiality of Alifax's company data,
including that preserving confidentiality was discussed at Alifax
R&D meetings; the company used generic email footers noting that
communications were confidential; and that Alifax provided devices
for holding company data, which was not to be stored on personal
devices.[11]  See Trial Tr. vol. 2, 31:3-17, 35:2-24; Trial Ex.  20.

_____

[11] The parties strongly dispute the import of Alifax's March
2009 non-disclosure agreement ("NDA") with its CPS manufacturer,

Alifax's evidence was bereft of additional proof concerning ascertainability. There was no evidence quantifying the man-hours or monies expended on developing a CPS component.[12] There was no evidence about the hardware found in ESR analyzers or similar diagnostic instruments produced by companies other than Alifax or Alcor. There was no evidence about the state of knowledge in the blood-testing or clinical instrument industries concerning technologies for measuring optical density.[13] Indeed, Alifax cites

---

IDEX. The Court finds that no juror could have reasonably relied on this information as probative of any reasonable effort to maintain the confidentiality of CPS-related information. The record shows, at most, that Alifax sent CPS-related specifications to IDEX almost a year before it executed an NDA and in the absence of any circumstances indicating that IDEX was obliged to maintain their confidentiality. See Trial Tr. vol. 2, 41:9-24, 108:6-10; Trial Exhibits 421, 422; see also Web Commc'ns Group, Inc. v. Gateway 2000, Inc., 889 F. Supp. 316, 320 (N.D. Ill. 1995) (finding no reasonable steps to maintain confidentiality where plaintiff disclosed allegedly confidential invention without designating documents confidential or executing a confidentiality agreement).

[12] Dr. Galiano testified that Alifax reinvests 10% of its annual profits into research and development activities, but provided no details concerning this project. See Trial Tr. vol. 6, 65:24-66:1. The Mecca project's slow progress was also attributed to Frappa's limited English proficiency and his responsibility for "other things." See Trial Tr. vol. 2, 41:24-42:6.

[13] Alifax has noted that, on cross-examination during Alcor's case, Frappa suggested that an "off-the-shelf" CPS would not work in an ESR analyzer. This testimony, however, does not explain whether using a plastic CPS in an ESR analyzer was "readily ascertainable" in the industry. Furthermore, unlike at summary judgment, there was no specific evidence at trial that its application of a CPS was novel or new in the industry. See Alifax Holding SpA v. Alcor Sci. Inc, No. CV 14-440 WES, slip op. at 19-20 (D.R.I. Mar. 26, 2019).

nothing to support the proposition in its briefing that, before Frappa joined Alcor, "no other supplier of any type of ESR analyzer had developed or used a clear plastic CPS." Opp'n to New Trial 8. Even if the Court credited that statement, "[s]imply being the first or only one to use certain information does not in and of itself transform otherwise general knowledge into a trade secret." TGC Corp. v. HTM Sports, B.V., 896 F. Supp. 751, 757 (E.D. Tenn. 1995).

The ruling in Pope v. Alberto-Culver Co., 694 N.E.2d 615, 617 (Ill. App. Ct. 1998) is also instructive.[14]  In Pope, an Illinois appellate court affirmed judgment for the defendant on a trade secret misappropriation claim. Id. at 619.  The plaintiff's alleged trade secret consisted of a lye-based hair relaxer in a squeezable tube that a consumer could use to spread the product. Id. at 616.  The Court affirmed summary judgment, agreeing that plaintiff failed to produce evidence that this combination trade secret was not comprised of information "generally known or understood" within the relevant industry. Id. at 617. "[T]he key to secrecy under the Act," the Court held, "is the ease with which information can be developed." Id. at 619.  The Pope plaintiff's asserted trade secret "could have been easily and cheaply

_____

[14] The statutory language of the Illinois Trade Secrets Act is substantially similar to RIUTSA's terms.

discovered utilizing existing technology." Id. at 618; see also
Buffets, Inc. v. Klinke, 73 F.3d 965, 968 (9th Cir. 1996) (recipes
that were "so obvious that very little effort would be required to
'discover' them" are not trade secrets).

Here, Alifax was obliged to prove that a "clear, plastic [CPS]
in an automated ESR analyzer" qualified as a trade secret. As a
court from the District of Kansas explained in Bradbury Co., Inc.
v. Teissier-duCros, "[t]here is a glaring lack of detail showing
any facts about how [the CPS-related trade secret] was not readily
ascertainable by the industry." 413 F. Supp. 2d 1209, 1227 (D.
Kan. 2006) (finding plaintiff failed to meet burden of proving a
protectable trade secret at summary judgment). There was no tes-
timony or documentary proof concerning how difficult, relative to
the state of industry knowledge, it would be to develop an ESR
analyzer that measured optical density using a plastic CPS. Al-
cor's generalized development timeline is, in and of itself, una-
vailing. See Trident Prods. & Servs., LLC v. Canadian Soiless
Wholesale, Ltd., 859 F. Supp. 2d 771, 779 (E.D. Va. 2012) ("[E]ven
if a company has expended significant resources to develop a trade
secret on its own, it cannot prevail . . . if the barrier to
obtaining that trade secret is quite low in reality."). Thus, for
at least these two reasons, the jury's verdict with respect to
misappropriation of a "clear, plastic CPS" under Count II must be
vacated.

22

2.  The Defendants Would Be Entitled to A New Trial On
    Liability for Misappropriation of the CPS-Related
    Trade Secret.

The Court would grant a new trial on the Defendants' lia-
bility for misappropriating the CPS-related trade secret even ab-
sent these evidentiary shortcomings.  Upon reflection, the Court
concludes that Trial Exhibit 136 – a prototype black reading cell
introduced by Alifax and produced on the eve of trial – should not
have been admitted into evidence.  Alifax's use of this tangible
evidence unfairly prejudiced Alcor and, by itself, justifies a new
trial.

Alifax first attempted to introduce Trial Exhibit 136 through
Duic.  See generally Trial Tr. vol. 2, 47-53.  Alcor objected based
on lack of disclosure.  Id. at 48-49.  The Court initially deferred
ruling and gave Alifax an opportunity to lay additional foundation.
Id. at 51:5-11.  Duic testified that he could not recall what
prototypes Frappa worked with and Alifax abandoned its attempt to
admit the exhibit at that time.  Id. at 53.

Alifax tried again four days later while examining Dr. Gali-
ano.  See Trial Tr. vol. 6, 77-82.  Dr. Galiano identified the
object as "the device called MECCA."  Id. 78:11.  Alcor renewed
its objection.  Id. at 78:3-5.  Counsel for Alifax explained that
the object "is simply the plastic reading cell which is one of our
trade secret components" and that it was "introduced in 2014" into

23

Alifax's products.  Id. at 79:18-80:2.[15]  Counsel also explained
that (1) Alcor had not specifically requested this object in dis-
covery, and (2) Alcor had an Alifax machine in their office, which
when combined with Frappa's knowledge, obviated any prejudice.
Id. at 80:24-81:9.  It was undisputed that Alifax had produced the
object at the final pretrial conference and that Alcor's counsel
photographed it.  Trial Tr. vol. 2, 49:11-50:4.  The Court ruled
that the exhibit was admissible for the reasons stated by Alifax's
counsel.  Trial Tr. vol. 6, 82:10-13.

    The Court should have sustained Alcor's objection.  Alcor's
purported failure to target a tangible version of the disputed
reading cell in its discovery requests is irrelevant.  Rule 26
requires a party to disclose "a copy . . . of all documents,
electronically stored information, and tangible things that the
disclosing party has in its possession, custody, or control and
may use to support its claims or defenses, unless the use would be
solely for impeachment." Fed. R. Civ. P. 26(a)(1)(A)(ii) (emphasis
added).  A party's initial disclosures must be made "without await-
ing a discovery request," Fed. R. Civ. P. 26(a)(1)(A), and must be
supplemented "in a timely manner" if the response is materially

---

[15] Regarding whether Trial Exhibit 136 reflected a component
Frappa worked on at Sire, Dr. Galiano testified on cross-examina-
tion that he could not answer questions about "technical modifi-
cations" made to Alifax instruments.  Id. at 88:10-12.

Appx24

incomplete and the additional information has not been made known to the other parties. Fed. R. Civ. P. 26(e)(1)(A). If a party fails to provide material supplemental information, it may not use that information at trial "unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

The physical properties of Alifax's CPS were always material to its trade secret misappropriation claim. The Court also has reason to doubt the contention that the substance of Trial Exhibit 136 was "made known" to the Defendants through their acquisition of one or more Alifax devices. Alifax's counsel represented that Alifax introduced the CPS represented by the exhibit into its machines in 2014. See Trial Tr. vol. 6, 79:24-25. But the deposition testimony of Alcor's CEO, Carlo Ruggeri, suggests that the Alifax devices Alcor acquired were from early 2012. See Ruggeri Dep. 162:1-22.[16] Examining machines from that period would not have revealed the proffered exhibit's substance. If a tangible version of the CPS existed and Alifax intended to use it at trial, it should have produced it during discovery. It neither did so nor offered a substantial justification for its last-minute disclosure. See Fed. R. Civ. P. 37(c)(1). Moreover, when the Court admitted the prototype, it did not fully appreciate the incongruity

---

[16] Alifax played part of this testimony for the jury during its case-in-chief.

25

between the proffered exhibit, the description of the asserted
trade secret as a "clear" plastic block, and the complete dearth
of evidence described above. With the benefit of 20/20 hindsight,
the correct outcome dictated by these facts is more apparent.

The Court also concludes that Alifax's failure to disclose
Trial Exhibit 136 was not harmless. In his summation, Alifax's
counsel urged the jury (as he urges the Court post-trial) to infer
misappropriation based on access and substantial similarity. See
Trial Tr. vol. 9 49:25-51:10; 54:3-11; Pl.'s Opp'n to New Trial
12-13. He argued that the design for Alifax' CPS "evolved into
the ultimate design . . . that's in evidence as Exhibit 136."
Trial Tr. vol. 9, 46:18-24. He invited the jury to compare Trial
Exhibit 136 and design specifications for Alcor's reading cell,
Trial Exhibit 81, physically placing the tangible object over the
drawings using the Court's document camera and achieving a com-
pelling dramatic effect. Trial Tr. vol. 9, 50:17-51:9; 54:3-11.
The Defendants, on the other hand, were hamstrung by their ina-
bility to investigate this object during discovery and challenge
its significance. Such circumstances are fundamentally unfair.
Thus, if the judgment for Alifax were not vacated, the Court would
order a new trial on liability for the CPS-related trade secret.
See Astro-Med, 2008 WL 4372727 at *1.

A judge must make snap judgments at trial that are guided by
experience    and    instinct    (and    often    based    on    imperfect

26

information).  At other times, a judge is afforded time and space
for effortful deliberation and reflection.  To borrow an analogy
offered by an observer of our profession: district judges sometimes
act like tortoises; at other times, they must act like hares.[17]
Rule 59 provides a means for the tortoise to correct the hare's
occasional wrong turns.  This is one such occasion.

B.    The Conversion Algorithm Containing Four Specific
Constants

The Court has remarked on infirmities in Alifax's proof of
trade secret misappropriation.  See, e.g., Alifax Holding SpA v.
Alcor Sci. Inc., No. CV 14-440 WES, slip op. at 19, 27 (D.R.I.
Mar. 26, 2019).  But a Rule 50 analysis is "weighted toward preser-
vation of the jury verdict." Rodowicz v. Massachusetts Mut. Life
Ins. Co., 279 F.3d 36, 41 (1st Cir. 2002).  And after scrutinizing
the trial record, the Court concludes that there was a legally
sufficient basis to support the jury's verdict that the Defendants
misappropriated Alifax's proprietary conversion algorithm.

While this conclusion forecloses a directed verdict for the
Defendants, Alifax's victory is pyrrhic.  The Court finds that,
regarding liability, the clear weight of the credible evidence is

---

[17] See Malcolm Gladwell, Episode 1: Puzzle Rush, Revisionist
History (2019), at http://revisionisthistory.com/seasons?se-
lected=season-4; Malcolm Gladwell, Episode 2: The Tortoise and the
Hare, Revisionist History (2019), at http://revisionisthis-
tory.com/seasons?selected=season-4.

27

inconsistent with the jury's verdict; regarding damages, Alifax's evidence of Alcor's gross revenues allegedly attributable to its misappropriation unfairly transgressed the boundaries of Rule 1006. Thus, a new trial is warranted.

> 1. Legally Sufficient Evidence Supported the Verdict that Alifax's Conversion Algorithm Was a Trade Secret.

The jury's finding that the conversion algorithm was a trade secret was reasonably supported by Alifax's evidence. The "golden standard" for determining ESR is known as the Westergren test. See Trial Tr. vol. 1, 82:2-5. This test is time consuming. A technician must mix the blood sample, fill a graduated pipet, wait an hour while the pipet remains stable, and visually determine the sedimentation of red blood cells from plasma. Id. at 82:15-83:16. An ESR analyzer automates this process. It provides rapid results by taking optical density measurements of a blood sample in just seconds. Id. at 111:8-112:1. These values can be correlated to the results from hour-long Westergren tests. Id. Converting the optical data into a reliable, Westergren-correlated ESR value is a critical step in the process. See, e.g., id. 94:20-23.

Duic testified that there were "no mathematical models in the market" for correlating optical signal data to Westergren results when Alifax developed its conversion algorithm. Id. at 94:2-50. To create such a model, Alifax ran comparative tests with more than 40,000 blood samples over ten months. Id. at 93:17-21.

28

Dr. Enzo Breda (one of Alifax's co-founders) used these results to
derive a conversion algorithm and to write the software used in
Alifax's instruments.  Id. at 94:2-12; Trial Tr. vol. 3, 105:18-
106:4, Apr. 17, 2019.  Breda's algorithm contained four easily
identifiable numerical constants:  1000, 3, 2.2 and 1.9.  Trial
Tr. vol. 3, 105:24-106:4.  Without a correlation algorithm, Ali-
fax's instruments could not generate ESR results.  See Trial Tr.
vol. 1, 94:20-23; 105:5-17.  The algorithm was not publicly known
and not readily accessible to purchasers of Alifax instruments.
See Trial Tr. vol. 3, 96:4-17.  In addition, as further explained
below, at least one rational interpretation of the evidence sup-
ports the conclusion that Alcor made some use of Alifax's algo-
rithm, indicating that the information confers some competitive
advantage.  This is enough evidence (if barely) to find that Ali-
fax's conversion algorithm containing four specific constants had
independent economic value from not being generally known or read-
ily ascertainable.  See R.I. Gen. Laws § 6-41-1.

     As for proof that Alifax undertook reasonable efforts to
maintain the secrecy of its conversion algorithm, Duic testified
that the confidentiality of company information was discussed at
development meetings attended by Frappa.  See Trial Tr. vol. 2,
31:18-32:8; Trial Ex. 20.  Frappa attended a meeting at Alifax's
Padova headquarters ten months before his departure where "[c]on-
fidentiality" was an identified agenda item.  Trial Ex. 20;

see also Trial Tr. vol. 2, 32:6-8.  Alifax provided Frappa with a
company-owned laptop connected to its servers; downloading company
information onto personal devices was prohibited.  Id. at 35:2-
24.  Dr. Galiano testified that company communications were con-
sidered "confidential."  Trial Tr. vol. 6, 98:6-15.  Emails sent
from Alifax accounts had a footer stating that, pursuant to Italian
law, the email's contents were "confidential and intended solely
for the use of the individual(s) to whom [the message] is addressed
or otherwise directed."  See, e.g., Trial Exs. 20, 34, 36.  Lastly,
it was established that Italy's national collective bargaining
agreement ("NCBA") for the mechanical engineering industry imposed
on Frappa as a matter of law "a post-employment duty of loyalty
prohibiting the disclosure or use of Alifax's confidential or pro-
prietary information in a manner that was likely to injure Alifax's
business."  See Alifax, 357 F.Supp.3d at 164.

     This proof is paper-thin.  Much of it is boilerplate stuff,
and there was no evidence showing that Alifax maintains or enforces
any written policies, procedures, or protocols touching on the
confidentiality of its information.  There was no evidence that
Alifax ensured that Frappa (or any similarly situated employee)
knew and understood the terms of the NCBA.  It is frankly stunning
to find that an international medical instrument company may rely
largely on the wording of a generic email footer to ensure the
confidentiality of its sensitive communications.  Nevertheless,

Rule 50 does not require a party to weld an air-tight case.  When
viewed in the light most favorable to the verdict, this evidence
was sufficient to support the jury's conclusion that Alifax's took
reasonable efforts under the circumstances to maintain the secrecy
of its conversion algorithm.  Accordingly, there was enough proof
to support the jury's verdict that the algorithm comprised a trade
secret and to preclude judgment as a matter of law for the Defend-
ants.  See R.I. Gen. Laws § 6-41-1.

> 2. Legally Sufficient Evidence Supported the Verdict
> that the Defendants Willfully Misappropriated
> Alifax's Conversion Algorithm.

An accusation of theft lies at the heart of this dispute:
Alifax's claim that the Defendants willfully misappropriated its
secret formula for obtaining ESR values.  At trial, the parties'
set out conflicting narratives about how Alcor developed the iSED.
Rule 50 does not permit the Court to decide who was the more
persuasive storyteller.  What matters is whether the trial evi-
dence, when considered in the most flattering light, reasonably
supports Alifax's rendition.

According to Alifax, Frappa had access to the company's con-
fidential information, including its source code and proprietary
conversion algorithm.  Trial Tr. vol. 2, 19:13-20, 22:15-23:10;
Trial Exs. 9, 11.  In August 2011, Frappa met with Alcor's CEO,
Carlo Ruggeri, in Rhode Island and discussed whether they might
work together on an ESR-related project.  Ruggeri Dep.

82:12-83:23, 90:1-25.[18]  He departed Alifax two months later and
began working with Alcor almost immediately.  See Trial Exs. 28,
39, 40.

Alcor had attempted to develop its own ESR analyzer with an
Italian company, Hospitex, in 2010.  See Trial Ex. 21.  That effort
was unsuccessful, but a changing tide accompanied Frappa's arri-
val.  Within eight months of Frappa joining the team, Alcor debuted
a new instrument at the June 2012 trade show for the American
Association for Clinical Chemistry ("AACC"): the iSED.  See Ruggeri
Dep. 143:7-144:11; Trial Tr. vol. 5, 51:18-20; Trial Ex. 77.

Marketing materials announced that the instrument wasn't
"from the future" but rather "here and now," touting the iSED's
ability to achieve results in twenty seconds with "walk away pro-
cessing" capabilities.  Trial Ex. 77.  Alcor beckoned potential
customers to have a look – "Seeing is believing." Id.  An August
6, 2012 internal Alcor email authored by its marketing director,
Mark Ecker, states that the company "has a fully functional pro-
totype for everyone to see and review."  Trial Ex. 82.

Several months later, on November 6, 2012, Frappa "committed"
iSED software source code titled "RECHON.C" to Alcor's Bitbucket
repository.  Trial Tr. vol. 5, 38:3-40:10; Trial Ex. 65.  Source

---

[18] Alifax played Carlo Ruggeri's deposition in part as part
of its case-in-chief.  See Fed. R. Civ. P. 32(a)(3).

code is comprised of commands written in a human-readable computer
programming language. Bitbucket is the brand name of Alcor's
source code version control repository. See Trial Tr. vol 3,
126:15-17; 128:6-7. Bitbucket shows when a user adds, deletes, or
alters code; it tracks historical revisions in much the same way
an author might keep an electronic file of redlined manuscript
drafts. Id. at 126:21-23. A change to the source code is called
a "commit" and reflects a snapshot of the code as of a certain
date. Id. at 127:14-17.

The November 6 commit identified Frappa as its author and was
titled "Version 1.00A." See Trial Tr. vol. 5, 41:5-7; Trial Ex.
65. On its face, the code appears to contain the numbers 1000, 3,
2.2 and 1.9.[19] Trial Ex. 65, 3-4. Alifax also introduced evidence
of a second source code file. See Trial Ex. 156; Trial Tr. vol.
3, 106:9-25. This code was not from a Bitbucket commit; it is
code produced by Alcor outside the Bitbucket environment in a file
folder with the title "1.04A." See id.; Trial Tr. vol. 3, 128:6-
22; Trial Tr. vol. 4, 18:6-16, Apr. 18, 2019. Alifax's expert,

---

[19] Alcor cites the testimony of Alcor's Chief Technology Of-
ficer, Peter Sacchetti, as additional support for this proposi-
tion. Sacchetti denied recognizing any conversion constants or
algorithm in in Exhibit 65 at trial. Alifax's counsel repeatedly
confronted Sacchetti with prior inconsistent statements from his
deposition, but such statements were admissible only to impeach
Sacchetti's credibility; they could not be considered for their
truth. See United States v. Hudson, 970 F.2d 948, 956 (1st Cir.
1992).

Dr. Bryan Bergeron, explained that the 1.04A file contained "math source code" for the iSED and identified Alifax's conversion algorithm (with its four constants) in that code. Trial Tr. vol. 3, 106:9-107:19. See also Trial Ex. 156 at ALCOR-0092342. He could not, however, pinpoint when the code contained in the 1.04A file was written or used because he never compared it to the historical Bitbucket record. Trial Tr. vol. 4, 21:5-14.

Several weeks after the November 6 commit, Frappa drafted an "iSED® Automated ESR Analyzer Correlation Test Protocol." Trial Ex. 92; Frappa Dep. 54:24-55:10. Frappa's protocol is dated November 29, 2012 and provides the specific steps for a correlation study designed to compare ESR values obtained from an iSED to those obtained from the Westergren method. Trial Ex. 92. The protocol specifically instructs that all instrument printouts should be saved and that results should be recorded on both handwritten charts and an Excel spreadsheet. Id. at 3. It also states that tests should be carried out with an iSED running "software version 1.00." Id. at 1.

Frappa made a "[f]irst commit" of the iSED "MATH.c" source code file to Bitbucket on December 1, 2012. Trial Ex. 470. Alcor began correlation testing using blood samples from Rhode Island's Fatima Hospital in late January 2013 to develop a conversion algorithm. See Trial Tr. vol. 5, 68:13-69:3, 70:8-73:14, Apr. 22, 2019; Trial Exs. 95, 97, 98. Frappa began revising the MATH.c

34

source code following these tests on January 28, 2013.  Trial Ex.
470.  Alcor refined its conversion algorithm over the ensuing
months.  It performed additional correlation testing in partner-
ship with Rhode Island Hospital in June 2013.  See Trial Tr. vol
5, 73:21-74:13; Trial Exs. 93, 104, 197.  The outcome of this
process was a fourth-degree polynomial equation.  See Trial Tr.
vol. 5, 82:8-83:2; Trial Exs. 104, 122; see also Trial Tr. vol. 8,
44:3-22, April 26, 2019. This equation comprises the conversion
algorithm Alcor uses in its iSED instruments.  Trial Tr. vol. 6,
16:12-22.

Alifax does not dispute that the Defendants developed a com-
plex equation through correlative testing between late January and
June 2013.  It claims instead that the Defendants ran other tests
between December 21, 2012 and January 9, 2013 with a device using
its proprietary algorithm (not an equation developed from testing
at Fatima and Rhode Island Hospital), achieved better results, and
exploited its use of the algorithm to market its instrument.  This
theory requires a detailed unpacking.

Trial Exhibit 92 is the cornerstone of Alifax's argument.
Attached to Frappa's protocol are results from a "Correlation Study
for ESR – ISED vs. CLSI ESR."[20]  This section of the exhibit is

---

[20] CLSI ESR is a reference to the "approved standard method-
ology (Westergren)." Trial Ex. 92.

written in a different font and style from the protocol but is
consecutively Bates-numbered. The correlation study was conducted
with "300 samples from healthy subjects" and includes a set of
typewritten and handwritten worksheets with the same data. <u>Id.</u>
The worksheets record ESR results for 311 samples using both the
Westergren method and the iSED. <u>Id.</u> Each worksheet is signed by
Frappa and has one of five handwritten dates: 12/21/12, 12/24/12,
1/03/13, 1/08/13 and 1/09/13. <u>Id.</u> at 5-24. Consistent with the
protocol, the last pages of Trial Exhibit 92 contain printouts
from an iSED. <u>Id.</u> at 25-31. The printouts identify the test
instrument as number "00027" and have a filename that corresponds
to a date, e.g., "File: 122112.XML." <u>Id.</u> at 25. The handwritten
date on each page matches the instrument-generated date. <u>Id.</u> The
second page of the attachment reports a correlation of "0.9569"
between the iSED results and the Westergren tests. <u>Id.</u> at 2. (The
Court refers to these results hereafter as the "Disputed Correla-
tion Tests.")

Alifax offered Frappa's deposition testimony about Trial Ex-
hibit 92 during its case-in-chief. Frappa confirmed that the dates
and signatures on the ESR worksheets were in his handwriting.
Frappa Dep. 56:12-57:1. He confirmed that the printouts were from
a prototype iSED and that the filenames correspond to the date the
file was created. <u>Id.</u> at 57:11-13, 58:1-8, 63:25-64:6. He agreed
that, based on the additional handwritten dates, the tests were

36

performed on the dates indicated. Id. at 58:21-21. He further agreed that a prototype instrument obtained actual ESR results from the blood samples. Id. at 59:22-60:3. In other words, the instrument obtained more than the raw optical measurements or the sample aggregation index[21]; it was performing a conversion. He could not recall the algorithm that the prototype used. Id. at 65:12-19.

Both Trial Exhibit 92 and the Rhode Island Hospital Report include scatter plots depicting the fit among the iSED-obtained ESR values and those from the Westergren tests. See Trial Exs. 92, 197. Trial Exhibit 92 expressly states that nearly a 96% correlation exists between the two values. See Trial Ex. 92 at 2. The Rhode Island Hospital Report does not provide such a calculation (known as an r-squared value). Regardless, a side-by-side comparison[22] of the two scatter plots (both contained in admitted exhibits) reveals that the Disputed Correlation Tests appear to have a higher correlation:

---

[21] For a more detailed explanation of how the device works, see Alifax Holding SpA v. Alcor Sci. Inc, No. CV 14-440 WES, slip op. at 4-5 (D.R.I. Mar. 26, 2019).

[22] Alifax elicited testimony at trial concerning how a scatter plot demonstrates the strength of a correlation. See Trial Tr. vol. 5, 64:6-65:4, April 25, 2019. In layman's terms, the stronger the correlation, the closer the plotted data cluster to the line depicted on the graph. See id.

Appx37



According to Alcor's Chief Technology Officer, Peter Sacchetti, the data in Trial Exhibit 92 were submitted to the U.S. Food and Drug Administration by Alcor to support a 2014 application made under the Clinical Laboratory Improvement Amendments, 42 U.S.C. § 263a ("CLIA").[24]  Trial Tr. vol. 5, 93:25-94:8; Trial Ex. 116.  The data was used to respond to the application reviewer's request for the comparison studies verifying Alcor's claim that the iSED

---

[23] Trial Exhibit 92 contains two scatter plots that are substantially similar.  The graph depicted here limits the range to 15 to 105 mm/h, whereas the other graph plots all data.

[24] There was unrebutted evidence that government clearance was not necessary to sell the iSED. See, e.g., Trial Tr. vol. 6, 33:3-10; Trial Tr. vol. 7, 12:22-24, 13:12-15; Trial Ex. 94.  The CLIA classification level (e.g., "moderately complex" or "highly complex") merely governs how a purchasing laboratory operates the instrument in question.  Trial Tr. vol. 6, 33:3-10.

38

produces twenty-second ESR results correlated to Westergren val-

ues.  See Trial Ex. 114 at ALCOR-0072693.

Alifax constructs the following argument to show misappro-

priation by improper use based on this evidence:

- Trial Exhibit 92 shows that Alcor had a functioning
  prototype iSED no later than December 21, 2012.
  Frappa's protocol called for the use of an iSED,
  and whatever prototype he used to conduct the Dis-
  puted Correlation Tests generated actual ESR re-
  sults with a 96% correlation to the industry
  standard Westergren method.

- Alcor did not begin writing its own conversion al-
  gorithm until January 28, 2013.  If a prototype
  iSED was obtaining ESR values before that date, it
  must have been using some other conversion algo-
  rithm.

- Frappa knew Alifax's conversion algorithm and in-
  corporated it into Alcor code for some purpose
  prior to December 21, 2012.  This is supported by
  evidence that versions 1.00A and 1.04A of Alcor's
  source code (at least one of which predates the
  Disputed Correlation Tests) contained Alifax's con-
  version algorithm and constants.

The jury could have made several reasonable inferences from this

evidence.  First, because Alifax's algorithm was the only algorithm

Alcor had before January 28, 2012, the Defendants must have used

it to obtain results from the iSED during the Disputed Correlation

Tests.  Alifax argued that Alcor submitted the Disputed Correlation

Tests to support its 2014 CLIA application because they appeared

to have a stronger correlation to the Westergren method than the

June 2013 Rhode Island Hospital tests.  Furthermore, Alifax argues

that (by working backwards from December 2012) the jury could infer

that Alcor could only have made its marketing claims at the 2012
AACC trade show as well as in its August 6, 2012 email (the gist
of which was that the company presently had a functioning instru-
ment) if it was already using Alifax's proprietary information.[25]

These arguments are circumstantial to be sure. That alone is
unremarkable. See, e.g., Pioneer Hi-Bred Int'l. v. Holden Found.
Seeds, Inc., 35 F.3d 1226, 1239 (8th Cir.1994) ("Wrongful taking
of a trade secret can be found based on circumstantial evidence."
(quoting Roger M. Milgrim, Trade Secrets § 15.01[1], at 15–18 n.
10 (1993) (collecting cases)); RKI, Inc. v. Grimes, 177 F. Supp.
2d 859, 876 (N.D. Ill. 2001) ("Because direct evidence of theft
and use of trade secrets is often not available, the plaintiff can
rely  on circumstantial evidence to  prove misappropriation by
drawing inferences from  perhaps  ambiguous circumstantial evi-
dence."). The evidence confirms Alifax's story, however, only if
it receives the benefit of every reasonable inference. Rule 50
requires such indulgences. The Court therefore agrees that the
jury's misappropriation verdict is supported by a rational inter-
pretation of Alifax's evidence. See Astro-Med, 591 F.3d at 18-19
(affirming denial of Rule 50 motion as, among other reasons, there
"is a logical inference that a competitor who hires away a rival's

---

[25] This latter argument was plainly the basis for the jury's
award of damages on Count II, the propriety of which is discussed
further below.

40

valued employee with access to inside information has done so in order to use that inside information to compete with the rival . . . "); GlobeRanger Corp. v. Software AG USA, Inc., No. 3:11-CV-0403-B, 2015 WL 3648577, *13 (N.D. Tex. June 11, 2015) (denying Rule 50 motion as evidence showed defendant "relied on [plaintiff's technology] to develop its own." (citing Wellogix, Inc. v. Accenture, L.L.P., 716 F.3d 867, 877 (5th Cir. 2013) (denying judgment as a matter of law where documents suggested defendants had access to plaintiff's source code and were using its content)).

   The Defendants focus tightly on the lack of evidence showing Alcor sold any device containing Alifax's conversion algorithm. See Renewed Mot. for JMOL at 23. Without a doubt, Alifax at one time focused its attention on the use of its conversion algorithm in production instruments sold to customers. See, e.g., Pl.'s Mem. of Law in Opp'n to Defs.' Mot. for Partial Summary J. 20-21, ECF No. 161-1. And as discussed throughout this opinion, it is also undeniable that Alifax's liability theories morphed through-out this litigation, including mid-trial. But as the foregoing summary shows, there is some proof that - if believed - supports finding that the Defendants had something more than a "dead end flirtation" with Alifax's confidential information. On-Line Techs., Inc. v. Perkin-Elmer Corp., 253 F.Supp.2d 313, 332 (D. Conn. 2003). To conclude otherwise, the Court would have to weigh

41

the evidence and reject Alifax's (and presumably the jury's) in-
terpretation of Trial Exhibit 92 (which Alifax bolstered at trial
with Frappa's own deposition) as well as Alcor's June and August
2012 statements.   Rule 50's strict requirements prohibit this.
Judgment as a matter of law on the issue of misappropriation of
the algorithm is therefore inappropriate.

> 3.   Legally Sufficient Evidence Supported The Jury's
> Award of "Head Start" Damages.

Alifax presented the jury with two alternative approaches for
calculating unjust enrichment damages: (1) one year of profits
reflecting the unfair head start Alcor obtained by launching the
iSED at the 2012 AACC; or (2) the financial benefit Alcor has
obtained from the iSED's "moderately complex" CLIA designation,
which was supported in part by the Disputed Correlation Tests.
See Trial Tr. vol. 12, 47:24-48:5, 49:18-21, 51:9-53:10, 55:4-9,
May 2, 2019. The jury awarded Alifax $6.5 million dollars.   Jury
Verdict: Phase II: Damages, ECF No. 299.

First, a procedural point. Alcor adequately preserved its
Rule 50 arguments that Alifax's damages methodologies were not
causally connected to misappropriation of the conversion algo-
rithm.  A party may only raise grounds under Rule 50(b) (a renewed
motion for judgment as a matter of law) that it preserved in a
Rule 50(a) motion at the close of the evidence. Parker v. Gerrish,
547 F.3d 1, 12 (1st Cir. 2008).  Rule 50(a) does not, however,

42

require a party to detail its reasoning with "technical precision"
mid-trial. Lynch v. City of Boston, 180 F.3d 1, 13 n.9 (1st Cir.
1999). All the rule requires is reasonable notice of the party's
legal position. Id. (stating reasons should be stated "with suf-
ficient certainty to apprise the court and opposing counsel of the
movant's position with respect to the motion."); see also Western
Union Co. v. MoneyGram Payment Sys., Inc., 626 F.3d 1361, 1367
(Fed. Cir. 2010)("[E]ven a cursory motion suffices . . . so long
as it 'serves the purposes of Rule 50(a), i.e., to alert the court
to the party's legal position and to put the opposing party on
notice of the moving party's position as to the insufficiency of
the evidence.'") quoting Blackboard, Inc. v. Desire2Learn, Inc.,
574 F.3d 1371, 1379-1380 (Fed. Cir. 2009)).

    The First Circuit's holding in Osorio v. One World Techs.,
Inc., 659 F.3d 81 (1st Cir. 2011), is an apt analog. In this
product liability action, Osorio argued that defendant Ryobi's
bench top table saw was unacceptably dangerous due to a defective
design. Id. at 83. In its Rule 50(a) motion, Ryobi argued Osorio
"failed to offer sufficient evidence . . . that the subject saw
was not designed with reasonable care or that the saw was both
defective and unreasonable dangerous." Id. at 87-8. In its re-
newed motion under Rule 50(b), Ryobi not only doubled down on its
sufficiency attack, but also argued that Osorio's expert witness
impermissibly advanced a "categorical liability" argument that

43

suggested all "low-cost portable benchtop table saws" were "in-
herently unsafe." Id. at 87.  Osorio argued on appeal that Ryobi
had waived its argument regarding categorical liability.

The First Circuit disagreed.  Ryobi's objection to the ex-
pert's testimony was a "corollary to [Ryobi's] sufficiency argu-
ment" that "flesh[ed] out" the question of whether the plaintiff
satisfied his burden of proof - an issue the court noted that Ryobi
had contested at each stage of the litigation." Id. at 88.  Alcor,
like Ryobi, made a distinct insufficiency argument in its Rule
50(a) motion: "Alifax did not satisfy its burden of proving Alcor's
gross sales attributable to the misappropriation . . . Alifax
presented no evidence that [Alcor's gross sales] are attributable
to the misappropriated computer code trade secret.  Demonstrating
Alcor's general gross sales is not sufficient."  Trial Tr. vol.
12, 10:7-20.  Thus, as in Osorio, Alcor's specific objections to
Alifax's CLIA designation and head-start calculations simply
"flesh out" an insufficiency argument that Alcor pressed at every
stage of this litigation.  There was no waiver.[26]

---

[26] Even if the Court had found that these objections were
waived, it would nevertheless have granted a new trial.  See 9B
Charles Alan Wright & Arthur R. Miller, Federal Practice and Pro-
cedure § 2537 (3d ed. 2008).

44

Appx44

Now to the meat of the issue. A plaintiff may recover under RIUTSA "both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss." R.I. Gen. Laws 6-41-3(a). "In lieu of damages measured by any other methods, the damages caused by misappropriation may be measured by imposition of liability for a reasonable royalty for a misappropriator's unauthorized disclosure or use of a trade secret." Id. A jury's damages award need only reflect a reasonable estimate based on a rational model. Abbey Med./Abbey Rents, Inc. v. Mignacca, 471 A.2d 189, 195 (R.I. 1984).

Here, Alifax sought only unjust enrichment damages. After hearing truncated arguments mid-trial, the Court adopted the burden-shifting framework set forth in the Restatement (Third) of Unfair Competition with respect to this theory.[27] The Restatement provides:

> The general rules governing accountings of profits are applicable in trade secret actions. The plaintiff is entitled to recover the defendant's net profits. The plaintiff has the burden of establishing the defendant's sales; the defendant has the burden of establishing any portion of the sales not attributable to the trade secret and any expenses to be deducted in determining net profits.

---

[27] The Court made it abundantly clear to the parties that their dispute over whether to apply the Restatement's burden shifting framework was brought to the Court's attention at the last possible moment with unsatisfactory briefing and argument.

45

Restatement (Third): Unfair Competition § 45, cmt. f (Am. Law Inst. 2019). Nothing in the Restatement's framework relieved Alifax from its obligation to prove causation in the first instance. Id. ("The traditional form of restitutionary relief in an action for the appropriation of a trade secret is an accounting of the de- fendant's profits on sales attributable to the use of the trade secret.") (emphasis added); see also id. cmt. b. ("The plaintiff bears the burden of proving the fact and cause of any loss for which recovery is sought."); R.I. Gen. Laws § 6-41-3(a) ("Damages can include . . . the unjust enrichment caused by misappropria- tion"). The Court instructed the jury suitably. See Jury In- structions: Phase II: Damages 8-9, ECF No. 298.[28]

The evidence supporting Alifax's argument that Alcor unjustly benefited from the iSED's CLIA designation was inadequate. Alifax presented practically no evidence about the CLIA designation pro- cess. Although it claims that Alcor obtained a "moderately com- plex" designation for the iSED, Alifax introduced almost no proof of that fact – no public records, no device specifications, no

---

[28] The Court instructed: "If you find that Alifax has proven that Alcor benefitted from using the computer code trade secret, you may award the monetary value you find has been proven by a preponderance of the evidence to be attributable to that benefit." Id. at 8. It also instructed: "Alifax must prove by a preponder- ance of the evidence Alcor's gross sales attributable to its mis- appropriation of the computer code trade secret." Id. at 9 (emphasis added).

Appx46

testimony.  Its best evidence was a statement in an undated draft
iSED operator's manual.  <u>See</u> Trial Exhibit 460.  Even assuming
this meagre statement sufficed, there was no evidence that FDA
clearance or a particular CLIA designation was necessary to sell
iSED instruments.  Indeed, the record from Alifax's case-in-chief
is at odds with its own position.  <u>See, e.g.</u>, Trial Tr. vol. 6,
33:3-10; Trial Ex. 94.

    The strongest nail in the CLIA-based calculation coffin is
the complete dearth of evidence about <u>why</u> customers purchased the
iSED.  Alifax offered no proof that a moderately complex designa-
tion drove sales in the clinical instrument industry.  There was
no evidence that a "moderately complex" designation led to even
one sale of an iSED.[29]  One statement from Ruggeri that one customer
asked about the iSED's designation cannot sustain an inference of
causation.  <u>See</u> Trial Ex. 114 at ALCOR-0072694.  It follows that
any calculation of damages based on the iSED's purported CLIA
designation would have been pure speculation on the part of the
jury.  <u>See</u> <u>McLaughlin v. Moura</u>, 754 A.2d 95, 98 (R.I. 2000)(holding
that the causal connection between plaintiff's cause of action and
damages "may not be based on conjecture or speculation").

_____

    [29] If anything, the evidence was to the contrary.  For example,
Ecker boasted about an "incredible" response from customers at the
2012 AACC trade show, which was two years before the iSED applied
for a CLIA designation.  <u>See</u> Trial Ex. 78.

47

Appx47

But this conclusion does not end the Court's inquiry.  If a party presents multiple damages calculations, an award may survive so long at least one of the alternatives has a sufficient evidentiary foundation.  See Northpoint Tech., Ltd. v. MDS Am., Inc., 413 F.3d 1301, 1312 (Fed. Cir. 2005) ("[W]here there are two alternative factual theories which might support the verdict, the verdict will be upheld if there is sufficient evidence to support either theory[.]") quoting Baumler v. State Farm Mut. Auto. Ins., 493 F.2d 130, 134 (9th Cir.1974)); Bank of Am. Nat'l Trust & Savings Ass'n v. Hayden, 231 F.2d 595, 602–03 (9th Cir. 1956) (holding where the parties present alternative damages calculations, the verdict should be upheld if there is sufficient evidence in the record as to any calculation).  The Court must therefore consider whether the evidence supports the proffered head start computation.

Alifax introduced evidence that the AACC trade show was a lucrative venue for launching new products, particularly diagnostic instruments like the iSED.  See Trial Tr. vol. 6, 69:4-17.  Ruggeri conceded that Alcor needed "to meet the deadline of having a working prototype" for this event.  Ruggeri Dep. 135:8-13.  "Time was [of] the essence," he said.  Id. at 135:7-9.  Frappa shared Ruggeri's concern.  Just weeks before the show, he wrote to a collaborator about the time required to finish a circuit board component, explaining that "the project is very important" and

48

that "even a little delay should be a big problem.  We cannot miss this deadline."  Trial Ex. 67.  As explained above, there was at least some evidence that Alcor succeed in creating a "fully functioning prototype" used to market the iSED by misappropriating Alifax's conversion algorithm.

Dr. Bergeron described the task of developing a conversion algorithm as a "hard problem" that would require a prototype instrument and "many experiments[] to collect data."[30]  Trial Tr. vol. 3, 115:16-17, 116:3.  He opined that it would "definitely take months" for Alcor to develop its own commercially viable algorithm.  Id. 117:23-116:1.  Alcor's development timeline for

_____

[30] As the Court observed in its order excluding the trade secret misappropriation damages opinion of Christopher Bokhart, Dr. Bergeron's did not disclose an opinion that developing a conversion algorithm would take "months" in his report. Alifax Holding SpA v. Alcor Sci. Inc., 2019 WL 1930763, *4 n.11 (Apr. 30, 2019). The Court made its observation sua sponte. Alcor did not object to that testimony at trial; it chose to cross-examine Dr. Bergeron on his statement instead.  Trial Tr. vol. 3, 115:23-116:9, 119:10-120:6.  Indeed, Alcor has never moved to strike Dr. Bergeron's questionable testimony.  The proper avenue to challenge this evidence would have been a contemporaneous trial objection, not post-trial briefing.  See Fed. R. Evid. 103; Waitek v. Dalkon Shield Claimants Tr., 934 F. Supp. 1068, 1083 (N.D. Iowa 1996) ("[T]he trial court is not 'required to exercise its gatekeeping authority over expert testimony without an objection'"), aff'd, 114 F.3d 117 (8th Cir. 1997) (quoting McKnight By & Through Ludwig v. Johnson Controls, Inc., 36 F.3d 1396, 1407 (8th Cir.1994)).  As Dr. Bergeron explained the basis for his testimony and Alcor had a fair opportunity for cross-examination, the Court does not find that this testimony "serious[ly] affected the fairness . . . of the judicial proceedings."  Fed. R. Evid. 103(d); United States v. Gandia-Maysonet, 227 F.3d 1, 5 (1st Cir. 2000).

49

its fourth-degree polynomial equation - roughly five months - cor-
roborates this conclusion.  See § III.B.2, supra.

Extrapolating from these facts, Alifax argued that, but for
Alcor's misappropriation, it would have taken several more months
to develop a functional iSED prototype.  Trial Tr. vol. 12, 55:14-
22. Months of delay would have meant missing the 2012 AACC trade
show; missing the trade should would have delayed the debut of a
new instrument until 2013.  Id. 46:18-47:5.  Simply put, Alifax
argues that a modest delay would have sparked a chain reaction.
Thus, one year of profits attributable to its unfair head start
was a rational measure of damages.  See id. 49:18-21; 54:14-55:9.
An estimated $6.5 million in net profits from iSED-related sales
during 2018 (a year in which Alcor would not have earned such
revenues absent misappropriation) can be derived through simple
arithmetic using the financial data from a spreadsheet created by
Alcor and introduced through Alifax's only damages witness, Chris-
topher Bokhart.[31]  See Trial Ex. 173; Trial Tr. vol. 11, 65:7-66:14;
68:22-70:17, May 1, 2019.

"[C]ausation can be shown from reasonable inferences drawn
from circumstantial evidence."  Melvin F. Jager, Trade Secret Law
§ 7:29 (2019); see also Cartel Asset Mgt. v. Ocwen Fin. Corp., 249

---

[31] As the Court explains below, the Court should have more
strictly cabined Bokhart's testimony, which in part warrants a new
trial.  More on that to come.

Fed. Appx. 63, 75 (10th Cir. 2007) ("A conclusion concerning cau-
sation may result from a fact-finder's "reasonable inferences from
the circumstantial evidence presented."). Alifax's argument for
head start damages is – like the rest of its case – thoroughly
circumstantial.  It is not, however, wholly unreasonable.  The
statements from Ruggeri and Frappa show an urgent desire to launch
the iSED at the 2012 AACC.  Dr. Bergeron's testimony and Alcor's
own algorithm development timeline suggest that it would have taken
more time than Alcor had available to create a conversion algorithm
and claim it had a functioning device. A year-long delay is one
outcome that may be reasonably inferred from the trial evidence.

To sum up, the Court concludes that there was legally suffi-
cient evidence at trial to support the jury's verdict that Alifax's
conversion algorithm with its four specific constants comprised a
trade secret that was willfully misappropriated by the Defendants.
The jury's award of $6.5 million was a rational appraisal of Al-
cor's unjust enrichment.  Accordingly, Alcor's Rule 50(b) motion
with respect to liability for misappropriation of this trade secret
must be denied.

    4.   The Verdict Finding Misappropriation of Alifax's
        Conversion Algorithm Is Against the Clear Weight of
        the Evidence, Warranting a New Trial.

A critical assumption underpins the jury's verdict: Alifax's
algorithm was capable of producing highly accurate results in a
non-Alifax device.  The Defendants challenged this premise at every

turn.  At trial, they relied on the testimony of embedded systems expert Daniel Smith.[32]  See generally Trial Tr. vol. 8, 21:12-17, 53-66.  Smith's background included years of diverse experiences as an embedded systems engineer.  He worked with or for numerous technology companies, taught several courses on developing embedded systems (including source code development), and had some expertise in designing medical devices.  Id. at 14:7-19:12.  His employment history included serving as the director of engineering for Tesla Electronics (where he was responsible for designing its vehicle's electronics and firmware) and as a lead engineer for Motorola.  Id. at 16:25-18:12, 19:13-20:3.  In the Court's opinion, these credentials made Smith's area of expertise a superior fit for this dispute.

Smith opined that Alifax's conversion algorithm and its four specific constants were, within a reasonable degree of engineering certainty, incapable of "produc[ing] accurate, meaningful ESR values in an iSED device[.]"  Id. at 66:25.  He designed a method to test his hypothesis.  The June 2013 Rhode Island Hospital test data included the aggregation index (a value based on raw optical density data) for each blood sample.  Id. at 58:1-7;

---

[32] Smith defined such a system as "an electronic system with an embedded microprocessor that has a dedicated function."  Trial Tr. vol. 8, 13:19-21.  ESR analyzers satisfy these criteria.  Id. at 14:3-5.

see Trial Ex. 484.  This value is determined through the well-known, non-proprietary principles of syllectometry and is the salient input for an ESR analyzer's conversion algorithm.  Trial Tr. vol. 3, 143:20-144:13. Smith's analysis compared the outputs generated by the respective algorithms of Alcor and Alifax when this aggregation data was used as a common input.  Id. at 54:23-56:5. Put another way, Smith tested the accuracy of Alifax's claim that Alcor could have implanted its conversion algorithm into Alcor hardware and produced ESR values highly correlated to Westergren results.

Using the Microsoft Excel software program, he created a spreadsheet with formulas.  See Trial Tr. 56:17-57:10, 61:5-15. Trial Ex. 505.  For each sample, the entry included  (1) the sample's iSED-generated aggregation index ("Integral iSED"); (2) an ESR value calculated using Alcor's conversion algorithm as of January 28, 2013 ("iSED ESR"); (3) an ESR value calculated using Alifax's proprietary algorithm ("ALIFAX ESR"); and (4) the sample's ESR value obtained from the traditional Westergren method ("WG").  See Trial Ex. 505; Trial Tr. vol. 8, at 62:25-66:2.  The maximum acceptable ESR value produced by the Westergren method is 180 mm/h.  Trial Tr. vol. 8, 66:5-8.  Smith's results speak for themselves:

Appx53

| Sample** | Integral iSED | Int/1000-3 | iSED ESR | WG | ALIFAX ESR |
|---|---|---|---|---|---|
| 1 | 16424 | 13.424 | 16 | 20 | 774 |
| 2 | 30177 | 27.177 | 87 | 48 | 2654 |
| 3 | 20056 | 17.056 | 29 | 25 | 1166 |
| 4 | 27566 | 24.566 | 69 | 65 | 2215 |
| 5 | 21751 | 18.751 | 36 | 17 | 1375 |

Trial. Ex. 505.  These first entries typify Smith's findings.  When
aggregation data is measured by an Alcor iSED but converted to an
ESR value using Alifax's algorithm, the instrument yields worth-
less results.  Id.; see also Trial Tr. vol. 8, 66:13-18.  The
instrument-generated values are in many entries an order of mag-
nitude larger than the highest permissible Westergren value.  See
Trial Ex. 505.  Smith concluded from this analysis that no mean-
ingful results could be obtained if Alcor used Alifax's algorithm
in an iSED.  Id. at Trial Tr. vol. 8, 66:19-25.  Conversion algo-
rithms are "device-specific."  Id. at 21:12-17.

Alifax failed to challenge this opinion in any serious way.
Its cross-examination largely concentrated on the timeline of Al-
cor's code development and relied on files produced outside Alcor's
version control repository.  Both Smith and Dr. Bergeron agreed
that information contained in such files could not be anchored to
a point in time.  Trial Tr. vol. 4, 20:21-14; vol. 8, at 92:24-9.
To be clear: the Court is not choosing to credit Smith's opinion
over Dr. Bergeron's.  Alifax did not ask Dr. Bergeron (who watched
Smith's testimony) or anyone else to provide a rebuttal opinion or
critique Smith's methodology.  In fact, on direct examination Dr.

Bergeron stated that he observed that Alifax did not employ the same constants consistently in different models of its instruments. Trial Tr. vol 3, at 124:2-20. He declined to identify changing hardware as the cause of these variations but acknowledged that "it [was] an assumption [he was] making . . . ". Id. at 124:23. Thus, even Dr. Bergeron appears to have assumed based on his considerable education, experience, and observations that conversion algorithms have some degree of device specificity.

Neither juries nor courts should casually dismiss potent and unrefuted scientific proof. Roma v. Thames River Specialties Co., 96 A. 169 (Conn. 1915) (holding a trial judge "would have failed in his duty" if he had not set aside the verdict when, among other things, "the laws of mechanics, as testified to and uncontradicted, tended to prove [the claimant's] story impossible"). Alifax argues – correctly – that the jury was free to reject Smith's testimony. See New Trial Opp'n 15. However, its apparent decision to do so absent any reasonable challenge to the basis for his opinions or an alternative explanation for his findings raises insuperable doubts about the verdict's soundness. See Venturelli v. Cincinnati, Inc., 850 F.2d 825, 833 (1st Cir. 1988) (stating a new trial may be ordered on appeal where verdict relies on evidence that "flies in the teeth of unimpeachable contradicting evidence and universal experience"); Kansas City Pub. Serv. Co. v. Shephard, 184 F.2d 945, 947 (10th Cir. 1950) ("Plaintiff cannot prevail . .

55

. if the evidence on which he relies is in irreconcilable conflict with immutable laws of physics or is wholly inconsistent with established and uncontroverted physical facts").

If conversion algorithms are device specific, Alifax's explanation of Trial Exhibit 92 breaks down. The record contains further corroborating evidence that Alifax's algorithm could not have been used to achieve those results. Sacchetti testified that Alcor assigned every iSED instrument a sequential serial number. See Trial Tr. vol. 4., 37:1-4; Trial Ex. 138. Serial numbers 00001, 00002, and 00003 were prototypes. Trial Ex. 138. The instrument printouts displaying ESR values attached to Frappa's protocol were generated by iSED number "00027." Trial Ex. 92. Alcor did not manufacture that instrument until June 2013, around the time Rhode Island Hospital was conducting its correlation tests. See Trial Tr. vol. 6, 38:22-25; Trial Ex. 138. There was also testimony that the date on the printouts reflects test instrument's internal clock, which may have been incorrectly set by Frappa when conducting the tests. See Frappa Dep. at 57:11-13, 63:25-64:6; Trial Tr. vol. 5 at 67:6-10, vol. 6 at 35:19-36:16. Consequently, Frappa's handwritten dates could reflect the printouts' filenames rather than when he ran the tests.

Like toppling dominos, these faltering arguments exacerbate other weaknesses in Alifax's proof. Alifax's interpretation of the phrase "fully functional prototype" in Ecker's August 6, 2012

internal email ignores relevant context.  In the proceeding sen-
tence, Ecker expressly states that while the iSED is "fast ap-
proaching final stages," it is "still in development."  Trial Ex.
82.  Consistent with Ecker's email, Ruggeri explained that Alcor
"didn't wait" for its "final product" – i.e., a device that gen-
erated reliable ESR values – before laying the groundwork for the
iSED's potential sales.  Ruggeri Dep. at 144:15-20.  So-called
"premarketing" activities such as advertisements and sales calls
began immediately after the 2012 AACC trade show.  Id. 144:4-20.
Alcor would not roll out production machines for at least six
months.  Id. at 144:4-7.

The statements from Ecker and Ruggeri are consistent with
Frappa's trial testimony.  Alcor's goal for the 2012 AACC trade
show was to produce a prototype showing how easy the iSED was to
use.  Trial Tr. vol. 7, 60:21-23, Apr. 25, 2019.  The prototype's
software was designed to demonstrate only the loading, identifi-
cation, mixing, and ejection of blood sample tubes.  Id. 61:19-
62:2.  The tubes were empty; nothing was measured and a "dummy"
ESR value was reported.  Trial Tr. vol. 62:1-8.  Alcor introduced
a video of Frappa testing a prototype device one day before the
show. Trial Ex. 73.  The video corresponds to his description and
shows Frappa using a prototype instrument simulating the end-
user's experience with empty tubes and a randomly generated ESR
value.  See id.; see also Trial Tr. vol. 7, at 62:13-65:16.

57

Frappa's testimony and the video are consistent with Alcor's con-
temporaneous advertising copy, which emphasizes the iSED's "set it
and forget it" features.  See, e.g., Trial Ex. 82, 77, 79.  None
of these ads claim that the iSED obtains ESR values in a novel or
noteworthy way.

    The record of Alcor's development of the iSED's reading cell
further undermines the reasonableness of any inference that Alcor
used Alifax's algorithm for any purpose in or around June 2012.
Alcor engaged with a Chinese injection mold manufacturer for six
to eight months to perfect the design of its reading cell.  See
Trial Tr. vol. 8, 10:18-11:7, Apr. 26, 2019; Trial Ex. 96.
Frappa's correspondence shows that Alcor did not even begin working
with the manufacturer until mid-September 2012.  Trial Ex. 96 at
ALCOR-0073477.  The company sent sample reading cells in January
2013.  Id. at ALCOR-0073459.  It is undisputed that the optical
density measurements necessary to obtain an ESR value are made in
the instrument's reading cell.  See, e.g., Trial Tr. vol. 3, at
34:2-18.  If Alcor's reading cell development did not even begin
until September 2012, it is unreasonable to infer that it could
make any use of Alifax's conversion algorithm three months earlier.

    One more omission is worth noting.  The parties repeatedly
clashed over the disclosure of their respective source code files.
Alifax's expert had access to Alcor's Bitbucket repository as well

58

as additional files. Trial Tr. vol. 4, 17:6-18:8. And yet, "Version 1.0" of Alcor's source code remains a mystery. This is the code referenced in Frappa's protocol attached to the Disputed Correlation Tests. See Trial Ex. 92. None of the evidence Alifax identified as code containing Alifax's conversion algorithm – Version 1.00A from November 6, 2012 and the code in a file titled 1.04A – has that designation. See Trial Exs. 65, 156.

They jury's verdict that the Defendants misappropriated Alifax's algorithm and thereby obtained a one-year head start in the market relies on extensive, inference-driven reverse engineering from a wafer thin factual. A rational fact finder could reach the same result as the jury. Nonetheless, achieving that outcome requires rejecting powerful expert testimony and a motherload of contrary evidence. These exceptional circumstances persuade the Court to excise its discretion under Rule 59 to order a new trial concerning whether the Defendants willfully misappropriated Alifax's proprietary conversion algorithm in violation of RIUTSA.

> 5.    A New Trial On Damages Is Necessary To Remedy Unfair
>       Prejudice.

A new trial would be required on damages even if the jury's verdict on liability for misappropriation of the conversion algorithm survived.

Christopher Bokhart served as Alifax's sole witness during the trial's damages phase. Alifax originally identified Bokhart

59

as an expert who would opine as to damages attributable to each of
its legal claims.   In a series of rulings, however, the Court
excluded all of Bokhart's opinions.  See generally Alifax Holding
SpA v. Alcor Sci. Inc., 2019 WL 1930763, *1 (Apr. 30, 2019); Alifax
Holding SPA v. ALCOR Sci. Inc., 2019 WL 1579503, *1 (Apr. 12,
2019).   The Court issued its final ruling mid-trial.   The Court
nonetheless understood that Bokhart reviewed Alcor's financial in-
formation in the course of preparing his opinions.  With the intent
of encouraging both practicality and fairness, the Court permitted
Alifax (over the Defendants' objection) to call Bokhart pursuant
to Rule 1006 of the Federal Rules of Civil Procedure to testify as
a summary fact witness concerning Alcor's iSED-related gross rev-
enues.   Trial Tr. vol. 11, at 20:11-22, 33:10-25.   The Court's
ruling neither allowed nor intended to allow Bokhart to provide
the jury with any opinion evidence.  As set forth above, the jury
returned an award that closely parallel's Alifax's theory of head
start damages based on his testimony.  See § III.B.3, supra.

Under Rule 1006, a party may "use a summary . . . to prove
the content of voluminous writings, recordings, or photographs
that cannot be conveniently examined in court."  The summary may
be comprised of a writing or witness testimony.  See United States
v. Casas, 356 F.3d 104, 119 (1st Cir. 2004).  Regardless of whether
such evidence is offered by an expert or a lay witness, Rule 1006
is not a backdoor for admitting otherwise impermissible opinions.

60

See Fagiola v. Natl. Gypsum Co. AC & S., 906 F.2d 53, 57 (2d Cir.1990) ("A summary must of course be based on foundation testimony connecting it with the underlying evidence summarized, and must be based upon and fairly represent competent evidence already before the jury…"); United States v. Radseck, 718 F.2d 233, 239 (7th Cir.1983) ("The nature of a summary witness's testimony requires that he draw conclusions based upon the evidence presented at trial."). Hence, First Circuit has explained that "the key to admissibility is that the summary witness's testimony does no more than analyze facts already introduced into evidence . . . ". United States v. Stierhoff, 549 F.3d 19, 28 (1st Cir. 2008) (emphasis added).

Alcor made vociferous objections to Bokhart testifying at trial. See, e.g., Trial Tr. vol. 11, 20:23-14. Alcor argued at that time (as it argues now) that Bokhart's testimony should have been excluded. See Mot. for New Trial 38-39, 43-44. Again, with the benefit of hindsight and a close review of testimony, the Court concludes that those objections should have been sustained. Bokhart's knowledge of facts concerning Alcor's revenues was too closely entwined with his excluded expert opinion to be cleanly dissected and presented under Rule 1006.

First, the documents and materials Bokhart purported to summarize were not already "competent evidence already before the jury." Radseck, 718 F.2d at 239; see also Stierhoff, 549 F.3d at

61

Appx61

28.  He testified with candor that his "understanding" of Alcor's
iSED-related revenues were based on "thousands of documents," in-
cluding Alifax and Alcor business records, marketing materials,
business proposals, and financial statements.  Trial Tr. vol. 11,
at 45:17-20.  He read "depositions of various employees of both
companies."  Id. at 23-24.  And he agreed that his testimony
concerning "the revenues and profits" Alcor obtained from iSED
analyzers was based on his review of all of these materials and
"discussions with various persons who are on both sides," including
Alifax CEO Paulo Galiano.  Id. 43:21-44:8.  Just one of these
primary sources was put before the jury: Trial Exhibit 173, a copy
of an Alcor financial statement.[33]  See Trial Ex. 173; Trial Tr.
vol. 11, at 63:3-16.  A basic prerequisite of Rule 1006 was there-
fore unsatisfied.

Second, Bokhart's testimony necessarily reflected the appli-
cation of his financial and accounting expertise to interpret the
evidence.  This was impermissible.  For example, he explained that
Alcor three or four financial statements that "didn't always agree"
and that there were "inconsistencies from document to document
. . . ".  Trial Tr. vol. 11, at 44:9-17.  He also testified that
sales numbers "only give[] part of the picture.  You have to

---

[33] Trial Exhibit 198 was also introduced through Bokhart but
was comprised of an attachment to Bokhart's expert report summa-
rizing his findings.

Appx62

understand what that item is . . . that's where the review and understanding of the underlying business documents come into play in interpreting financial statements." Id. at 44:18-23.  He came to his "understanding" based on all his "work in in this litigation," id. at 50:19.  That is, through his work as an expert.

Alifax's evidence about convoyed sales illustrates the Court's concern.  Bokhart offered testimony about objects called "test cards."  He told the jury these were items "used to make the iSED operational," thus the revenues they generated should be considered iSED-related. See id. at 50:9-22, 64:22-65:1.  Test-card related revenues were "close to four million [dollars]."  Id. at 67:24-68:4.  He provided similar evidence regarding "diagnostic services." See, e.g., id. at 50:18-51:5, 57:4-10, 64:22-65:1, 68:9-11.  At the time of Bokhart's testimony, however, there was no evidence from any other witness about test cards, diagnostic services or any other ancillary products that allegedly generated iSED-related revenues.  None of this testimony was permissible within the strict confines of Rule 1006.[34]

---

[34] Although Alcor argues at length about excluding Bokhart's testimony as improper lay opinion, Rule 701 was never the basis for the Court's ruling and would provide no support for allowing this evidence.  See A.J. Amer Agency, Inc. v. Astonish Results, LLC, C.A. No. 12-351 S, 2014 WL 3496964 at *22 (D.R.I. July 11, 2014) (stating a lay witness may testify under Rule 701 regarding a party's financial information "based on the witness's own perceptions and knowledge and participation in the day-to-day affairs of the business.").

The Seventh Circuit has recognized that in tax evasion prosecutions "the line between summary testimony and expert testimony is indistinct." United States v. Pree, 408 F.3d 855, 869 (7th Cir. 2005). The Court has found no binding precedent suggesting that such hybrid testimony is permissible in a different context. It will not expand this doctrine here. See United States v. McElroy, 587 F.3d 73, 82 (1st Cir. 2009) (urging "caution" with summary witness testimony and stating "such witnesses are allowed only in limited situations"). Bokhart's testimony exceeded the scope permitted by Rule 1006, unfairly prejudicing Alcor.[35]  Permitting the jury's damages award to stand would constitute a miscarriage of justice. Therefore, it must be vacated in favor of a new trial.

IV.  Conclusion

For the foregoing reasons, Alcor's Renewed Motion for Judgment As A Matter of Law (ECF No. 304) IS GRANTED IN PART AND DENIED IN PART. Judgment as a matter of law shall enter for the Defendants on Count II regarding the claim of "[u]sing a clear, plastic capillary photometer sensor ("CPS") in an automated ESR analyzer" in violation of the Rhode Island Uniform Trade Secrets Act ("RIUTSA"),

---

[35] The Court is neither intending to suggest nor has any reason to believe that either Bokhart or Alifax's counsel intentionally expanded the scope of his testimony. The fog surrounding this issue was thick and the boundary was less than obvious.

Appx64

R.I. Gen. Laws § 6-41-1 et seq.  In all other respects, the motion is DENIED.

Alcor's Motion for a New Trial, Or In the Alternative, For Remittitur (ECF No. 303) is GRANTED IN PART AND DENIED IN PART. If judgment is not entered for the Defendants with respect to the CPS-related trade secret, the Court hereby provisionally orders a new trial with respect to that allegation.  The Court furthermore orders a new trial regarding the Defendants' liability for alleg-edly misappropriating Alifax's proprietary conversion algorithm and damages attributable to that alleged harm under RIUTSA.  In all other respects, the motion is DENIED.

In as much as a new trial is required with respect to the claim of misappropriation of Alifax's secret conversion algorithm, the case will be returned to the trial calendar.  Final judgment will not enter until all claims are decided.

IT IS SO ORDERED.

_William E. Smith_
William E. Smith
Chief Judge
Date: September 5, 2019

65

**Mary Clifford**

| | |
|---|---|
| **From:** | cmecf@rid.uscourts.gov |
| **Sent:** | Thursday, September 5, 2019 10:49 AM |
| **To:** | cmecfnef@rid.uscourts.gov |
| **Subject:** | Activity in Case 1:14-cv-00440-WES-LDA Alifax Holding Spa v. Alcor Scientific Inc. et al Order on Motion for New Trial |

**\*\*\*This message originated outside your organization\*\*\***

<span style="color:red">This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.</span>
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* There is no charge for viewing opinions.**

**U.S. District Court**

**District of Rhode Island**

**Notice of Electronic Filing**

The following transaction was entered on 9/5/2019 at 10:48 AM EDT and filed on 9/5/2019
**Case Name:**       Alifax Holding Spa v. Alcor Scientific Inc. et al
**Case Number:**     1:14-cv-00440-WES-LDA
**Filer:**
**Document Number:** 348

**Docket Text:**
<span style="color:blue">OPINION AND ORDER granting in part and denying in part [303] Motion for New Trial; granting in part and denying in part [304] Motion for Judgment as a Matter of Law; final judgment will not enter until all claims are decided. So Ordered by Chief Judge William E. Smith on 9/5/2019. (Jackson, Ryan)</span>

**1:14-cv-00440-WES-LDA Notice has been electronically mailed to:**

Brian D. Coggio     coggio@fr.com

Christine K. Bush     cbush@hinckleyallen.com, pstroke@hinckleyallen.com

Christopher H. Little     clittle@pierceatwood.com, mdefontes@pierceatwood.com

Craig M. Scott     cscott@hinckleyallen.com, ehanson@hinckleyallen.com, lgilbert@hinckleyallen.com

Jason C. Williams     jwilliams@hinckleyallen.com

Kyle M. Noonan     knoonan@pierceatwood.com

Laurel M Gilbert     lgilbert@hinckleyallen.com

1

Appx66

Margaret K. Minister    mminister@pierceatwood.com, hstevens@pierceatwood.com

Michael J. Daly    mdaly@pierceatwood.com, mgosetti@pierceatwood.com

Nicole M. Matteo    nmatteo@pierceatwood.com

Robert H. Stier , Jr    rstier@pierceatwood.com, mclifford@pierceatwood.com

**1:14-cv-00440-WES-LDA Notice has been delivered by other means to:**

Daniel A. Lev
Pierce Atwood LLP
100 Summer Street
22nd Floor
Boston, MA 02110

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1096917572 [Date=9/5/2019] [FileNumber=1444149-0]
[92faa31520f9bbd0e1ce822bcd151b8e0d07ef99e365f4c5e2024f15c65c730aa25a
06cd9ec8eda2f7cf3fbc6b14dadf99b32662291f215e7a2d7f6332cd74dc]]

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

_____
                                      )
ALIFAX HOLDING SPA,                   )
                                      )
         Plaintiff,                   )
                                      )
    v.                                )    C.A. No. WES 14-440
                                      )
ALCOR SCIENTIFIC INC.; and            )
FRANCESCO A. FRAPPA,                  )
                                      )
         Defendants.                  )
_____)

**MEMORANDUM AND ORDER**

WILLIAM E. SMITH, District Judge.

At trial, Alifax's claims were gradually whittled down. Alifax Holding Spa v. Alcor Sci. Inc., 404 F. Supp. 3d 552, 558 (D.R.I. 2019). The jury returned a verdict in favor of Alifax, but the Court granted in part Defendants' renewed request for judgment as a matter of law and ruled that retrial was necessary on the claim that Defendants misappropriated Alifax's conversion algorithm. Id. at 582. Subsequent attempts at settlement failed repeatedly. During a conference in February, the Court instructed Defendants to file a motion addressing, inter alia, their request to file a renewed summary judgment motion and the scope of the new trial. The Court also invited the parties to submit supplemental memoranda regarding Alcor's Motion for an Exceptional Case

Appx68

Determination Under the Patent Act and for Attorney and Expert Fees ("Alcor's Motion for Patent Legal Fees"), ECF No. 306.

For the reasons that follow, Defendants' request to file a renewed motion for summary judgment is DENIED, Defendants' request to limit the scope of the new trial is GRANTED IN PART, and Alcor's Motion for Patent Legal Fees is DENIED. The parties are instructed to submit further briefing, as explained below, regarding potential damages on the remaining claim.[1]

I.   SUMMARY JUDGMENT

In a renewed motion for summary judgment, Alcor would argue that the four conversion constants are not trade secrets because they can be derived using simple regression analysis. See Defs.' Request for Case Management Order Permitting Alcor to File Mot. for Summ. J. and Set the Limited Scope of Any Second Trial ("Defs.' Mot. for CMO") 2-5, ECF No. 354. However, the Court already ruled on this issue in its post-trial decision:

> The jury's finding that the conversion algorithm was a trade secret was reasonably supported by Alifax's evidence. . . . Converting the optical data into a reliable, Westergren-correlated [erythrocyte sedimentation rate ("ESR")] value is a critical step in the process. . . . Duic testified that there were "no mathematical models in the market" for correlating optical signal data to Westergren results when Alifax developed its conversion algorithm. . . . Without a

---

[1] This decision assumes familiarity with the case. For additional background, the reader is referred to the Court's post-trial decision on Defendants' renewed request for judgment as a matter of law. See Alifax Holding Spa v. Alcor Sci. Inc., 404 F. Supp. 3d 552 (D.R.I. 2019).

> correlation algorithm, Alifax's instruments could not
> generate ESR results.  The algorithm was not publicly
> known and not readily accessible to purchasers of Alifax
> instruments.

_Alifax_, 404 F. Supp. 3d at 567 (citations omitted).  Moreover,

Alcor's arguments regarding the ease of doing regression analysis

via publicly available tools would likely require additional

expert discovery.  _See_ Defs.' Mot. for CMO 5.  As stated below,

discovery closed years ago, and no new discovery will be allowed.

Alcor also argues that the conversion algorithm had no

economic value in non-Alifax machines.  _See_ _id._ at 3-4.  Again,

this argument directly contradicts the Court's post-trial

findings: "[A]t least one rational interpretation of the evidence

supports the conclusion that Alcor made some use of Alifax's

algorithm, indicating that the information confers some

competitive advantage.  This is enough evidence (if barely) to

find that Alifax's conversion algorithm containing four specific

constants had independent economic value from not being generally

known or readily ascertainable."  _Alifax_, 404 F. Supp. 3d at 567-

68 (citing R.I. Gen. Laws § 6-41-1).

Alcor's last argument for summary judgment is that Alifax did

not take sufficient steps to protect its purported trade secret.

_See_ Defs.' Mot. for CMO 4-5.  Once more, this contention runs

counter to a specific ruling of the Court:  "[The] evidence was

sufficient to support the jury's conclusion that Alifax's took

Appx70

reasonable efforts under the circumstances to maintain the secrecy of its conversion algorithm." Alifax, 404 F. Supp. 3d at 568.

Thus, Alcor's request to file a second motion for summary judgment is, in fact, a motion for reconsideration of the Court's post-trial decision.  As with any interlocutory ruling, that decision "'remain[s] open to . . . reconsideration' until the entry of [final] judgment." Nieves-Luciano v. Hernandez-Torres, 397 F.3d 1, 4 (1st Cir. 2005) (quoting Geffon v. Micrion Corp., 249 F.3d 29, 38 (1st Cir. 2001)).  However, for reasons recounted here and explained in the post-trial decision, reconsideration is not warranted.  Therefore, Alcor's request for permission to file a renewed motion for summary judgment is denied.

II.  SCOPE OF NEW TRIAL

In their Motion, Defendants raise three issues regarding the scope of the new trial.

A.   New Evidence

Discovery in this case was extensive.  More than four years elapsed between the filing of the original Complaint and the final close of discovery.  See Compl., ECF No. 1 (filed Oct. 7, 2014); Jan. 11, 2019 Mem. & Order 2, ECF No. 212 (granting motion to compel the production of source code).  The Court has issued dozens of written decisions regarding discovery disputes and substantive motions.  See, e.g., Jan. 11, 2019 Mem. & Order (reopening discovery for limited purposes).  At some point, enough is enough,

4

Appx71

and that point has long passed. For reasons of fairness and judicial efficiency, no new evidence or witnesses will be permitted. See Fusco v. Gen. Motors Corp., 11 F.3d 259, 267 (1st Cir. 1993) ("[T]he discovery deadline had long since passed and the district court had no automatic obligation to reopen the discovery period. The matter was one for the informed discretion of the trial judge, and the breadth of that discretion in managing pre-trial mechanics and discovery is very great."); Oriental Fin. Group, Inc. v. Fed. Ins. Co., 483 F. Supp. 2d 161, 167 (D.P.R. 2007) (barring new discovery where "the exclusion of new evidence would not result in manifest injustice to either party").

B.    Signal Acquisition Trade Secret

At trial, Alifax sought to prove two software trade secrets, both of which were contained within the second count of its Second Amended Complaint. See Second Am. Compl. ¶¶ 61-70, ECF No. 68. The first involved the process by which Alifax's devices gathered ESR-related raw data through signal acquisition. See Charge Conference Tr. 12-15, ECF No 345. The second involved the algorithm that converted that raw data into Westergren-equivalent values. See id.; Alifax, 404 F. Supp. 3d at 567-68. At the charge conference, the Court noted that all of the pertinent evidence "concern[ed] the use of the so-called four constants" in the conversion algorithm, and therefore ruled that the evidence would not "support a finding by the jury that source code or software

5

used in Alifax's analyzers were misappropriated to acquire the photometric measurements." Charge Conference Tr. 12; <u>see also</u> <u>id.</u> at 15-16.

Defendants now argue that this limitation should also apply to the new trial, thus barring Alifax from advancing a theory of misappropriation of a signal acquisition trade secret. Defs.' Mot. for CMO 9-10. In response, Alifax contends that a trial on solely the conversion algorithm, without a signal acquisition claim, "would inevitably cause confusion and uncertainty for the jurors, who would wonder why Alifax was not claiming that all its software was a trade secret." Pl.'s Mem. in Opp'n to Defs.' Request for Case Management Order ("Pl.'s Opp'n to Defs.' Mot. for CMO") 6, ECF No. 355.

A partial retrial is inappropriate "unless it clearly appears that the issue to be retried is so distinct and separable from the others that a trial of it alone may be had without injustice." <u>Gasoline Prods. Co. v. Champlin Refining Co.</u>, 283 U.S. 494, 500 (1931). Based on its extensive involvement in this case, the Court concludes that the distinction between signal acquisition and conversion can be readily grasped by a lay jury. Indeed, the complexity of this distinction is dwarfed by that of other concepts involved in Alifax's theory of liability. The signal acquisition claim "ha[s] been properly and conclusively resolved," and the remaining issue of the conversion constants is "so distinct and

6

separable from the [signal acquisition claim] that a trial [on the conversion constants] alone may be had without injustice." See Drumgold v. Callahan, 707 F.3d 28, 46 (1st Cir. 2013) (quoting Gasoline Prods., 283 U.S. at 500); see also Oriental Fin. Group, 483 F. Supp. 2d at 166 (holding that issue resolved at previous trial was "sufficiently separable [from remaining issues] to permit the former to be submitted to a new jury independently from the other issues without confusion or uncertainty" (citing Gasoline Prods., 283 U.S. at 500)).

Therefore, the scope of Alifax's claim on retrial will be limited to the conversion algorithm. Alifax will not be permitted to pursue its theory that Defendants misappropriated a signal acquisition trade secret.

C.   Damages Expert

At trial, Alifax sought to introduce expert testimony from Christopher J. Bokhart on the issue of damages caused by trade secret misappropriation. April 30, 2019 Mem. & Order 2, ECF No. 288. In his expert report, Mr. Bokhart opined that Alifax was entitled (based on a theory of unjust enrichment) to all of Alcor's earned revenue from iSED sales. Id. at 3-4. The Court excluded this theory because it "rest[ed] on an unsound factual basis." Id. at 7. Additionally, Alifax sought to introduce Mr. Bokhart's opinion that Alifax was entitled to one year of iSED revenue based on a "head-start" theory. Id. at 4. However, the head-start

Appx74

theory was dependent on Dr. Bryan Bergeron's statement that the
software would take at least one month to create from scratch
(which Mr. Bokhart expanded to a one-year head start based on trade
show schedules).  Id. at 10-11.  As the Court noted, Dr. Bergeron
never discussed the amount of time necessary to develop the
conversion software; rather, he opined that the signal acquisition
software would take a month to produce.  Id.[2]  Therefore, the Court
excluded Mr. Bokhart's head-start testimony as "unreliable and
inadmissible."  Id. at 13.

As discussed, no new discovery will be allowed on retrial.
Therefore, the Court's rulings on Defendants' Motion to Exclude
the Opinions of Expert Witness Christopher J. Bokhart, ECF No.
230, will apply with full force at the second trial.

Defendants argue that, without Mr. Bokhart's testimony,
Alifax has no evidence that the alleged misappropriation of trade
secrets caused damages.  See Defs.' Mot. for CMO 10, 13.  Alifax
does not provide a substantive response.  See Pl.'s Opp'n to Defs.'
Mot. for CMO 12-13.  Instead, Alifax argues that the Court did not
solicit briefing on this issue and that the matter should be left
until later.  See id.  The Court disagrees.  Within one week of
the issuance of this decision, Alifax shall articulate its theory

-------

[2] The Court's decision to exclude parts of Mr. Bokhart's
testimony was issued after the liability phase (during which the
signal acquisition claim was tossed out), but before the damages
phase.

of damages in a filing of no more than five pages, with citations
to any evidence that supports its theory.  Moreover, if there is
no admissible evidence regarding damages stemming from the alleged
misappropriation of the conversion algorithm, Alifax must explain
why it should not be limited to seeking nominal damages.
Defendants shall file a reply of no more than five pages within
three business days of the filing of Alifax's brief.

III. PATENT LEGAL FEES

    Under 35 U.S.C. § 285, "[t]he court in exceptional [patent]
cases may award reasonable attorney fees to the prevailing party."
Invoking this provision, Alcor submitted a post-trial request for
the legal fees it incurred defending the patent claims.  See
Alcor's Mot. for Patent Legal Fees 1.  The Court denied the Motion
as moot, stating that it could not ascertain which party had
prevailed until after the new trial.  Sept. 5, 2019 Text Order.
However, at the February 25, 2021 conference, the Court invited
the parties to submit supplemental briefing on the fee request.
The Court has reconsidered its previous determination.  As
explained below, Alifax's patent claims were not exceptional, and
Alcor's Motion for Patent Legal Fees must therefore be denied on
the merits.

    "[A]n 'exceptional' case is simply one that stands out from
others with respect to the substantive strength of a party's
litigating position (considering both the governing law and the

9

facts of the case) or the unreasonable manner in which the case was litigated." Octane Fitness, LLC v. ICON Health & Fitness, Inc., 572 U.S. 545, 554 (2014). "District courts may determine whether a case is 'exceptional' in the case-by-case exercise of their discretion, considering the totality of the circumstances." Id. Relevant factors include "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." Id. (quoting Fogerty v. Fantasy, Inc., 510 U.S. 517, 534 n.19 (1994)). Absent misrepresentation regarding the evidence, a plaintiff's success on summary judgment indicates that its patent claims were not frivolous or unreasonable. See Medtronic Nav., Inc. v. BrainLAB Medizinische Computersysteme GmbH, 603 F.3d 943, 954 (Fed. Cir. 2010), and cases cited. The party seeking fees must prove exceptionality by a preponderance of the evidence. Octane Fitness, 572 U.S at 557-58.

Alcor's basic argument is that Alifax pulled a bait and switch regarding its theory of patent infringement. Alcor's Mot. for Patent Legal Fees 15-16. According to Alcor, Alifax represented to the Court that it would show literal infringement, all the while pursuing a theory based on the doctrine of equivalents.[3] Id.

_____

[3] Under the doctrine of equivalents, "a product or process that does not literally infringe upon the express terms of a patent

Appx77

Furthermore, Alcor contends, Alifax was estopped from pursuing a doctrine-of-equivalents claim due to its actions during patent prosecution.  Id. at 3.

Alifax's argument for literal infringement was always tenuous.  However, the Court was well aware of the creativity inherent in Alifax's theory.  The Court's summary judgment decision explains the needle that Alifax was attempting to thread and why the Court allowed the patent claims to go forward.  Prior to summary judgment, the Court had construed the limitations in the two patents to mean "processing the acquired optical density or absorbance data to obtain the speed of sedimentation, viscosity, elasticity and density."  Mar. 26, 2019 Mem. & Order 10, ECF No. 244 (citation and quotations omitted).  And at summary judgment, the Court recognized that "the iSED does not measure, record, or report any measurement for the viscosity, elasticity, or density of blood."  Id.  However, the Court rejected Alcor's argument that "[o]btaining a parameter in the context of the patents-in-suit . . . means obtaining a numerical value for that parameter" and "that the iSED [therefore] does not 'obtain' these parameters."

---

claim may nonetheless be found to infringe if there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention." Warner-Jenkinson Co. v. Hilton Davis Chem. Co., 520 U.S. 17, 21 (1997) (quoting Graver Tank & Mfg. Co. v. Linde Air Products Co., 339 U.S. 605, 609 (1950)).

Appx78

Id. (citations and quotations omitted).  This was because "[n]one of the asserted claims, as construed by the Court, include the limitation that the iSED measures, calculates, records, reports, or obtains a 'numerical value' for the parameters of viscosity, elasticity, and density of blood." Id. at 10-11.

But how could the iSED obtain those parameters if it did not produce a numerical value for them?  The Court accepted (for the purposes of summary judgment) Dr. Bergeron's answer:  the parameters "are a function of data obtained from the [iSED's] optical density readings; thus by processing optical density measurement data the iSED obtains the correlated parameters." Id. at 11 (citations and quotations omitted).  At trial, though, Alifax's theory did not pan out.  Dr. Bergeron testified, arguably inconsistently with his previous conclusions, that the iSED did not obtain viscosity, elasticity, or density, and Alifax decided to drop the patent claims.  Trial Tr., Vol. 4, at 88:5-18, ECF No. 341; Trial Tr., Vol. 5, at 4-6, ECF No. 342.[4]

---

[4] The parties had trouble agreeing on a method for disposing of the patent claims, and the Court decided, with the parties' approval, to reconsider its summary judgment decision and grant judgment for Defendants on the patent claims.  See Trial Tr., Vol. 5, at 76:22-78:7, ECF No. 342.  This decision does not cast doubt on the Court's original decision to allow the patent claims to proceed to trial.  Rather, the mid-trial reconsideration was based on Dr. Bergeron's trial testimony and Alifax's resulting decision to abandon those claims.  See id.

12

Appx79

Alcor thus argues that there was never a legitimate theory of literal infringement because the iSED did not actually obtain those parameters; instead, the iSED merely accomplished an equivalent task. Alcor's Mot. for Patent Legal Fees 8, 15. But this argument rehashes arguments that were rejected on summary judgment, where the Court ruled that Dr. Bergeron's opinion created a genuine issue of material fact as to whether the iSED literally infringed on the patents. Moreover, Alcor has not shown that Alifax misrepresented its evidence to the Court. Rather, the evidence shifted between summary judgment and trial. Thus, through its summary judgment decision, the Court indicated that the patent claims were "suitable for resolution at trial." Medtronic, 603 F.3d at 954.

Based on its extensive involvement – lasting the better part of a decade – with this litigation, the Court determines that this case does not "stand[] out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." Octane Fitness, 572 U.S. at 554. Accordingly, the Court withdraws its previous decision to defer ruling. See Sept. 5, 2019 Text Order. Alcor's Motion for Patent Legal Fees is denied on the merits.

IV.  CONCLUSION

For the reasons contained herein, Defendants' request to file a renewed motion for summary judgment is DENIED, Defendants'

13

Appx80

request to limit the scope of the new trial is GRANTED IN PART,
and Defendant's Motion for Patent Legal Fees, ECF No. 306, is
DENIED.


IT IS SO ORDERED.



_____
William E. Smith
District Judge
Date:  July 16, 2021

14

Appx81

**Mary Clifford**

| | |
|---|---|
| **From:** | cmecf@rid.uscourts.gov |
| **Sent:** | Friday, July 16, 2021 10:25 AM |
| **To:** | cmecfnef@rid.uscourts.gov |
| **Subject:** | Activity in Case 1:14-cv-00440-WES-LDA Alifax Holding Spa v. Alcor Scientific Inc. et al Order on Motion for Miscellaneous Relief |

**<span style="color:red">***This message originated outside your organization***</span>**

<span style="color:red">This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.</span>
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* There is no charge for viewing opinions.**

**U.S. District Court**

**District of Rhode Island**

**Notice of Electronic Filing**

The following transaction was entered on 7/16/2021 at 10:24 AM EDT and filed on 7/16/2021

| | |
|---|---|
| **Case Name:** | Alifax Holding Spa v. Alcor Scientific Inc. et al |
| **Case Number:** | 1:14-cv-00440-WES-LDA |
| **Filer:** | |
| **Document Number:** | 357 |

**Docket Text:**
**<span style="color:blue">MEMORANDUM AND ORDER granting in part and denying in part [354] MOTION/Defendants' Request for Case Management Order Permitting Alcor to File Motion for Summary Judgment and Set the Limited Scope of any Second Trial; and, denying [306] MOTION for Exceptional Case Determination Under the Patent Act and For Attorney and Expert Fees. Additional briefing due as described. So Ordered by District Judge William E. Smith on 7/16/2021. (Jackson, Ryan)</span>**

**1:14-cv-00440-WES-LDA Notice has been electronically mailed to:**

Brian D. Coggio    coggio@fr.com

Christine K. Bush    cbush@hinckleyallen.com, pstroke@hinckleyallen.com

Craig M. Scott    cscott@hinckleyallen.com, ehanson@hinckleyallen.com, lgilbert@hinckleyallen.com

Jason C. Williams    jwilliams@hinckleyallen.com

Kyle M. Noonan    knoonan@pierceatwood.com

Laurel M Gilbert    lgilbert@hinckleyallen.com

1

Margaret K. Minister    mminister@pierceatwood.com, hstevens@pierceatwood.com

Michael J. Daly    mdaly@pierceatwood.com, mgosetti@pierceatwood.com

Nicole M. Matteo    nmatteo@pierceatwood.com, mgosetti@pierceatwood.com

Robert H. Stier , Jr    rstier@pierceatwood.com, mclifford@pierceatwood.com

**1:14-cv-00440-WES-LDA Notice has been delivered by other means to:**

Daniel A. Lev
Pierce Atwood LLP
100 Summer Street
22nd Floor
Boston, MA 02110

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1096917572 [Date=7/16/2021] [FileNumber=1649085-0
] [a50503e14ed27223729961ba1a7b1059763bc71182f46ad6453d532f87473babe25
668277f46b4e6fdf3cc378e8bf4828992c677e6a87089a6311b18585ae029]]

2

Appx83

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

```
_____
                                 )
ALIFAX HOLDING SPA,              )
                                 )
          Plaintiff,             )
                                 )
     v.                          )   C.A. No. WES 14-440
                                 )
ALCOR SCIENTIFIC INC.; and       )
FRANCESCO A. FRAPPA,             )
                                 )
          Defendants.            )
_____)
```

## MEMORANDUM AND ORDER

After Defendants filed a Request for Case Management Order, ECF No. 354, the Court ruled, inter alia, that the parties would not be allowed to introduce any new evidence at retrial and that the Court's evidentiary rulings made prior to the first trial would apply to the second. See July 16, 2021 Mem. & Order 5, 8, ECF No. 357.[1] However, the Court did not reach a decision on Defendants' argument that Alifax should be limited to nominal damages, as Alifax had not substantively responded to that contention. See id. at 8-9. Having solicited further briefing on the issue, the Court now concludes that Alifax will be precluded from seeking compensatory damages at the second trial.

Alifax's theory of damages is as follows. At some point prior to the June 2012 trade show for the American Association for

_____

[1] This Order assumes familiarity with those that precede it.

Clinical Chemistry, Alcor and Francesco Frappa misappropriated Alifax's conversion algorithm and used it in an iSED prototype. Alifax Holding Spa v. Alcor Sci. Inc., 404 F. Supp. 3d 552, 576-77 (D.R.I. 2019). Thanks in part to the illicitly borrowed algorithm, Alcor's trade show presentation, which was buoyed by its bullish claims regarding the iSED's capabilities, was a hit. Id. at 572, 576-77. Without Alifax's algorithm, Alcor would have been forced to spending months developing its own, and it could not have made such a successful showing. Id. at 576. Because the June 2012 exposition generated sales of the iSED and related products, Alcor's misdeeds led to its unjust enrichment. Id.

For this theory to hold up, Alifax needs evidence (1) that the alleged misappropriation gave Alcor a head start and (2) that the head start helped to bring about certain earnings over the following months or years. While Alifax has (marginal) evidence of a head start, there is no admissible evidence tying that head start to a measure of unjust enrichment.

1.   Evidence of a Head Start

At the first trial, Dr. Bergeron testified that it would have taken Alcor months to produce an original conversion algorithm. Trial Tr. vol. 3, 115:23-116:1, ECF No. 333. Although this opinion was not contained in his expert report, Defendants did not object. See Alifax Holding Spa, 404 F. Supp. 3d at 576 n.30 (citing Trial Tr. vol. 3, 115:23-116:9, 119:10-120:6); April 30, 2019 Mem. &

2

Appx85

Order 10 & n.8, 12-13 & n.11, ECF No. 288; Expert Report of Dr. Brian Bergeron ¶¶ 44-46, ECF No. 144-11.   However, on retrial, Defendants presumably would object on the basis that the opinion was not disclosed, and their objection would be sustained.   See Fed. R. Civ. P. 26(a)(2)(D), 37(c)(1).

Dr. Bergeron's surprise statement was not the only evidence to support the head start theory.   According to some evidence, when Alcor ultimately set out to develop its own algorithm, the effort spanned from January to June 2013.   See Alifax Holding Spa, 404 F. Supp. 3d at 570, and documents cited; id. at 576.   For the sake of this Order, the Court will assume that this evidence would be sufficient for a jury to infer that Alcor could not have developed an original algorithm in time for the trade show.

2.   Evidence Linking the Head Start to Unjust Enrichment

To show unjust enrichment, a plaintiff "has the burden of producing evidence permitting at least a reasonable approximation of the amount of the wrongful gain."   Restatement (Third) of Restitution and Unjust Enrichment § 51(5)(d).   And of course, a plaintiff must provide timely disclosures regarding the witnesses and evidence through which the plaintiff will attempt to establish damages.   See Fed. R. Civ. P. 26(a)(2)(D), 26(e), 37(c)(1).

Prior to the first trial, the only damages witness disclosed by Alifax was Christopher Bokhart.   See Alifax Holding Spa, 404 F. Supp. 3d at 580; see also Pls.' Initial Disclosures 5, ECF No.

3

284-1; Plaintiff's First Am. Answers to Defs.' First Set of
Interrogatories 29, ECF No. 284-2. Although the Court ruled that
Bokhart's expert opinions regarding damages stemming from
conversion algorithm misappropriation were "unreliable and
inadmissible[,]" April 30, 2019 Mem. & Order 13, the Court
permitted Bokhart to testify as a summary witness pursuant to Rule
1006 of the Federal Rules of Evidence, Alifax Holding Spa, 404 F.
Supp. 3d at 580 (citing Trial Tr. vol. 11, at 20:11-22, 33:10-25).
As the Court noted in its prior Order granting in part the motions
for new trial, that decision was made in error. Id. at 581-82.
Nonetheless, Alifax contends that it should once again be permitted
to introduce Bokhart's testimony, this time through an
"appropriately limited summary examination." Alifax's Mem.
Regarding Damages 4, ECF No. 358.

"[T]o prove the content of voluminous writings, recordings,
or photographs that cannot be conveniently examined in court[,]"
a party may use summary evidence, either documentary or
testimonial. Fed. R. Evid. 1006. Bokhart's summary testimony was
impermissible, among other reasons,[2] because it was "too closely
entwined with his excluded expert opinion to be cleanly dissected

---

[2] For example, Bokhart did not summarize already admitted
evidence. Alifax Holding Spa, 404 F. Supp. 3d at 581 ("[T]he key
to admissibility is that the summary witness's testimony does no
more than analyze facts already introduced into evidence . . . ."
(quoting United States v. Stierhoff, 549 F.3d 19, 28 (1st Cir.
2008))).

and presented under Rule 1006." Alifax Holding Spa, 404 F. Supp. 3d at 581; cf. Colon-Fontanez v. Municipality of San Juan, 660 F.3d 17, 31 (1st Cir. 2011) (affirming admittance of summary testimony, in part because the witness's testimony regarding "her method of preparing and summarizing the exhibits d[id] not an instant expert of her make"); SEC v. Franklin, 265 Fed. Appx. 644, 646 (9th Cir. 2008) (unpublished) ("There was no error in allowing the preparer of the [summary] exhibits to testify because no expert opinions or conclusions were offered."(citation omitted)).

On retrial, this obstacle would prove impassable for Alifax. Any testimony from Bokhart would necessarily be based on his expert knowledge and opinions of the case.  Moreover, the materials Bokhart would presumably summarize are not sufficiently voluminous to justify a summary witness, let alone one who has intertwined – and inadmissible – opinions he seeks to share.  Therefore, Bokhart will not be permitted to testify in any capacity, on any topic.

Furthermore, as the Court has instructed, "no new evidence or witnesses will be permitted."  July 16, 2021 Mem. & Order 5, ECF No. 357.  In addition to the reasons already given, id., the decision to bar new testimony on damages is also supported by the standard considerations pertaining to preclusion under Rule 37(c)(1):  "(1) the history of the litigation; (2) the sanctioned party's need for the precluded evidence; (3) the sanctioned party's justification (or lack of one) for its late disclosure; (4) the

5

Appx88

opponent-party's ability to overcome the late disclosure's adverse effects — e.g., the surprise and prejudice associated with the late disclosure; and (5) the late disclosure's impact on the district court's docket." Esposito v. Home Depot U.S.A., Inc., 590 F.3d 72, 78 (1st Cir. 2009) (citing Macaulay v. Anas, 321 F.3d 45, 51 (1st Cir. 2003)).[3] Preclusion of new evidence is warranted by the years-long slog of this litigation, the numerous failed theories of liability and damages (concerning patent and copyright claims that were asserted all the way to trial before crashing and burning), the lack of justification for any late-breaking evidence, the obvious prejudice that Defendants would suffer, and the continued, outsized impact of this case on the Court's docket.

Because Alifax did not disclose any damages witnesses besides Bokhart, Alifax will be unable to meet its "burden of producing evidence permitting at least a reasonable approximation of the amount of the wrongful gain." Restatement (Third) of Restitution and Unjust Enrichment § 51(5)(d); see also Adv. Training Group Worldwide, Inc. v. Proactive Techs. Inc., 19-CV-505, 2020 WL 4574493, at *2, 4-9 (E.D. Va. Aug. 7, 2020) (barring the plaintiff from presenting lay testimony on damages where the only properly

---

[3] The Court's discretion to exclude undisclosed witnesses is arguably even greater on retrial than in the original-trial scenario addressed in Esposito. See Fusco v. Gen. Motors Corp., 11 F.3d 259, 267 (1st Cir. 1993); Oriental Fin. Group, Inc. v. Fed. Ins. Co., 483 F. Supp. 2d 161, 167 (D.P.R. 2007).

disclosed damages witness was an expert whose testimony had been excluded).[4]

The history of this case is replete with shifting theories and dubious litigation practices. These are described in various places throughout the record, in prior written orders, bench rulings during trial, and the like. These practices led to the error that resulted in the grant of a new trial, wasting the time of the jury and the Court. All of this was preventable. The rules are not that complicated, and they are designed to avoid situations like this if they are followed. Alifax did not disclose an admissible damages expert and therefore has no evidence at this late date that could sustain the relief it seeks.

For these reasons, as sought by Defendants' Request for Case Management Order, ECF No. 354, Alifax will be precluded from seeking compensatory damages at the second trial.

IT IS SO ORDERED.

_William E. Smith_
William E. Smith
District Judge
Date:  September 1, 2021

---

[4] Alifax argues that certain fact witnesses could provide additional foundation for damages testimony from Bokhart. <u>See</u> Alifax's Mem. Regarding Damages 4-5, ECF No. 358. But the strongest foundation is little use without a structure (Bokhart's testimony) to go on top.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

```
_____
                                    )
                                    )
ALIFAX HOLDINGS SPA,                )
                                    )
         Plaintiff,                 )
                                    )
    v.                              )   C.A. No. 14-440 WES
                                    )
ALCOR SCIENTIFIC INC.; and          )
FRANCESCO A. FRAPPA                 )
                                    )
         Defendants.                )
_____)
```

<u>ORDER</u>

After years of fraught litigation, this case remains tied to the district court by a thread – a single count which may only be tried for nominal damages.  The parties agree that the Court should cut this thread by "enter[ing] final judgment on all claims and counterclaims asserted in this matter," so that their case may move on to appeal.  Joint Status Report ("Dec. 10 JSR") 1, Dec. 10, 2021, ECF No. 362.  Because both parties fear waiving their appellate rights, however, they disagree on the proper procedural path to arrive at entry of final judgment.  <u>Id.</u> 2-6.  For the reasons that follow, the Court dismisses the remainder of Count II, with prejudice.[1]

_____

[1] Alcor also asks the Court to revisit its motion for attorneys' fees now that final judgment may enter on all claims. Joint Status Report ("Dec. 10 JSR") 6, Dec. 10, 2021, ECF No. 362. On Counts III and IV, that Motion was denied with prejudice.  Mem.

I.    BACKGROUND

        While the full course of this litigation has been recounted
at length in the Court's prior orders, a short summary is warranted
here.    Alifax  produces  automated  clinical  instruments  which
measure  certain  characteristics  of  human  blood  samples.    Alifax
Holding SpA v. Alcor Sci. Inc., 404 F. Supp. 3d 552, 557 (D.R.I.
2019).    Defendant  Francesco  Frappa  left  an  Alifax  subsidiary  and
began  working  with  Alcor,  a  Rhode  Island-based  competitor.    Id.
Less  than  a  year  after  Frappa's  arrival,  Alcor  launched  a  new
product,  the  iSED,  which  had  capabilities  comparable  to  some  of
Alifax's instruments.  Id.

        Believing the iSED was developed by Alcor and Frappa through
the  theft  of  its  intellectual  property,  Alifax  sued,  claiming:
(1) infringement of two patents under 35 U.S.C. § 271; (2) willful
and  malicious  misappropriation  of  trade  secrets  under  the  Rhode
Island  Uniform  Trade  Secrets  Act  ("RIUTSA"),  R.I.  Gen.  Laws  §  6-
41-1  et  seq.;  (3)  breach  of  Frappa's  confidential  relationship
with  Alifax;  and  (4)  copyright  infringement.    Id.    Alcor
counterclaimed  seeking  a  declaration  of  patent  invalidity  and
interference  with  contractual  relations.    Id.  at  557–58.

———————————

& Order 9, Sept. 5, 2019, ECF No. 349. On Count II, the claim was
dismissed without prejudice to refiling.  Given the resolution of
the case in this Order, the Court will take up any renewed motion
for fees on Count II after appeal.

2

Both before and at trial, the case winnowed considerably. The jury deliberated on only two claims, the misappropriation of trade secrets and Mr. Frappa's breach of a confidential relationship. See id. (explaining fate of each dropped claim). The jury found for Plaintiff, concluding Alcor appropriated two distinct trade secrets: using a specific type of optical sensor ("CPS trade secret") and a portion of computer program source code containing an important conversion algorithm ("algorithm trade secret").[2] Id. At the damages phase of a bifurcated trial, the jury awarded Alifax 6.5 million dollars for the algorithm trade secret and nominal damages for the CPS trade secret.[3] Id.

This verdict did not survive scrutiny. Upon a post-trial challenge from Alcor, the Court concluded that the evidence presented at trial was insufficient to support a finding that the CPS trade secret was protectable under RIUTSA. Id. at 560-65. Accordingly, it vacated the jury's verdict and entered judgment as a matter of law for Alcor. Id. at 565, 582. The Court also determined that certain tangible evidence was admitted in error,

---

[2] The jury also found that, although Alcor did not misappropriate a trade secret comprised of "[i]nformation concerning an anemia factor," Frappa did. Jury Verdict Form Phase I: Liability 2-3, 4-5, ECF No. 292; see also Alifax Holding SpA v. Alcor Sci. Inc., 404 F. Supp. 3d 552, 558 (D.R.I. 2019).

[3] The Court held Alifax to its representation that it was only seeking nominal damages for misappropriation of the CPS-related trade secret. See Alifax, 404 F. Supp. 3d at 558 n.7.

3

and that its wrongful admission would independently warrant a new trial on the CPS trade secret claim. Id. at 565-67.

For the algorithm trade secret, Alifax avoided a directed verdict, but not an order for a new trial. Id. 567-80. With respect to liability, the Court determined that "[a] rational fact finder could reach the same result as the jury. . . [, but] achieving that outcome requires rejecting powerful expert testimony and a motherload of contrary evidence." Id. at 580. Having found the verdict to be against the weight of the evidence, the Court exercised its discretion to order a new trial. Id.

Finally, the Court also determined a new trial was independently required for damages stemming from any misappropriation of the algorithm trade secret. Id. In a series of rulings both before and at trial, the Court eventually excluded all expert opinion testimony from Alifax's sole expert witness at the damages phase, Christopher Bokart. Id.; see also Alifax Holding SpA v. Alcor Sci. Inc., 387 F. Supp. 3d 170, 171-72 (D.R.I. 2019); Alifax Holding SpA v. Alcor Sci. Inc., No. 14-440 WES, 2019 WL 1579503, at *1 (D.R.I Apr. 12, 2019). Nevertheless, Bokhart was allowed to testify as a summary fact witness pursuant to Rule 1006 of the Federal Rules of Civil Procedure. Alifax, 404 F. Supp. 3d at 580. The Court later determined that this testimony was admitted in error, because it was inextricably bound up with

Appx94

Bokart's excluded expert opinions and therefore exceeded the permissible scope of Rule 1006.  Id. at 580-82.

In response to Defendants' Request for a Case Management Order, ECF No. 354, the Court ruled that the parties would not be allowed to introduce any new evidence at the second trial, and that the Court's evidentiary rulings made prior to the first trial would apply to the second.  See Mem. & Order 5, 8, July 16, 2021, ECF No. 357.  With respect to Bokhart, after soliciting additional briefing, the Court concluded that because he can testify neither as an expert nor a summary fact witness, he "will not be permitted to testify in any capacity, on any topic."  Mem. & Order 5, Sept. 1, 2021, ECF No. 360.  Alifax is therefore left with no admissible evidence to support its claim for compensatory damages on the algorithm trade secret, and may proceed at retrial only on a claim for nominal damages.

II. DISCUSSION

Neither the parties nor the Court deem it prudent to conduct a multi-week jury trial to give Alifax a shot at winning a single, symbolic dollar.  And while, as a practical matter, all agree that the case is ripe for appeal, the parties disagree as to the proper route to the entry of final judgment.  See Dec. 10 JSR 1.  Alifax is "prepared to stipulate to the Court's entry of summary judgment

Appx95

in favor of Alcor on damages and injunctive relief,"[4] which it argues would permit the Court to dismiss the remaining claim against it, with prejudice. Id. at 2. It points to Apple, Inc. v. Motorola, Inc., 869 F. Supp. 2d 901 (N.D. Ill. 2012) (Posner, J.), reversed on other grounds, 757 F.3d 1286 (Fed. Cir. 2014), as precedent for this path. Dec. 10 JSR 1-2.

Alcor suggests that the proper way forward is for the parties to file a joint motion for the entry of final judgment. Id. at 3. It fears consenting to or filing a joint motion for summary judgment for damages "may affect Alcor's standing or substantive arguments in ways no one can appreciate now." Id. Therefore, Alcor suggests following Taylor Brands, LLC v. GB II Corp., 627 F.3d 874 (Fed. Cir. 2010), in which the parties filed a joint motion for the entry of final judgment, and the Federal Circuit subsequently accepted the appeal. Dec. 10 JSR 3. Presumably, Alifax has not assented to this plan because it fears that any stipulation would require it to acquiesce to a substantive judgment that Alcor did not misappropriate its algorithm trade secret, and that this could be treated as a substantive abandonment of the claim on appeal. See Taylor Brands, 627 F.3d at 878 ("A party who consents to the substance of a judgment should indeed be presumed

---

[4] As Alcor points out, the Court has already dismissed Alifax's claim for injunctive relief. See Text Order, Sept. 5, 2019 (Denying Alifax's Motion for a Permanent Injunction as moot).

to have waived its right to appeal—absent an express reservation
of that right on the record—because voluntarily agreeing to an
adverse substantive outcome is an indication that the party has
abandoned its underlying claims or defenses.").

Ultimately, the Court concludes there is a path forward that
addresses the concerns of both parties and preserves their rights
on appeal. The Court construes Alifax's willingness to stipulate
to the entry of summary judgment on damages as an abandonment of
its claim for nominal damages, the last form of relief available
to it. The Court does not treat this as an abandonment of its
underlying claim as to liability or as consent to the entry of
judgment against it on the substance of that claim. Rather, Alifax
has abandoned its claim only for that specific relief. And while
Alifax can appeal this ruling, it does not want a chance to win a
dollar; rather, it wants the 6.5 million dollars awarded to it by
the jury. The only path to this end is a successful appeal of
this Court's Order. With nominal damages removed from the case,
Alifax has failed to support any form of damages and there are no
grounds for relief. The Court therefore dismisses Count II, with
prejudice.

Furthermore, as Alcor suggests, the parties may confer and
move for a stipulated form of the judgment entered under Rule 58
of the Federal Rules of Civil Procedure. Therein both parties

should clearly and expressly reserve their appellate rights in whatever terms they deem appropriate.

III. CONCLUSION

    For the reasons contained herein, Count II is dismissed, with prejudice.

IT IS SO ORDERED.


_____
William E. Smith
District Judge
Date:  February 18, 2022

Appx98

**Mary Clifford**

| | |
|---|---|
| **From:** | cmecf@rid.uscourts.gov |
| **Sent:** | Friday, February 18, 2022 3:14 PM |
| **To:** | cmecfnef@rid.uscourts.gov |
| **Subject:** | Activity in Case 1:14-cv-00440-WES-LDA Alifax Holding Spa v. Alcor Scientific Inc. et al Order |

**\*\*\*This message originated outside your organization\*\*\***

This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.

\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

**U.S. District Court**

**District of Rhode Island**

**Notice of Electronic Filing**

The following transaction was entered on 2/18/2022 at 3:13 PM EST and filed on 2/18/2022
**Case Name:**       Alifax Holding Spa v. Alcor Scientific Inc. et al
**Case Number:**    1:14-cv-00440-WES-LDA
**Filer:**
**Document Number:** 363

**Docket Text:**
**ORDER: The Court dismisses the remainder of Count II, with prejudice. So Ordered by District Judge William E. Smith on 2/18/2022. (Urizandi, Nissheneyra)**

**1:14-cv-00440-WES-LDA Notice has been electronically mailed to:**

Brian D. Coggio     coggio@fr.com

Christine K. Bush     cbush@hinckleyallen.com, pstroke@hinckleyallen.com

Craig M. Scott     cscott@hinckleyallen.com, ehanson@hinckleyallen.com, lgilbert@hinckleyallen.com

Jason C. Williams     jwilliams@hinckleyallen.com

Kyle M. Noonan     knoonan@pierceatwood.com

Appx99

Laurel M Gilbert    lgilbert@hinckleyallen.com

Margaret K. Minister    mminister@pierceatwood.com, hstevens@pierceatwood.com

Michael J. Daly    mdaly@pierceatwood.com, anadeau@pierceatwood.com

Nicole M. Matteo    nmatteo@pierceatwood.com, anadeau@pierceatwood.com

Robert H. Stier , Jr.    rstier@pierceatwood.com, mclifford@pierceatwood.com

**1:14-cv-00440-WES-LDA Notice has been delivered by other means to:**

Daniel A. Lev
Pierce Atwood LLP
100 Summer Street
22nd Floor
Boston, MA 02110


The following document(s) are associated with this transaction:


**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1096917572 [Date=2/18/2022] [FileNumber=1717353-0
] [41c2f963c6db96d92c8df45eccf0d78482777c2e3d101b86d436bce65f4d7bc0109
a62d80083d61c84d46736a925c97f8eee2f43382f7c0ec7eb0eb2f43c1076]]

Appx100

**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

ALIFAX HOLDING SPA,                      :
                                         :
          Plaintiff,                     :
                                         :          C.A. No. 14-440-S
     v.                                  :
                                         :
ALCOR SCIENTIFIC INC. and                :
FRANCESCO A. FRAPPA,                     :
                                         :
          Defendants.                    :

**FINAL JUDGMENT**

WHEREAS, the Court has ruled on all claims and counterclaims asserted by Alifax

Holding SpA ("Alifax"), Alcor Scientific Inc. ("Alcor") and Francesco A. Frappa ("Frappa")

(together, "the Parties");

WHEREAS, the Parties have jointly moved for entry of final judgment consistent with

the Court's disposition of all claims and counterclaims;

WHEREAS, all claims and counterclaims are resolved, and the Parties expressly reserve

their rights to appeal from this Judgment as well as any and all orders and judgments of this

Court, past or prospective;

IT IS HEREBY ORDERED AND ADJUDGED:

1.     Judgment enters in favor of Alcor and against Alifax on Count I of Alifax's

Second Amended and Supplemental Complaint;

2.     Judgment enters in favor of Alcor and Frappa and against Alifax on Count II of

Alifax's Second Amended and Supplemental Complaint;

3.     Judgment enters in favor of Alifax and against Frappa on Count III of Alifax's

Second Amended and Supplemental Complaint; and

14743345.1

1

Appx101

4.      Judgment enters in favor of Alcor and Frappa and against Alifax on Count IV of Alifax's Second Amended and Supplemental Complaint.

5.      The Parties have expressly reserved their rights to appeal from this Judgment as well as any and all rulings, orders and judgments of this Court, past or prospective.

William E. Smith
United States District Judge
Dated: 3/25/2022

14743345.1

Appx102

**Mary Clifford**
_____

| | |
|---|---|
| **From:** | cmecf@rid.uscourts.gov |
| **Sent:** | Friday, March 25, 2022 4:33 PM |
| **To:** | cmecfnef@rid.uscourts.gov |
| **Subject:** | Activity in Case 1:14-cv-00440-WES-LDA Alifax Holding Spa v. Alcor Scientific Inc. et al Judgment |

**\*\*\*This message originated outside your organization\*\*\***
_____

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

**U.S. District Court**

**District of Rhode Island**

**Notice of Electronic Filing**

The following transaction was entered on 3/25/2022 at 4:33 PM EDT and filed on 3/25/2022

| | |
|---|---|
| **Case Name:** | Alifax Holding Spa v. Alcor Scientific Inc. et al |
| **Case Number:** | 1:14-cv-00440-WES-LDA |
| **Filer:** | |

**WARNING: CASE CLOSED on 03/25/2022**

**Document Number:** 365

**Docket Text:**
**JUDGMENT: Judgment enters in favor of Alcor and against Alifax on Count I of Alifax's Second Amended and Supplemental Complaint; Judgment enters in favor of Alcor and Frappa and against Alifax on Count II of Alifax's Second Amended and Supplemental Complaint; Judgment enters in favor of Alifax and against Frappa on Count III of Alifax's Second Amended and Supplemental Complaint and Judgment enters in favor of Alcor and Frappa and against Alifax on Count IV of Alifax's Second Amended and Supplemental Complaint. So Ordered by District Judge William E. Smith on 3/25/2022. (Urizandi, Nissheneyra)**

**1:14-cv-00440-WES-LDA Notice has been electronically mailed to:**

Brian D. Coggio    coggio@fr.com

Christine K. Bush    cbush@hinckleyallen.com, pstroke@hinckleyallen.com

1

Appx103

Craig M. Scott     cscott@hinckleyallen.com, ehanson@hinckleyallen.com, lgilbert@hinckleyallen.com

Jason C. Williams     jwilliams@hinckleyallen.com

Kyle M. Noonan     knoonan@pierceatwood.com

Laurel M Gilbert     lgilbert@hinckleyallen.com

Margaret K. Minister     mminister@pierceatwood.com, hstevens@pierceatwood.com

Michael J. Daly     mdaly@pierceatwood.com, anadeau@pierceatwood.com

Nicole M. Matteo     nmatteo@pierceatwood.com, anadeau@pierceatwood.com

Robert H. Stier , Jr.     rstier@pierceatwood.com, mclifford@pierceatwood.com

**1:14-cv-00440-WES-LDA Notice has been delivered by other means to:**

Daniel A. Lev
Pierce Atwood LLP
100 Summer Street
22nd Floor
Boston, MA 02110

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1096917572 [Date=3/25/2022] [FileNumber=1730061-0
] [6f8f57f8c8d732f0909d4d8ff67efd49d7064f7c703f0abb38483a119fcb1dec7ed
038cb1395fa2e5e20d6c4ffeec8ba803bb7fe9774ed063d63a13be7b76bd7]]

Appx104

**FORM 30. Certificate of Service**                                    Form 30
                                                                       July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

### CERTIFICATE OF SERVICE

**Case Number** 2022-1641, 2022-1723

**Short Case Caption** Alifax Holding SpA v. Alcor Scientific, Inc.

---

**NOTE:** Proof of service is only required when the rules specify that service must be accomplished outside the court's electronic filing system. See Fed. R. App. P. 25(d); Fed. Cir. R. 25(e). Attach additional pages as needed.

---

I certify that I served a copy of the foregoing filing on __07/01/2022__

by  ☐  U.S. Mail   ☐   Hand Delivery   ☑ Email   ☐ Facsimile
    ☐  Other: _____

on the below individuals at the following locations.

| Person Served | Service Location (Address, Facsimile, Email) |
|---|---|
| Craig M. Scott; Christine K. Bush; Laurel M. Gilbert<br>Hinckley Allen & Snyder, LLP | cscott@hinckleyallen.com; cbush@hinckleyallen.com; lgilbert@hinckleyallen.com |
|  |  |
|  |  |
|  |  |
|  |  |

☐    Additional pages attached.

Date: __07/01/2022__

Signature:  /s/ Todd R. Tucker

Name:    Todd R. Tucker

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:**  2022-1641, 2022-1723

**Short Case Caption:**  Alifax Holding SpA v. Alcor Scientific, Inc.

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑    the filing has been prepared using a proportionally-spaced typeface and includes  12,902  words.

☐    the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐    the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 07/01/2022          Signature:  /s/ Todd R. Tucker

                          Name:  Todd R. Tucker

Form 31
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF CONFIDENTIAL MATERIAL

**Case Number:** 2022-1641, 2022-1723

**Short Case Caption:** Alifax Holding SpA v. Alcor Scientific, Inc.

---

**Instructions:** When computing a confidential word count, Fed. Cir. R.
25.1(d)(1)(C) applies the following exclusions:

- Only count each unique word or number once (repeated uses of the same
  word do not count more than once).

- For a responsive filing, do not count words marked confidential for the first
  time in the preceding filing.

The limitations of Fed. Cir. R. 25.1(d)(1) do not apply to appendices; attachments;
exhibits; and addenda.  *See* Fed. Cir. R. 25.1(d)(1)(D).

---

The foregoing document contains ___12___ number of unique words (including
numbers) marked confidential.

☑ This number does not exceed the maximum of 15 words permitted by
Fed. Cir. R. 25.1(d)(1)(A).

☐ This number does not exceed the maximum of 50 words permitted by
Fed. Cir. R. 25.1(d)(1)(B) for cases under 19 U.S.C. § 1516a or 28
U.S.C. § 1491(b).

☐ This number exceeds the maximum permitted by Federal Circuit Rule
25.1(d)(1), and the filing is accompanied by a motion to waive the
confidentiality requirements.

Date: 07/01/2022        Signature: /s/ Todd R. Tucker

                        Name: Todd R. Tucker